**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| OSAGE NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 01-CV-0516-JHP-FHM |
| | ) | |
| THOMAS E. KEMP, JR., Chairman of | ) | |
| the Oklahoma Tax Commission; JERRY | ) | |
| JOHNSON, Vice-Chairman of the | ) | |
| Oklahoma Tax Commission; and CONS- | ) | |
| STANCE IRBY, Secretary-Member of the | ) | |
| Oklahoma Tax Commission, | ) | |
| | ) | |
| Defendants. | ) | |

## REPLY IN SUPPORT OF ALTERNATIVE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS KEMP, JOHNSON, AND IRBY

**Oklahoma Tax Commission**
*Douglas B. Allen, General Counsel*
*Guy L. Hurst, Assistant General Counsel*
    First National Center
    120 N. Robinson
    Suite 2000W
    Oklahoma City, Oklahoma   73102
    Phone:  (405) 319-8550
    Fax:  (405) 601-7144

**Modrall, Sperling, Roehl, Harris & Sisk, P.A.**
*Lynn H. Slade*
*William C. Scott*
    Bank of America Centre
    500 Fourth Street, NW, Suite 1000
    Albuquerque, New Mexico  87102
    P. O. Box 2168
    Albuquerque, New Mexico  87103
    Phone: (505) 848-1800
    Fax: (505) 848-1889

The Nation's Response in Opposition to Alternative Motion for Summary Judgment ("Response") rehashes prior argument, fails to respond to the Commissioners' summary judgment argument, and adds only irrelevant and inadmissible materials.  Under the undisputed facts, the Commissioners are entitled to judgment as a matter of law that (1) the Oklahoma Enabling Act, 34 Stat. 267 (June 16, 1906) ("Enabling Act"), and Osage Allotment Act, 34 Stat. 539 (June 28, 1906) ("Osage Allotment Act"), terminated the Osage Reservation; and (2), even if the Reservation was not terminated, those statutes and others subject Osage members not living and working on trust or restricted lands to Oklahoma tax, including its income tax.

## I.    THE RESPONSE DOES NOT CONTROVERT THE UNDISPUTED FACTS MATERIAL TO SUMMARY JUDGMENT.

The Response does not controvert the Commissioners' Statement of Undisputed Material Fact Nos. 1, 4, 6, 8, 9, 13-15, 17-26, 29 and 30.  Pursuant to LCvR56.1(c), those paragraphs are deemed admitted.  The Nation's objections to the remaining undisputed facts are meritless, and its own proffered "undisputed facts" do not create genuine issues of material fact.

### a.   The Response Fails to Create Genuine Issues as to the Commissioners' Material Facts.

Relying on *Bryant v. Farmers Insurance Exchange*, 432 F.3d 1114 (10th Cir. 2005), the Nation argues that historical materials attached to the Supplemental Brief, and certain undisputed material facts those materials support, Nos. 2, 3, 5, 7, 10, 12, 16 & 27, should not be considered. The Nation is wrong.  *Bryant* makes clear that any witness may authenticate materials in an affidavit based on personal knowledge, and such materials can be considered on summary judgment if their *content* can be offered at trial in an admissible form.  *Id*. at 1123.  The facts from Baird's 1972 history of the Osage people, referred to in Undisputed Material Fact Nos. 2, 3, 5, 7, 16, and 27, will be admissible at trial as a learned treatise under Fed. R. Evid. 803(18), as an

ancient document under Rule 803(16), or as containing facts subject to judicial notice. *See Oneida Indian Nation v. New York*, 691 F.2d 1070, 1086 (2d Cir. 1982) (facts in historical treatise subject to judicial notice on summary judgment unless adequately disputed). Here, the Nation has not disputed the authenticity of the excerpt from Baird's treatise or the facts contained within it.

Undisputed Fact No. 10 refers to President Roosevelt's proclamation admitting Oklahoma as a state, which is admissible at trial upon judicial notice as a matter of public record. *See Van Woudenberg v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000). Undisputed Fact No. 12 refers to several historians' excerpts Professor Kelly authenticated and attached to his affidavit. The content of the excerpts will be admissible as either learned treatises, ancient documents, or judicially noticeable matters of public record. Under *Bryant* the Court properly may consider these materials on summary judgment.[1]

