# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| OSAGE NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 01-CV-0516-JHP-FHM |
| vs. | ) | |
| | ) | |
| THOMAS E. KEMP, JR., Chairman of | ) | |
| the Oklahoma Tax Commission; JERRY | ) | |
| JOHNSON, Vice-Chairman of the | ) | |
| Oklahoma Tax Commission; and | ) | |
| CONSTANCE IRBY, Secretary-Member | ) | |
| of the Oklahoma Tax Commission, | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S SUBMISSION PURSUANT TO
### RULE 26 OF THE FEDERAL RULES OF CIVIL PROCEDURE

COMES NOW Plaintiff Osage Nation and, pursuant to Rule 26 of the Federal Rules of

Civil Procedure, respectfully submits as Exhibit "1" attached hereto the report of Garrick A.

Bailey, Ph.D, previously identified by Plaintiff as its expert witness under Rule 26(a)(2).

Dated this 20th day of November, 2008.

Respectfully submitted,

/s/ O. Joseph Williams
_____
Gary S. Pitchlynn, OBA #7180
O. Joseph Williams, OBA # 19256
PITCHLYNN & WILLIAMS, PLLC
124 East Main Street
P.O. Box 427
Norman, Oklahoma 73070
Telephone: (405) 360-9600
Facsimile: (405) 447-4219
Email: gspitchlynn@pitchlynnlaw.com
            jwilliams@pitchlynnlaw.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of November, 2008, a true and complete copy of the within and foregoing **PLAINTIFF'S SUBMISSION PURSUANT TO RULE 26 OF THE FEDERAL RULES OF CIVIL PROCEDURE** was electronically transmitted to the Clerk of Court using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Douglas B. Allen | Lynn H. Slade |
| Guy Hurst | William C. Scott |
| OKLAHOMA TAX COMMISSION | Modrall, Sperling, Roehl, Harris & Sisk, P.A. |
| 120 N. Robinson Avenue, Suite 2000W | 500 Fourth Street, NW, Suite 1000 |
| Oklahoma City, Oklahoma 73102 | Albuquerque, NM 87102 |
| *Attorneys for Defendants* | *Attorneys for Defendants* |

*/s/ O. Joseph Williams*

_____

O. JOSEPH WILLIAMS

# Exhibit 1

## Rule 26 Expert Report of Garrick A. Bailey, Ph.D.

**I.   INTRODUCTION**

**a.  <u>Disclosure of my Qualifications, Including List of All Publications Authored in the Previous 10 Years per Fed. R. Civ. P. 26(a)(2)(B)(iv).</u>**

- **Background and Education**

  I was born in Hartshorne, Oklahoma. I have been a professor of Anthropology for 40 years. I received by B.A. in History from the University of Oklahoma in 1963 and my M.A (1968) and Ph.D. (1970) in Anthropology from the University of Oregon.

  **1.  Professional Teaching Experience**

  In 1968 I became an Instructor in Anthropology at the University of Tulsa while researching my dissertation on changes in Osage social organization. I have been there ever since, becoming an Assistant Professor in 1970, an Associate Professor in 1976 and a Professor in 1987.

  **2.  Professional Specialization**

  I am a Socio-Cultural Anthropologist; specializations, among other things in Native American Culture, Ethnohistory, Ethnicity, and Socio-cultural adaption.

  **3.  Research**

  The type of research I am involved in is what is called Ethnohistoric research; the studies of the changes in the culture and socio-political institution of a group of people over time. This type of research combines the study of historical records and documents with field research, the oral interviewing of members of the group being studied. The historical documents are used to create a factual outline of events, while the interviews serve to help in the interpretation of the events and the effects on the society being studied. My research has included the Osage 1964-1976 and intermittently since; the Navajo 1977-1982 and intermittently since, Western Samoa summer of 1970 and Highland Guatemala, summer of 1989 and 1990.