### b. The Nation's Proposed Additional Facts Are Immaterial or Are Not Properly Considered on Summary Judgment.

Paragraphs 4 through 9 of the Nation's "Statement of Disputed Material Facts" and the accompanying unauthenticated exhibits do not create any genuine issue of material fact. That data is immaterial because it post-dates the relevant legislation's enactment by more than 75 years and neither analyzes nor sheds light on the dispositive elements here. For example, like the NIGC land status opinion the Tenth Circuit rejected as "arbitrary and capricious" in *Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001), the July 28, 2005 NIGC letter (Disputed Fact ¶ 4) largely ignores congressional intent in the 1906 enactments and instead relies principally upon documents from the 1990s. The stipulation between the Osage Nation and federal attorneys in

---

[1] The only opinions arguably excludable under *Bryant* are Professor Kelly's opinions in Fact No. 2 that Baird is an authoritative source and Fact No. 10 that the referenced historians are "leading historians." Even if the Court does not consider those opinions, the Commissioners' remaining undisputed facts entitle them to summary judgment.

*Osage Nation v. United States* (Disputed Fact ¶ 6) was not material in that case, is not material evidence here, and has no preclusive effect.[2]   Similarly, the dictum from *Quarles v. United States* (Disputed Fact ¶ 7) has no relationship to the holdings of that case and has no persuasive force here.  *See, e.g., Oxy USA, Inc. v. Babbit*, 230 F.3d 1178, 1184-85 (10th Cir. 2000) (it is "well-established" that "broad language in an opinion, which is unnecessary to the court's decision, cannot be considered binding authority.").

## II.    THE RESPONSE DOES NOT CREATE A GENUINE ISSUE AS TO WHETHER THE OSAGE RESERVATION WAS DISESTABLISHED.

The Response misses the mark on all three elements of the Supreme Court's disestablishment test.[3]  It fails to address the relevant statutory language.  It relies selectively on modern-day rather than contemporaneous understandings.  And it concedes that the *de facto* situation on the ground in Osage County points to disestablishment.

### a.  The Absence of "Magic Words" Pertinent To Other Reservations Does Not Negate Congress' Intent to Disestablish the Osage Reservation.

To correctly assess Congressional intent, courts must "avoid reliance on platonic notions of Indian sovereignty and . . . look instead to the applicable treaties and statutes which define the limits of state power."  *See McClanahan v. Ariz. Tax Comm'n*, 411 U.S. 164, 172 (1973).  The Response fails to address the language of the relevant statutes.  Instead the Nation insists because Congress did not include specific words providing for "cession and sum certain" payment or restoration of lands to the public domain, it could not have disestablished the Osage Reservation. Response at 15.  While inclusion of those terms certainly would have disestablished the reservation, their absence does not work the opposite result.

---

[2] *See, e.g., United States v. Botefuhr*, 309 F.3d 1263, 1282 (10th Cir. 2002).  Not even the United States would be bound by that stipulation.  *Pompa v. Am. Family Mut. Ins. Co.*, 520 F.3d 1139, 1144 (10th Cir. 2008) (a "party that has stipulated to a fact in a civil case . . .  is not barred by the issue-preclusion doctrine from challenging the fact in later litigation because it has not yet actually litigated the issue.").

[3] *See Solem v. Bartlett*, 465 F.3d 463, 470-71 (1984).

Rather, no "magic words" are required where the relevant Acts, considered as a whole, reflect an intent to disestablish. *See Shawnee Tribe v. United States*, 423 F.3d 1204, 1222-25 (10th Cir. 2005). Here, the relevant Acts, considered as a whole, clearly disestablished the Osage Reservation. The Nation's Response does not rebut the Commissioner's demonstration that, by the plain language of the Enabling Act, Congress disestablished all Indian reservations in Oklahoma and transmuted the Osage Reservation into a county. *See* Commissioner's Reply in Support of Motion to Dismiss ("Commissioner's Reply") at 3-4; *see also Murphy v. Sirmons*, 497 F. Supp. 2d 1257, 1290 (E.D. Okla. 2007).

### i. The Relevant Acts Supplanted Tribal Government.

Congress plainly evinced its intent to terminate the Osage Reservation by mandating that the area "constitute . . . a separate county . . . until changed by the legislature of Oklahoma." Enabling Act, § 21. Congress understood counties were subordinate governmental entities of the state, "created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them," for which the "number, nature, and duration of the powers conferred upon [them] . . . and the territory over which they shall be exercised rests in the absolute discretion of the state." *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178 (1907). Congress thus transformed the former reservation into a political subdivision of the new State of Oklahoma, terminating any reservation status.