  **4.  Other Professional Activities**

  - Member of the NAGPRA (Native American Graves Protection and Repatriation Act) Review Committee, Department of the Interior, 2000-2006
  - Member of the Committee to Review the Glen Canyon Environment Studies, National Research Council, National Academy of Science, 1993-1996 (my major role was with the

cultural-historical properties of the Navajo, Hopi, Hualapai, Zuni, and Havasupai)
- Senior Fellow in Anthropology, National Museum of Natural History, Smithsonian Institution, Washington, D.C., 1992 (working with the Osage material in the National Anthropological Archives)
- Weatherhead Resident Scholar, School of American (now Advanced) Research Santa Fe, New Mexico (working on Navajo ethnohistory)
- Member of the Indian Health Advisory Committee, Indian Health Service, Department of Health, Education and Welfare, 1975-70 (public policy issues)

**5.  Professional Honors and Awards**
- 2005, Outstanding Book on History for 2004, Oklahoma History Society. (with Daniel Swan) for Art of the Osage
- 2004, Who's Who in America. Marquis
- 1996, Finalist, Oklahoma Book Award, Oklahoma Center for the Book. for The Osage and the Invisible World

**6.  Publications**
- Traditions of the Osage (submitted for publication)
- 2008. Indians in Contemporary Society Vol. 2, (editor) Handbook of North American Indians, Smithsonian Institution, Washington, D.C. GPO.
- 2004. Art of the Osage. (with Daniel Swan, John Nunley and Sean Standingbear) St. Louis: St. Louis Museum of Art and the University of Washington Press.
- 2001. "Osage" in (Raymond Demallie ed.) Plains Vol.3 part 1, Handbook of North American Indians, Smithsonian Institution,
- 1995   The Osage and the Invisible World.  Norman: The University of Oklahoma Press.
- 1985   The Navajo: The Reservation Years (with Roberta Bailey). Santa Fe. School of American Research Press
- 1973   Changes in Osage Social Organization: 1673-1906. University of Oregon Press. Anthropological Papers No. 5.

**b.  <u>Disclosure of List of All Other Cases in Previous 4 years in which I have Testified as an Expert by Trial or Deposition per Fed. R. Civ. P. 26(a)(2)(B)(v).</u>**
- I have not testified as an expert in trial or in deposition in the previous four years.

**c.  <u>Disclosure of Compensation Paid for  My Study and Testimony in this Case per Fed. R. Civ. P. 26(a)(2)(B)(vi).</u>**

2

- For my study and testimony in this case, I am being compensated a $6000.00 flat fee for my pre-trial work and $150 per hour for work in connection with trial preparation and testimony.

## II.   MATERIALS REVIEWED

### a.   <u>Disclosure of Data/Information Considered in Forming these Opinions per Fed. R. Civ. P. 26(a)(2)(B)(ii).</u>

- Historical Documents
  - In forming my opinions, I relied upon my own body of research, including my texts noted below.  This research includes historical documents, available at the following libraries and collections:
    - The Gilcrease Museum, Tulsa, OK
    - The Oklahoma Historical Society, Oklahoma City, OK
    - Fletcher and LaFlesche Papers, National Anthropological Archives, National Museum of Natural History, Washington, D.C.
    - National Archives (microfilm publications)
    - Specific documents upon which I base my opinion are referenced in my publications and books noted elsewhere in this report.
- Personal Interviews with Osage Indians
  - Specific individuals interviewed at Osage cultural events as cited in my publications below.
- Books

  - Bailey, Garrick
    - 1995  -  <u>The Osage and the Invisible World</u>. Norman: University of Oklahoma Press

  - Bailey, Garrick and Daniel Swan.
    - 2004  -  <u>Art of the Osage</u>

    Bailey, Garrick
        1973 – <u>Changes in Osage Social Organization:1673-1906</u>.
        University of Oregon, Anthropological Papers No. 5

  - Burns, Louis
    - 1984  -  <u>Osage Indian Bands and Clans</u>. Fallbrook CA: Ciga

    - 1989  -  <u>A History of the Osage People</u>. Fallbrook CA: Ciga

  - Callahan, Alice Ann
    - 1990  -  <u>The Osage Ceremonial Dance I'n-Lon-schka</u>. Norman: University of Oklahoma Press.

  - Mathews, John Joseph
    - 1932  -  <u>Wah'kon-tah</u>. Norman: University of Oklahoma Press

3

> - 1961 - <u>The Osage: Children of the Middle Water</u>. Norman: University of Oklahoma Press.
> - Wilson, Terry
>   - 1985 - <u>The Underground Reservation: Osage Oil</u>. Lincoln: University of Nebraska Press

## III.   OPINIONS AND BASES

### a.   <u>Disclosure of Statement of Opinions I Will Express and Bases/Reasons per Fed. R. Civ. P. 26(a)(2)(B)(i)</u>

The following opinions are based upon my education, training, personal experience, research, and review of the above-listed materials.