### ii. The Acts Clearly Addressed the Reservation in the Past Tense.

The Response suggests that because the Enabling Act refers to "the Osage Indian Reservation" in what it contends is the "present tense," Response at 4-5, the Reservation must have continued to exist after statehood. The Nation seems not to notice that in the same passages it quotes, Congress, using the same verb tense, also referred to the "Indian Territory" and the

4

"Territory of Oklahoma," which, like the Osage Reservation, ceased to exist when Oklahoma achieved statehood.  The parallel structure reveals that, by referencing "those parts of said State now known as *the Indian Territory and the Osage Indian Reservation* and within any other parts of said State which existed as Indian reservations … ," Response at 5 (quoting Enabling Act, § 3) (emphasis added by the Nation), Congress merely provided geographic reference points for areas that, upon statehood, would take on a new legal character—in the case of the Osage Reservation, that of a county, rather than a reservation.

> **b.  The Nation Provides No Material Evidence of Historical Context Indicating the Reservation Was Not Disestablished.**

As the Response recognizes, "the historical context surrounding the passage of legislation opening up the reservation" is a factor in determining disestablishment.  Response at 12.  But the Nation provides not one example of the requisite "***contemporary*** historical evidence"[4] from the only body capable of designating reservation status—Congress.  The Response relies exclusively on Paragraphs 3-9 of its Statement of Disputed and Undisputed Facts to support its contention that "the historical context favors the Nation's position that the Osage Reservation remains in existence today."  Response at 15.  However, those paragraphs refer only to statements made between 1984 and the present.[5]  The Court has cautioned that while contemporaneous historical evidence is probative, subsequent congressional statements are not.  *Hagen*, 510 U.S. at 420 ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.").  Even repeated references by subsequent Congresses to a tribe's "reservation" after an earlier Congress disestablished the reservation do not indicate the reservation still

---

[4] *Hagen*, 510 U.S. at 416 (emphasis added).  "Contemporary" refers to the period of the dispositive acts, not to the litigation drawing those acts into question. *See id.* at 416-420.
[5] Exhibit 1 to the Response, a statement referring to the Osage Reservation as "contiguous" with Osage County, contains no indication whether it refers to the status of the Reservation before or after statehood.

exists.[6]  Although Congress could have addressed jurisdictional questions in the 2004 Act the

Nation contends is probative on reservation status, *see* Response at 5-6,[7] Congress chose instead

only to alter the Nation's governmental structure and not to grant the Nation any authority over

surface lands that had long before left tribal hands.  *See* Pub. L. 108-431.

As the Nation concedes, *see* Response at 20, Congress alone can determine whether

reservation status applies to tribal lands.[8]  By the Act of June 30, 1919, 41 Stat. 3, § 27,[9]

Congress declared, "hereafter no public lands of the United States shall be withdrawn . . . for or

as an Indian reservation except by an act of Congress."  Although in 1934 Congress delegated

authority to determine the reservation status of Indian lands to the Secretary of the Interior, *see*

25 U.S.C. § 467, it expressly withheld that delegation with respect to the Osage and other

Oklahoma tribes.  25 U.S.C. § 473.  Thus, the federal agency opinions or alleged State of

Oklahoma statements more than 75 years after 1906 concerning an Osage "reservation" do not

constitute pertinent legal authority or create genuine issues of material fact.  The Nation cites no

relevant historical congressional contextual materials surrounding the passage of the Enabling

Act and Osage Allotment Act that support that the Reservation was intended to, and did, survive

Statehood.  The undisputed facts establish that the historical context supports disestablishment.

---

[6] *See Hagen*, 510 U.S. at 420 (later statements "are merely passing references in text, not deliberate expressions of informal conclusions about congressional intent in 1905"); *Yankton Sioux*, 522 U.S. at 355-356 ("We need not linger over whether the many references . . . in legislative and administrative materials utilized a convenient geographical description or reflected a considered jurisdictional statement. The mixed record . . . 'carries but little force' in light of the strong textual and contemporaneous evidence of diminishment.") (citations omitted).
[7] The "1.5 million-acre reservation" could refer to the Nation's ownership of a subsurface mineral reservation.  *See* Osage Allotment Act, § 3.
[8] It is well settled that Congress' authority to recognize, restore, and terminate the federally recognized status of Indian tribes is "broad," "plenary and exclusive," *United States v. Lara*, 541 U.S. 193, 200, 203 (2004), and extends to Indian lands, *Spalding v. Chandler*, 160 U.S. 394, 402-403 (1896).  By like token, the Commissioners cannot establish or disestablish a reservation.  *See* Commissioners' Brief in Support of Motion to Dismiss at 6-7.
[9] Codified at 43 U.S.C. § 150.