- Modern day Osage County has been continuously used by the Osage Indians since it was taken from the Caddoan speaking tribes in the 1770s.

  1. Most of the major hunting trails used by the Osage from their permanent villages along the Osage and later the Neosho and Verdigris Rivers to the buffalo hunting areas west of the Arkansas past through Osage county. After the Treaty of 1825, not only did the off-reservation Osage in the Three Forks area continue to use these trails, many the "on-reservation" Osage living in villages mainly along the Neosho and Verdigris rivers in Kansas continued to cross Osage county in their trips to the buffalo range. The reason for this was that two of the major areas in which they hunted were the Salt Fork Creek and the Cimarron valley. Even after the Treaty of New Echota in 1836 which created the Cherokee Outlet and Treaty of 1839 which removed the Osage of the Three Fork area to the Kansas Reservation, they continued to come south across the county to the buffalo range. During these trips the Osage regularly hunted deer and other animals, as well as frequently captured wild horses. Agents made no attempt to control their movements in this area or restrict their activities within the areas.

- Because of their relative wealth resulting from the sale of their Kansas reservation, and income from their mineral estate, the Osage were relatively immune to the assimilation policies and programs of the U.S.

  - At the time of the passage of the Osage Allotment Act in 1906, it was recognized by Congress that the Osage were not yet assimilated. There were two unusual if not unique articles in the act. The mineral rights would be owned by the tribe, and three tribally-owned village sites established.  The government's expectation that the Osage would vanish at some time in the future was based on the fallacious assumption that Indians were doomed to vanish with the survivors being absorbed into the general population and that Indian cultural beliefs and practices as well as their social institutions were not compatible with living in a "modern" white American society. However, through its subsequent actions, namely extensions of trust status in 1921,

4

1929, 1938, 1964, and 1978, Congress recognized that the Osage were not assimilated, and retained their social and cultural distinction.

- The same basic assumption that the Indian was doomed to eventually vanish was present in every allotment agreement made. Thus what we have today are numerous allotted reservations throughout the western states. The major differences between most of these allotted reservations and the Osage reservation are that (1) the Osage as a tribe collectively owns the mineral rights and (2) except for townships, railroad right ways and certain other small set asides, all of the reservation land was allotted to one or another of the Osage allottees. There was no land opened for settlement of non-Indians.

- The Osage retain their own distinctive cultural traditions and institutions which are different from those of the local non-Indian community as well as other neighboring tribes.

  - Osage culture today is neither an anachronism nor inert. It is a living, constantly changing, cultural tradition. As such it has the adaptive ability to incorporate new ideas and institutions and make them distinctively Osage. For example, the American Legion Post in Pawhuska, unlike other posts, has special Osage songs which are used, a drum, and sponsors Osage dances and other "Osage" cultural events. The same is true of the Hominy and Gray Horse chapters of American War Mothers. The Osage have not and are not on the verge of "vanishing" into mainstream American society. Although, as in all societies, most events are concentrated in the more populated areas, Osage families, and their property, remain throughout Osage County.

- The Osage have been able to maintain their government and political structure throughout the historic period because the Osage were organized at multiple levels and because Osage culture placed a strong emphasis on tribal unity in relations with other societies.

  - During the earliest period there was collective leadership of the clan priests, a strong divisional identity if not leadership, and a local group or village level leadership. Leadership at these levels continued until sometime after 1872 when the clan priesthood structure collapsed, leaving only local band chiefs and/or divisional chiefs. In 1881 Osage leaders organized the Osage National Council to fill the leadership void at the tribal level. Since then, with one minor exception when the federal government unilaterally dissolved the National Council, there has been a tribal level governing body as well as formal organized leadership at the local group/band level and/or historic division (the E-lon-schka societies) level.

5

**b.** <u>**Disclosure of Exhibits Used to Summarize or Support these Opinions per Fed. R. Civ. P. 26(a)(2)(B)(iii).**</u>

- At this time, I do not intend to offer any exhibits to support or summarize these opinions.  Any exhibits would likely be based upon publications noted above.

Garrick A. Bailey, Ph.D.

11-19-08

Date

6