   c.   **The Undisputed Facts Establish That Events Surrounding Passage of the Acts Support Disestablishment.**

Except for its attempt to dismiss the Commissioners' probative evidence of "events surrounding" the 1906 Acts as "potentially unreliable," Response at 14, the Nation does not and cannot controvert the evidence the census data and BIA Superintendants' Annual Reports provide that immediately following passage of the 1906 Acts, the contemporaneous understanding was that the Reservation had been dissolved.[10] The Nation's citation to the Osage County Museum's vague reference to Osage cultural influence does not create a fact issue regarding Congressional intent. *See* Ex. 2 to Response.  The undisputed facts show events surrounding the 1906 passage of the dispositive acts were responsive to disestablishment of the Osage Reservation.

**III.   THE RESPONSE DOES NOT CONTROVERT CONGRESS' INTENT THAT OSAGE MEMBERS PAY STATE TAX ON FEE LANDS ACTIVITIES.**

The Response does not address the numerous statutory expressions evidencing Congress' intent that, once restrictions were removed from Osage allotments, Osage members would pay state tax on activities on those lands.  *See* Enabling Act, §§ 3, 25 (providing exceptions for Indians not taxed in Arizona and New Mexico, but omitting any exception for Oklahoma Indians); Osage Allotment Act, § 2, Seventh (removing restrictions on Osage land and taxation, and granting members the right to manage, control and dispose of land "the same as any citizen of the United States"); *see also Yankton Sioux*, 522 U.S. at 344 (in the allotment era "the notion

---

[10] The scant demographic data the Nation provided in Exhibit 1 to the Response, an unauthenticated excerpt from the Oklahoma Historical Society's web site, largely comports with the admissible evidence the Commissioners provided, although it indicates that the American Indian population in Osage County as of 2000 was even less than indicated by the census reports affiant Warren Glimpse relied upon, *see* Ex. F, ¶ 14 to the Commissioners' Supplemental Brief in Support of Alternative Motion for Summary Judgment ("Supplemental Brief"), Doc. 79-8. The Nation did not contest Undisputed Fact No. 18, describing the remaining lands set aside for the Osage.

that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar").

The authority the Nation cites addressing the relevant statutes supports the State's ability to tax Osage members. *McClanahan* does not, as the Nation contends, Response at 18, "dispose" of *Leahy*[11] as "inapplicable in light of the Indian sovereignty doctrine." Rather, it recognizes that, in *Leahy*, the Supreme Court found the federal instrumentality doctrine ***did not bar*** state income taxation of an Osage tribal member, and that Congressional acts may authorize state income taxation of tribal members within reservations. *McClanahan*, 411 U.S. at 169-171.[12] The Nation also misapprehends the significance of *Mason*,[13] which, decided just months after *McClanahan*, distinguished the result in that case and noted the holdings of cases other courts relied upon in other contexts "are of questionable relevance, since they arose under [other Acts] rather than the Osage Allotment Act." *Mason* further observes, contrary to the Nation's contentions that the cases are irrelevant, that "*McClanahan* cited *Oklahoma Tax Comm'n v. United States*, 319 U.S. 598 (1943), the predecessor of *West*, with approval." 412 U.S. at 396 n.7. The Nation's assertion that "to the extent any of the cases cited by the Commissioners are directly contrary to *McClanahan* and progeny, such authority is not applicable," Response at 19, advances a false premise that *McClanahan* prescribes an inflexible rule, a notion the Supreme Court has soundly rejected, and it neglects the need to assess the relevant statutes plainly contemplating state taxation of Osage members, except upon restricted homesteads.

The Nation's citation of the Commissioners' regulation and administrative decision does not establish that the Commission has taken a contrary position. As the Commissioners have

---

[11] *Leahy v. State Treasurer of Okla.*, 49 P.2d 570 (Okla. 1935), *aff'd*, 297 U.S. 420 (1936).
[12] The Nation again fails to address the impact of *Atkinson Trading Co., Inc. v. Shirley*, 520 U.S. 645, 651 (2001), holding 18 U.S.C. § 1151 of the federal criminal code has no civil effect, except when dealing with "a claim of statutorily conferred power." *See* Commissioners' Brief in Support of Motion to Dismiss at 20.
[13] *United States v. Mason*, 412 U.S. 391 (1973).

shown,[14] the regulation contemplates that the phrase, "the Indian titles to which have not been extinguished," modifies all of the categories of lands preceding it (formal and informal reservation, dependent Indian community, allotment), just like the phrase immediately following it, "whether restricted or held in trust by the United States."   The regulation could have incorporated or quoted 18 U.S.C. § 1151; it did not.   It merely cited it as a reference. Significantly, because it is limited to lands retaining trust or restricted status, the regulation and administrative decision are consistent with the understanding of "Indian country" applicable to Oklahoma at the critical time: 1906.   *See Yankton Sioux*, 522 U.S. at 344 ("the notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar"); *Bates v. Clark,* 95 U.S. 204, 208 (1877) (lands were "Indian country whenever the Indian title had not been extinguished . . . .").

## IV.   GIVEN THAT THE NATION CONCEDES OKLAHOMA'S RELIANCE, LACHES BARS THIS ACTION.

Although conceding the "Commissioners' long-standing reliance on the legitimacy" of their taxation of members' fee lands income, the Nation contends applying laches is legally barred. *See* Response at 20.  The Nation is wrong.  The Nation's attempts to distinguish *City of Sherrill*[15] on grounds that it has "occupied" Osage County and "maintained a continuous presence" there, Response at 21, are belied by the undisputed material facts, which establish just .04% of Osage County is "Indian Village Lands" or lands the United States holds in trust for the benefit of the Nation.[16]  Because the Nation seeks a declaration preventing the Commissioners from taxing the income of all Osage members residing and working ***anywhere*** in Osage County,

---

[14] *See* Commissioners' Reply in Support of Motion to Dismiss at 8 n.13.
[15] *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005).
[16] Ex. E, ¶ 7 to Commissioners' Supplemental Brief, Doc. No. 79-7.

the Nation unquestionably seeks relief without regard to the ownership or occupation—at any time—of the specific lands upon which the Nation's members live and work.

The Nation misunderstands that, under *City of Sherrill,* the issue is not whether a tribe previously "occupied and maintained a continuous presence" in the general geographic area in question, but whether the state government entity developed "justifiable expectations, grounded in [longstanding] exercise of its [applicable] jurisdiction, until recently uncontested . . ." by the Nation. *City of Sherrill,* 544 U.S. at 215-16. There is no dispute that, at least from the early 1930s, the Commission has relied on its longstanding taxation of the fee lands income of Osage members. *City of Sherrill* supports summary judgment that the Nation's long acquiescence bars the equitable and declaratory relief requested in the Complaint.

## CONCLUSION

WHEREFORE, the undisputed material facts establish that the Court should grant summary judgment in favor of the Commissioners, dismissing with prejudice all claims of the Plaintiff, the Osage Nation.

**Oklahoma Tax Commission**
Douglas B. Allen, General Counsel
Guy L. Hurst, Assistant General Counsel
    Oklahoma Tax Commission
    120 N. Robinson
    Suite 2000 W
    Oklahoma City, Oklahoma 73102
    Phone: (405) 319-8550
    Fax: (405) 601-7144

**MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.**
    *Electronically Filed 10-08-08*
By:   */s/ William C. Scott*
    Lynn H. Slade
    William C. Scott
    Attorneys for Defendants
    Post Office Box 2168
    Bank of America Centre
    500 Fourth Street NW
        Suite 1000
    Albuquerque, New Mexico
        87103-2168
    Phone: (505) 848-1800
    Fax: (505) 848-1889

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of October, 2008, a true and complete copy of the Within and foregoing **REPLY IN SUPPORT OF ALTERNATIVE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS KEMP, JOHNSON AND IRBY** was electronically transmitted to the Clerk of Court using ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:


Gary S. Pitchlynn, OBA #7180
O. Joseph Williams, OBA #19256
Pitchlynn & Williams, PLLC
124 East Main Street
P. O. Box 427
Norman, Oklahoma 73070
*Attorneys for Plaintiff*
E-mail:gspitchlynn@pitchlynnlaw.com
        jwilliams@pitchlynnlaw.com


**MODRALL, SPERLING, ROEHL, HARRIS & SISK, P.A.**

By:      */s/  William C. Scott*
         William C. Scott
         ¶


K:\dox\CLIENT\83353\0001\W0889843.DOCX