# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| OSAGE NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 01-CV-516-JHP-FHM |
| | ) | |
| STATE OF OKLAHOMA EX REL. | ) | |
| OKLAHOMA TAX COMMISSION; | ) | |
| THOMAS E. KEMP, JR., Chairman of | ) | |
| the Oklahoma Tax Commission; JERRY | ) | |
| JOHNSON, Vice-Chairman of the | ) | |
| Oklahoma Tax Commission; DON | ) | |
| KILPATRICK, Secretary-Member of the | ) | |
| Oklahoma Tax Commission, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Now before the Court is Defendants' Motion for Summary Judgment (Dkt.# 79). Defendants initially filed a motion to dismiss (Dkt.# 72), under Fed.R.Civ.P. 12(b)(1) and 12(b)(6) arguing: (1) the Court lacks subject matter jurisdiction over the Nation's claim for a judicial determination as to reservation status; and (2) the Nation has failed to adequately state a claim upon which relief may be granted. The Court converted Defendants' motion to dismiss to a motion for summary judgment pursuant to Fed.R.Civ.P. 56 and provided the parties with additional time to present all materials made pertinent to such a motion. Plaintiff Osage Nation ("the Nation") has opposed the motions, and Defendants have filed Replies.

In its Second Amended Complaint ("Complaint"), the Nation seeks a declaratory judgment

that its reservation boundaries have not been disestablished and that, as a matter of law, the Osage Reservation is Indian country within the meaning of 18 U.S.C. §1151.  The Nation further seeks injunctive relief prohibiting Defendants from imposing and collecting taxes on the income of the Nation's members who both reside and earn income within reservation boundaries.

In general, summary judgment is proper where the pleadings depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).* An issue is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. *Id. at 249.*

In considering a motion for summary judgment, this court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Gray v. Phillips Petroleum Co., 858 F.2d 610, 613 (10th Cir. 1988).* In regard to the necessary burdens, however, the Supreme Court has instructed that:

> in cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file. Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule,"and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by their own affidavits, or by the"depositions, answer to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).* Furthermore, if on any part of the prima facie case there is insufficient evidence to require submission of the case to the jury, summary judgment is appropriate. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).* In addition, one of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex,* 477 U.S. at 323-24.

## I. Article III Jurisdiction

Defendants have asserted a federal jurisdictional challenge to the claims asserted by the Nation. Specifically, Defendants challenge the standing of the Nation to bring its claim regarding the status of its reservation against Defendants, as members of the Oklahoma Tax Commission.

When a court makes an inquiry as to a party's standing, the court must accept as true all material allegations of the complaint, and any other particularized allegations of fact, in affidavits or in amendments to the complaint. *Warth v. Seldin, 422 U.S. 490, 501 (1975).* "If, after this opportunity [to present facts to support standing], the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." *Id. at 501-02.*

In its Complaint, the Nation alleges that its reservation boundaries were established by the Act of June 5, 1872, and that those reservation boundaries have never been disestablished by Congress. The Nation further alleges that the functions of its tribal government are carried out within its reservation and that, by virtue of its constitution, the Nation's jurisdiction and exercise of self-government extends to all lands within its reservation. The Nation does not seek to have this Court create or re-establish its reservation boundaries; rather, its claim against Defendants is based

on allegations that its reservation continues to exist and that Defendants' present taxing activity against its tribal members located in the reservation violates federal law.

Thus, construing these material allegations as true, the Court finds  the Nation has standing to challenge the actions of Defendants under well-established law prohibiting the state from imposing and collecting taxes on the income of a tribal member who both resides and earns that income within Indian Country.  *See, e.g., Oklahoma Tax Commission v. Chickasaw Nation, 515 U.S. 450 (1995); Oklahoma Tax Commission v. Citizen Band Potawatomie Indian Tribe of Oklahoma, 498 U.S. 505 (1991); McClanahan v. State Tax Commission of Arizona, 411 U.S. 164 (1973).*

Likewise, it is well-established that Indian tribes have standing to sue to protect sovereign or quasi-sovereign interests.  *See Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation, 425 U.S. 463 (1976)(Indian tribe had standing as a tribe, apart from the claims of individual tribal members, to challenge legality of state motor vehicle tax); Prairie Band of Potawatomie Indians of Pierce, 253 F.3d 1234, 1241 (10th Cir. 2001)(Indian tribe had standing to sue State of Kansas to prevent interference with or infringement on tribe's right to self-government).*  Therefore, the Court finds the  Nation has adequately alleged Defendants' taxing activity within its reservation boundaries is an unlawful infringement on the Nation's sovereignty and right of self-government.  Thus, Defendants' challenge to federal jurisdiction is overruled.

## II. Introduction

In this case, the Nation mounts an unprecedented challenge, asserting that the income of any Osage member who works and resides anywhere within Osage County is absolutely immune  from state income taxation, even if that member works on privately owned fee land, not held in trust by

4

the United States or subject to federal restraints on alienation ( private fee lands ), drives exclusively on state or county maintained roads to a home on private fee lands, has children attending state supported schools, and receives the great bulk of his or her social services from the State, not the Nation. Defendants' concern is expressed in the Joint Status Report:

> Because of its potentially far-reaching impact on the State of Oklahoma, this is one of the more important cases relating to state sovereignty and jurisdiction to arise since statehood in 1907. In this case, the Osage Nation seeks to divest the state of over 100 years of the exercise of sovereignty and jurisdiction over all of Osage County, the largest county in Oklahoma in area. If the Osage Nation were to prevail, precedent would be set potentially threatening the jurisdiction of the state as a whole, the counties, and local jurisdictions.  If the Osage Nation's original reservation boundaries have not been disestablished, then a number of other tribes in Oklahoma could assert the same claim.  The implications of this on the civil and criminal jurisdiction of the state are staggering, because this is a state that is largely made up of former Indian reservations.

(Dkt.# 66 Joint Status Report at 1-2.).

The Nation's Complaint requests two kinds of relief.  First, the Complaint asks this Court to declare that all 2,296 square miles of Osage County comprise a reservation. Second, based upon the claim that the entire county should be declared a reservation, the Complaint seeks to prospectively enjoin the Commissioners, in their official capacities on behalf of the State of Oklahoma Tax Commission ( Commission ), from levying Oklahoma state income taxes upon the Nation's members who earn income and reside anywhere within the geographic boundaries of its alleged reservation –  all of Osage County.  The Complaint also seeks to support its claim by contending that a federal criminal statute, 18 U.S.C. § 1151, forecloses state taxation of all income

5

earned within "Indian country."

Defendants contend they have not acted in excess of their authority under federal law, and have not violated federal law in imposing Oklahoma's income tax on incomes of members of the Osage Nation who neither earn income in employment nor reside on Trust, or Restricted Lands In Osage County.  Further, Defendants argue  that Osage County is not a reservation, and the tax is not preempted because the Nation cannot show specific federal statutes or established policies that foreclose the State's legitimate interest in securing revenues necessary to support its services to tribal members in predominantly non-Indian and non-Osage, Osage County.[1]   Specifically, Defendants allege  the Osage Reservation, as created by the Act of June 5, 1872, was disestablished, dissolved, and no longer exists as provided by, and pursuant to, the intent of Congress.  *See Hagen v. Utah*, 510 *U.S. 399, 410-411 (1994).*  Defendants contend Congress' intent is reflected in:

> (a) the statutory language used in the Oklahoma Enabling Act, Act of June 16, 1906, 34 Stat. 267 (the "Enabling Act"), and the Osage Allotment Act, Act of June 28, 1906, 34 Stat. 539 (the "Allotment Act"), by which Congress disestablished the Osage Reservation, providing, among other things, for taxation of the Osage and conversion of the reservation into a county, and subjecting the Osage to state law;
>
> (b) the historical context surrounding the passage of the Enabling Act and the Allotment Act, *see United States v. Mason*, 412 *U.S. 391, 396 n.7 (1973)*; *Murphy v. Sirmons*, 497 *F. Supp. 2d 1257, 1290 (E.D. Okla. 2007);*
>
> (c) the contemporaneous understandings surrounding the passage of the Enabling Act and the Allotment Act, which, reflect the influx of nonmember population and recognition by federal officials of the former reservation status of the Osage Reservation in the years soon following those Acts, reinforce Congress' intent to disestablish the Osage Reservation; and

---

1. Osage County population is 80% non-Indian and 95% nonmembers of the Nation, and less than one-sixth of Osage County remains in residential status. *See 2000 United States Census.*

(d) even if the Osage Reservation was not disestablished, dissolved, and terminated pursuant to the Enabling Act and the Allotment Act, federal law does not preempt or otherwise bar the Commissioner Defendants from imposing Oklahoma's income tax on income of Osage members who neither earn income from employment on, nor reside on, Trust or Restricted Lands in Osage County, because State taxation, including income taxation, of such Osage members is expressly contemplated and permitted by federal law, including the Enabling Act and the Allotment Act. *See United States v. Mason*, *412 U.S. 391, 396 n.7 (1973).*

Finally, Defendants argue  the equitable defense of laches bars the Osage Nation's claims for declaratory and injunctive relief.  The Osage Nation has left unchallenged the State's taxation of the income of its members for more than seventy years.  The State would be prejudiced if declaratory or injunctive relief were now entered upsetting its long-standing taxation of the income of Osage members who neither reside on, nor earn income from employment on, Trust or Restricted Lands in Osage County.  *See City of Sherrill v. Oneida Indian Nation*, *544 U.S. 197 (2005).*

### III. Background

To be clear, this action does not concern taxation of tribal members living and earning income on trust or restricted lands in Osage County.  Consequently, this case does not present the issues addressed in prior litigation concerning tribal members residing and working on trust or restricted lands. *See, e.g., Okla. Tax Comm n v. Sac & Fox Nation*, *508 U.S. 114 (1993).*   Indeed, Defendants do not contest the right of Osage tribal members both earning income and residing on the limited, scattered parcels of trust or restricted lands within Osage County to be free from state income taxation. Instead, the Nation asks this Court to confirm the entirety of Osage County is a reservation, notwithstanding that Congress  provided  for the transfer or sale of the surface of all but

a very few acres of Osage lands, thereby disestablishing any reservation more than a century ago. Premised upon its requested ruling confirming reservation status, the Nation then asserts that all tribal members who reside and work *anywhere* in Osage County are exempt from state income taxation, even if they neither reside nor work on trust or restricted lands, and irrespective of whether other factors material in prior preemption cases support state taxation.

These positions are contrary to long settled understandings and expectations concerning land status and principles governing federal preemption of state taxing jurisdiction. Since the allotment of the Osage Reservation and Oklahoma Statehood as enacted in 1906, Congress and the courts have repeatedly recognized there are no reservations in Oklahoma. As Congress recognized over seventy years ago, [i]n Oklahoma the several Indian reservations have been divided up. . . as a result of this program, ***all Indian reservations as such have ceased to exist*** and the Indian citizen. . . is assuming his rightful position among the citizenship of the State." *S. Rep. No. 1232, 74th Cong., 1st Sess. 6 (1935) (emphasis added) cf., Murphy v. Sirmons, 497 F. Supp. 2d 1257, 1290 (E.D. Okla. 2007) ("A careful review of the Acts of Congress which culminated in the grant of statehood to Oklahoma in 1906, as well as subsequent actions by Congress, leaves no doubt the historic territory of the Creek Nation was disestablished as a part of the allotment process.").*

The Nation's attempt to categorically exempt its members, who are Oklahoma citizens, recipients of Oklahoma services, and subject to Oklahoma laws, from state income taxation simply because they reside and work anywhere in Osage County disregards established law. Even within acknowledged reservations, exemptions from state tax have depended on specific factors establishing tribal and federal interests overriding a state's valid interest in raising revenue to support its services. The Nation fails to plead any such factors supporting preemption of Oklahoma's

legitimate taxing interest.

Applicable policies, treaties and statutes reflect the unmistakable intent that Osage County is no longer a reservation. No federal policy exempts the  Nation's members who both work and reside on non-trust, non-restricted lands within Osage County from Oklahoma state income tax -- whether or not the lands are a reservation.  The Oklahoma Organic Act,[2] the Oklahoma Enabling Act,[3] and the Act for the Division of the Lands and Funds of the Osage Indian[4] ("Osage Allotment Act") reflect Congressional intent to subject the Nation, its members and its lands to Oklahoma law and to disestablish and terminate Osage County's reservation status.  Further, neither the United States Supreme Court, nor any court, has held that the federal criminal law provisions of 18 U.S.C. § 1151 apply to immunize activities on Oklahoma private fee lands from state taxation.  However, even if there remained an "Osage reservation," no federal policy erects a general barrier against income taxation of tribal members whose livelihoods and residences do not implicate trust or restricted land. The Court will not unsettle the jurisdictional understandings established by enactment over a century ago.

### IV.  The Osage Reservation does not Remain Intact

The Oklahoma Organic Act, the Oklahoma Enabling Act, and the Osage  Allotment Act, demonstrate the Osage reservation ceased to exist more than a century ago. A reservation consists of lands set aside under federal superintendence for the residence of tribal members. *See COHEN'S*

---

2. Act of May 2, 1890, Ch. 182 § 1, 26 Stat. 81 (1890).

3. Act of June 16, 1906, Ch. 3335, 34 Stat. 267 (1906).

4. Act of June 28, 1906, Ch. 3572, 34 Stat. 539 (1906).

*HANDBOOK OF FEDERAL INDIAN LAW at 34 (1982 ed.).* The 1906 Osage Allotment Act terminated the federal set-aside and federal superintendence of Osage County as the place of residence of Osage members. While that Act retained certain small tracts for tribal use and occupancy and reserved the minerals underlying Osage County for the Nation, the great majority of lands in Osage County were freed from restrictions on their alienability. Income that relates exclusively to those unrestricted private fee lands is the subject of this action. Whatever may be the status of the mineral estate and the islands of trust or restricted lands, the plain Congressional intent in 1906 was to terminate any reservation status as to surface estate lands in Osage County that were freed of restrictions on alienation.

The Supreme Court has articulated an analytical structure for determining when Congress disestablished a reservation. *Solem v. Bartlett*, *465 U.S. 463, 470 (1984)*. The most probative evidence of diminishment is the statutory language used to open the Indian lands. *Hagen v. Utah*, *510 U.S. 399, 411 (1994)*. The historical context surrounding the passage of the relevant act also informs the analysis. *Id.*

> When events surrounding the passage of [applicable statutes] particularly the manner in which the transaction was negotiated with the tribes involved and the tenor of legislative Reports presented to Congress unequivocally reveal a widely held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation, we have been willing to infer that Congress shared the understanding that its action would diminish the reservation, notwithstanding the presence of statutory language that would otherwise suggest reservation boundaries remained unchanged.

*Solem*, *465 U.S. at 471.*

The language of the 1906 Osage Allotment Act and the surrounding historical

circumstances establish Congress' plain intent to terminate the Nation's reservation and to

subject the Nation, its members, and their non-restricted lands to Oklahoma law and Oklahoma

courts. The Osage Allotment Act effected the transfer of nearly all Osage tribal lands to its

members. The Act declared that the tribal lands of the Nation "shall be equally divided among

the members of said tribe"  by allowing each member to make three selections of 160 acres of

land, with the remaining unselected lands divided equally among all members by an appointed

commission. Osage Allotment Act §§ 1, 2. [5]  "Each member of said tribe shall be permitted to

designate which of his three selections shall be a homestead, and his certificate of allotment and

deed shall designate the same as a homestead, and the same shall be inalienable and nontaxable

until otherwise provided. . . .  Osage Allotment Act, § 2, Fourth.  The remaining selections

would be "surplus land and shall be inalienable for twenty-five years," *Id.*, provided that any

adult member could petition the Secretary of the Interior ( "Secretary" ) to issue a "certificate of

competency, authorizing [such member] to sell and convey any of the lands deeded him by

reason of this act, except his homestead . . . . *Id.*, § 2; Seventh.   Upon the issuance of the

certificate of competency, "the lands of such member (except his or her homestead) shall become

subject to taxation, and such member . . . . shall have the right to manage, control, and dispose of

---

5.  The Division Act limited such allotments and related rights to those on the official U.S. Government roll as of January 1, 1906, and certain of their children. Members so enrolled were known as headright owners. *See* Osage Allotment Act, §§ 1-4; *Quarles v. Dennison, 45 F.2d 585, 586 (10th Cir. 1930) (defining headright )*. The roll so established constituted "the legal membership" in the Nation.   Osage Allotment Act, § 1.

his or her lands the same as any citizen of the United States." *Id.*

Other provisions of the Act reinforce the intent to terminate the reservation. "The Osage Boarding School reserve, . . . the reservoir reserve . . . , and the agent's residence reserve, together with all the buildings located on said reservations in the town site of Pawhuska" were reserved from selection but could be sold "under such rules and regulations as the Secretary of the Interior may provide." *Id.*, § 2, Tenth.   The "United States Indian agent's office building, the Osage council building, and all other buildings which are for the occupancy and use of Government employees, in the town of Pawhuska, together with the lots on which said buildings are situated, shall be sold to the highest bidder . . . " with the proceeds to be "placed to the credit of the individual members of Osage tribe of Indians. . . ." *Id.*, § 2, Eleventh.[6]

Although the Osage Nation retained the beneficial interest in the minerals underlying the former Osage reservation area, that interest is contrasted starkly with the pattern divesting the surface, either directly or through authorizations for future sales, of all vestiges of tribal ownership. *See* Osage Division Act, §§ 2-4.[7]   While the minerals underlying the former tribal

_____

6. The Supreme Court has described the Government's plan for Osage members under the 1906 Division Act. *See Choteau v. Burnet, 283 U.S. 691, 694 (1931) ( "This plan has included imposing upon him both the responsibilities and the privileges of the owner of property, including the duty to pay taxes."); see also Shaw v. Gibson-Zahniser Oil Corp., 276  U.S. 575, 579 (1928) (same, regarding Creek tribal members).*

7. Of the total original Osage lands comprising over 1.47 million acres, all were allotted except 645.34 acres retained by the tribe and 4,575.49 acres reserved for town sites, schools, cemeteries and federal agency purposes(with those lands generally subject to sale). *See*  Report of Subcommittee on Indian Affairs, Osage Nation of Indian Judgment Funds at 18 *accompanying* S. 1456 and S. 3234 (March 28, 1972). As of 1972, of the 1,464,838.5 acres that were originally allotted, only 231,070.59 acres remained in restricted status.  *Id.*

lands were reserved to the Nation, all royalties received from such minerals were to be "placed in the Treasury of the United States to the credit of the members of the Osage tribe . . . and . . . . distributed to the individual members . . . . [8] Osage Allotment Act, § 4, Second.  Consequently, the Nation stood as recipient of those funds solely for the benefit of the allottee members.

Although the Act contemplated a continuing tribal government, it left few powers to exercise.  All moneys received from the sale of terminated reservation land, as with the royalties from minerals, were held as property of individual members. Osage Allotment Act, § 4, First. Public highways could be established within the "Osage Indian Reservation"  lands without any compensation therefore."  Osage Allotment Act, § 10.  Although the Act mentions the "Osage Indian Reservation," as do some subsequent enactments, it plainly does so only to describe a known geographic area.  Given that the Enabling Act, earlier in the same month, had subjected the Osage lands to Oklahoma law and courts, the Division Act left little role for a general tribal government over a "reservation" area.  Despite the Complaint's assertion that it arises under the Act of June 28, 1906, the Osage Allotment Act,  the Act does not support this contention.  The termination of Osage reservation status was part of a broader pattern of reservation termination

_____

8. The retention of a subsurface mineral interest for the benefit of the Nation's members does not render the entirety of Osage County a reservation. The term reservation refers to land set aside under federal protection for the residence of tribal Indians.  *See* COHEN S HANDBOOK OF FEDERAL INDIAN LAW at 34 (1982 ed.). The mineral retention did not preserve the surface estate for the residence of Osage members and cannot continue or establish a reservation. *See Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1267 (10th Cir. 2001) (land reserved by the government to preserve the tract s status as a tribal burial ground did not make that land a reservation, as it was not reserved for or used for purposes of residence). Similarly, *Murphy v. Sirmons*, 497 F. Supp. 2d 1257, 1290 (E.D. Okla. 2007), expressly rejected the contention that an "unobservable," partial mineral interest  could support "Indian country" status for the surface of those lands.

accompanying Oklahoma s entry into the Union.

During the late 1890s and early 1900s, Congress  systematically negotiated or legislated transfers of tribal lands to tribal members and the opening of unallotted lands to settlement and entry by non-Indians. *See generally*, *II FRANCIS  PAUL  PRUCHA,  THE  GREAT  FATHER, 735-757 (1984) ( "Prucha").*  Thirteen Indian reservations were in Oklahoma Territory as established by an act of Congress on May 2, 1890. The last of these reservations to be dissolved by allotments was that owned and occupied by the Osage, embracing about 1,470,059 acres, now comprising Osage County; *see also B. B. Chapman, Dissolution of the Osage Reservation, 20 Chronicles of Oklahoma 244 (1942).*  Francis Paul Prucha, "widely considered the leading historian of federal Indian policy," has concluded that, as a result of this history: " There are no Indian reservations in Oklahoma . . . and the reservation experience that was fundamental for most Indian groups in the Twentieth Century was not part of Oklahoma Indian history." *PRUCHA at 757.* Recently, the U. S. District Court for the Eastern District of Oklahoma reached the same conclusion in *Murphy v. Sirmons*, *497 F. Supp. 2d 1257, 1290 (E.D. Okla. 2007).*

The language of the Oklahoma Enabling Act and its incorporation of the Oklahoma Organic Act support the conclusion that there are no Indian reservations in Oklahoma. The Act of March 3, 1885, Ch. 341, 23 Stat. 362 (1885) ,  which applied to territories generally, was made applicable by passage of the Oklahoma Organic Act to the Oklahoma Territory upon its formation in 1890. Section 9 of the 1885 Act provided that any Indian committing a crime within any of the Territories of the United States shall be subject to the laws of the Territory and be subject to the same punishment as a non-Indian. 23 Stat. 362, 385. The Oklahoma Organic Act,

14

Ch. 182, 26 Stat. 81 (1890), § 11 generally made laws of the state of Nebraska applicable throughout the Oklahoma Territory. Under the Organic Act, the Territorial courts had jurisdiction over crimes involving Indians, whether or not the crime occurred on Indian lands. The Territorial courts were given jurisdiction over all cases involving Indians, except controversies between members of the same tribe, while maintaining their tribal  relations. Organic Act, § 12.

This broad jurisdiction over tribes and their members under the Organic Act was carried forward under § 20 of the Enabling Act. The Oklahoma Enabling Act, Ch. 3335, 4 Stat. 267, §13, provided that the laws in force in the Territory of Oklahoma, as far as applicable, shall extend over and apply to said State until changed by the legislature thereof. Consequently, Territorial law subjecting all residents, regardless of race or ethnicity, to the same courts and making them subject to the same penalties was extended over all Oklahoma Indians, including the Nation, upon Statehood.[9]  Accordingly, the Oklahoma Enabling Act also does not support the Nation's claim for relief.

These provisions have led to the understanding that Oklahoma reservations were disestablished. As stated in *Murphy v. Sirmons* with respect to the Muscogee (Creek) Nation, "State laws have been applied over the lands within the boundaries of the Creek nation for over a hundred years.  *Murphy v. Sirmons*, 497 F. Supp. 2d at 1290. "The Organic and Enabling Acts confirm that . . . Indian reservations do not exist in Oklahoma." *Id*. at 1289-1290.

_____

9.  The Complaint cites a disclaimer provision of § I of the Enabling Act However, such provisions pertain to retained tribal lands, not the unrestricted lands involved here. *See, e.g., Indian Country USA, Inc. v. Okla.*, 829 F.2d. 967,  976-81 (10th Cir. 1987).

Contemporaneous consensus at the time also reflected the understanding that the Acts divested Oklahoma tribes of both title and jurisdiction through land transfers authorized by contemporaneous legislation, and that Oklahoma law would apply to all civil matters occurring on former Indian lands. *Cf., Montana v. United States,* 450 U.S. 544, 559 n. 9 (1981) ( allotment of Indian land was consistently equated with the dissolution of tribal affairs and jurisdiction. ).[10] Section 21 of the Enabling Act specified that the former Osage reservation should constitute a separate county, and  that Oklahoma's constitutional convention shall designate the county seat and provide rules and regulations and define the manner of conducting the first election for officers in said county. The Supreme Court recognized that Osage history distinguished the Nation from tribes like the Navajo Nation in *United States v. Mason*, *412 U.S. 391 (1973).* *Mason* held the United States had no duty to resist payment of Oklahoma inheritance tax on unrestricted interests in an Osage deceased member's estate. The *Mason*  Court distinguished *McClanahan v. Ariz. State Tax Comm'n* , *411 U.S. 164, 174 (1973)*, because *McClanahan* had contrasted the trust land of the Navajo Reservation with the status of the Osage as described in *Oklahoma Tax Comm n v. United States,* 319 U.S. 598 (1943), observing "that 'the [Indian sovereignty] doctrine has not been rigidly applied in cases where Indians have left the reservation and become assimilated into the general community.'"   *Mason, 412 U.S. at 396 n.7.*

Subsequent Congressional enactments further confirm Congress' intent and contemporaneous understanding that there were no remaining reservations in Oklahoma. The

---

10. The Supreme Court observed in *United States v. Oklahoma Gas & Elec. Co.,* 127 F.2d 349, 353 (10th Cir. 1942), *aff'd,*  318 U.S. 206 (1943), that it is common knowledge that lands allotted in severalty in Oklahoma are essentially a part of the [non-Indian] community in which they are situated . . . ."

legislative history of the Oklahoma Indian Welfare Act, Ch. 831, 49 Stat. 1967 (1936), a statute

central to defining an Oklahoma tribes' status, provides: [i]n Oklahoma the several Indian

reservations have been divided up. . .  as a result of this program, *all Indian reservations as such*

*have ceased to exist* and the Indian citizen. . . is assuming his rightful position among the

citizenship of the State. S. Rep. No. 1232, 74th Cong., 1st Sess. 6 (1935) (emphasis added).   In a

Senate report accompanying a 1974 amendment to the Federal Property and Administrative

Services Act, the Report explained: The Committee amendment to H.R. 8958 adds a provision

that will extend the same disposal authority for excess land in Oklahoma that is provided by the

bill for the rest of the United States. ***This provision is necessitated by the fact that there are no***

***reservations in Oklahoma***." *S. Rep. No. 93 -1324, 93rd Cong., 2nd Sess. 2 (Dec. 11, 1974)*

*(emphasis added).*   Under  *Solem v. Bartlett,* those understandings are entitled to great weight.

*See Shawnee Tribe v. United States*, *423 F.3d 1204, 1227 (10th Cir. 2005) ( "we may not ignore*

*the plain language of the instrument that 'viewed in historical context and given a 'fair*

*appraisal,' clearly runs counter to a  tribe's later claims.'")(citation omitted); Yankton Sioux*

*Tribe v. Gaffey, 188 F.3d 1010, 1020 (8th Cir. 1999) ("It is well established that similar treaty*

*language does not necessarily have the same effect when dealing with separate agreements,*

*context has been found   to play a similarly important role in interpreting the language of the*

*surplus land acts.").*

**V. Income of Tribal Members Working and Living on Private Fee Lands in Osage**
**County is not Exempt from Taxation  — Federal Common Law**

The Complaint arises under several bases in federal law, including federal treaties, statutes and federal common law.  However, none of these sources support the claim that tribal members working and living anywhere within Osage County are immune from Oklahoma income tax. Consequently, the focus is on the Nation's assertion that federal common law governing tribal immunity from state taxation preempts Oklahoma's taxation authority.

The Nation seeks to immunize all tribal members in Osage County from income tax if they both live and earn income in Osage County irrespective of the actual status of the land on which the members reside, and the actual source of that income. Federal common law with respect to the preemption of state income taxation of reservation Indians does not support such a broad claim.[11] *See McClanahan v. Ariz. State Tax Comm n, 411 U.S. 164 (1973).*   In *McClanahan,* the United States Supreme Court analyzed treaties and  statutes applicable to the trust land of the Navajo Nation before concluding Arizona's taxation was preempted. *McClanahan's* holding*,* however, was premised on the fact the Court was dealing with a reservation.  Therefore, *McClanahan*, merely established that a tribal member who resided on a recognized reservation, and whose income was derived wholly from reservation sources, was exempt from state income taxation. *Id. at 179.  McClanahan*  never established either an exemption applying categorically to all tribal members residing in Indian country, or an exemption which applied, regardless of the source of the tribal member's income.

---

11.  *See Dep t of Tax. & Finance of NewYork v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 69 (1994) (challenge to tribal taxation) ("Respondents' challenge to New York s regulatory scheme is essentially a facial one. In reviewing a challenge of this kind, we do not rest our decision on consequences that, while possible, are by no means predictable. …[W]e confine  ourselves to those alleged defects that inhere in the regulations as written.") The facial challenge the Nation presents here is whether all members living and earning income on fee lands within Osage County are absolutely immune from tax.

Further, although the Supreme Court has referenced Indian country status as supportive of tribal immunity from state taxation, *see Okla. Tax Comm'n v. Sac & Fox Nation*, *508 U.S. 114 (1993),* its cases do not support the notion that all lands described by the subparagraphs of 18 U.S.C. § 1151 are automatically immunized from state taxation.   To the contrary, while "Indian  country" status under 18 U.S.C. § 1151 has been deemed pertinent in some instances, the Court has in each case considered other factors in determining state taxing powers.

Application of the Indian country analysis to address taxation have required lands to satisfy two requirements: "first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence. *Alaska v. Native Village of Venetie Tribal Gov't, 522 U.S. 520, 527 (1998)(addressing dependent Indian community subcategory of Indian country.").*  The Court's most recent reference to the pertinence of the federal criminal code in civil matters, *Atkinson Trading Co. v. Shirley, 532 U.S. 654 (2001)*, reversed the Tenth Circuit's determination that the Navajo Nation could tax Atkinson's fee lands operation within the boundaries of the Navajo Nation under the language of 18 U.S.C. § 1151(a) defining Indian country as lands within the limits of an Indian reservation, notwithstanding the issuance of any patent . . ."  The Court made plain that "Indian country" status is not dispositive if there is no "claim of statutorily conferred power. Section 1151 simply does not address an Indian tribe's inherent or retained sovereignty over non-members on non-Indian fee land."  532 U.S. at 653 n.5.  Under the same analysis, given that there is no claim Congress expressly immunized tribal members' incomes in "Indian country" from state taxation, Section 1151 simply does not address an Osage tribal member's claimed immunity from state

income taxation.

Also, probative of the issue is the tribes' diminished power over fee lands and enhanced state powers over such lands.  Income derived from fee land sources is akin to income derived outside the tribe's jurisdiction, which *is* subject to taxation.  Indeed, in *Washington v. Confederated Tribes of the Colville Indian Reservation*, *447 U.S. 134, 155 (1980),* the Supreme Court contrasted the taxability of cigarettes marketed by the smoke shops to persons outside Indian country, and which value was not generated on the reservation , with the claim of the tribal member in *McClanahan* who derived all her income from reservation sources. The *Colville* Court rejected the notion that a tribe could exploit "principles of federal Indian law, whether stated in terms of pre-emption, tribal self-government, or otherwise, [to] authorize Indian tribes to market an exemption from state taxation to persons who would normally do their business elsewhere." *Id.*  Instead, the Court found, "[t]he State also has a legitimate governmental interest in raising revenues, and that interest is likewise strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services."  *Id. at 157.*

Under a preemption analysis, income of a tribal member resident on fee lands earned from sources in which the Nation does not have a significant interest, i.e., from employment with the State or a non-member enterprise or entity, even in Osage County (assuming it were a reservation),  would be subject to state income tax. The Nation fails to address  whether tribal interests, or federal interests that could give rise to preemption under federal law, are implicated when tribal members earn income on fee lands and drive across state highways to a home on fee lands. The Complaint fails to articulate a single federal interest that conflicts with Oklahoma

income taxation of such members.

As applied to the unique and uncommon history of Oklahoma tribes, and the Osage Nation in particular, these principles do not oust or preempt Oklahoma's income taxation challenged here. *See Oklahoma Tax Comm n v. United States*, *319 U.S. 598 (1943)*. In holding that portions of the estates of deceased members of the Five Civilized Tribes are subject to Oklahoma estate taxation, the Oklahoma Tax Commission Court recognized that principles applicable to Indians elsewhere in the United States do not apply directly to Oklahoma Indians: "Although there are remnants of the form of tribal sovereignty, these Indians have no effective tribal autonomy . . . [T]hey are actually citizens of the State with little to distinguish them from all other citizens except for their limited property restrictions and [express] tax exemptions." *319 U.S. at 603*. The Court distinguished the sovereignty principles laid down in *Worcester v. Georgia, 31 U.S. (6 Pet.) 515 (1831)*, where "the Indian tribes were separate political entities with all the rights of independent status --  a condition which has not existed for many years in the  State of Oklahoma." *319 U.S. at 602*. Recognizing that Oklahoma supplies "schools, roads, courts, police protection, and all the benefits of an ordered society. . . " to the tribal members involved in the case, and that an income tax, based solely on ability to pay. . . , " [12] is not an unreasonable burden, *Id. at 609*, the Court upheld Oklahoma's taxes on the restricted cash and securities in the tribal members' estates, but disallowed only the tax on statutorily restricted allotment lands, which the statute expressly rendered expressly"restricted and tax exempt."  *Id*.

---

12. The Court also noted the substantial wealth of members of the Osage Tribe. *Id.* at 609 n.13.

*at 611*.

With respect to Osage lands in Osage County, the Supreme Court long ago recognized the Congressional intent that such lands be subject to state taxation. *See McCurdy v. United States*, *246 U.S. 263, 269-70 (1918) (once restrictions on Osage lands were removed pursuant to the Act of June 28, 1906, former Osage restricted lands became subject to state taxation).*  In *Choteau v. Burnet, 283 U.S. 691, 695-96 (1931)*, the Court reasoned similarly that an Osage allottee's income from oil and gas royalties after the removal of restrictions under the 1906 Osage Act is subject to federal income tax.  "His shares of the royalties from oil and gas leases was payable to him, without restriction upon his use of the funds so paid. It is evident that as respects his property other than his homestead his status is not different from that any citizen of the United States." *Id.* [13] With respect to the Osage, Oklahoma's Congressional delegation has expressly acknowledged that funds and securities, income, and estates of these Osage Indians are subject to taxation, the same as for other citizens. *Hearing before the Subcommittee on Indian Affairs on H. Con. Res. 108 (July 22, 1953), Statement of Oklahoma Members in Congress.* Osage unrestricted fee lands, and income related to them, are presumptively subject to state taxes.

## VI. The  Major Crimes Act

The Supreme Court requires a tribe alleging claims under federal common law to "articulate

---

13. The Court relied on § 2, Seventh, of the Osage Allotment Act, Ch. 3572, 34 Stat. 539 (1906): "upon the issuance of such certificate of competency, the lands of such member (except his or her homestead) shall become subject to taxation, and such member shall have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States."

what prescription of federal common law enables a tribe to maintain an action for declaratory and injunctive relief establishing its sovereign right to be free from state [law]. " *See  Inyo County v. Paiute-Shoshone Indians of the Bishop Cmty.*, *538 U.S. 701, 712 (2003)*. Just as in *Inyo  County*, it is unclear what federal law, if any, the Tribe's case "aris[es] under." *Id* (*quoting 28 U.S.C. § 1331)(brackets in original).* The Nation's  citation to a federal criminal statute and cases pertaining to trust or restricted lands affords no specific support.

Given the requirement of a prescription of federal law, *see Id.*, 18 U.S.C. § 1151 is not a federal law that the Nation's case arises under.  In addition to defining federal criminal powers, that statute "confer[s] upon Indian tribes jurisdiction over certain criminal acts occurring  in 'Indian country.'" *Atkinson Trading Co. v. Shirley*, *532 U.S. 645, 653 n.5 (2001).* The  statute's legislative history confirms that it was intended to codify prior case law governing jurisdiction to prosecute crimes in Indian country. *See  Report of Judiciary Committee accompanying H. R. 3190, 80th Cong., 1st Sess. (April 24, 1947) at A-91, A-92.*   It does not establish civil immunities from state taxation.

The Supreme Court's references to 18 U.S.C. § 1151 in prior cases do not support a different result. *Okla. Tax Comm n v. Sac & Fox Nation*, *508 U.S. 114 (1993)*, does not address taxation on fee lands within an alleged reservation. Rather, it reversed a decision in which the lower courts construed *McClanahan v. Ariz. State Tax Comm n*, *411 U.S. 164 (1973),* as immunizing tribal members income from State taxation whenever the income was derived from tribal employment on tribal trust lands, and specifically required that the member *also* live on trust land: ***"The residence of a tribal member is a significant component*** of the *McClanahan* presumption against state tax jurisdiction." *Sac & Fox, 508 U.S. at 123 (emphasis added).*

23

Although *Sac & Fox* contains some broad language, it narrowed the scope of available immunity to tribal members living and working on land set aside for those members. *Id. at 124.* The *Sac & Fox* Court s discussion of *Oklahoma Tax Comm n v. Citizen Band Potawatomi Tribe of Okla., 498 U.S. 505, 511 (1991)*, while employing broad language regarding Indian country, again emphasized that the case concerned a tribal convenience store located outside the reservation on **land held in trust** for the Potawatomi. *508 U.S. at 125 (emphasis added).* Thus, while the Court in *Sac & Fox* and *Citizens Band* referred to Section 1151, neither case  addressed tax immunity with respect to tribal members both working and residing on fee lands.  Indeed, subsequent to both those decisions, the Supreme Court ruled that Oklahoma may tax the income of tribal members who earn income working for the tribe on tribal lands, but who live outside Indian country. *See Oklahoma Tax Comm n v. Chickasaw Nation*, *515 U.S. 450, 464 (1995).* Given that holding, the Nation cannot establish that state income taxation is foreclosed when the taxpayer neither works nor lives on restricted lands.

  While the Supreme Court has occasionally said Section 1151 **generally** applies to questions of civil jurisdiction, the cases have carefully couched such language in nonmandatory terms. *DeCouteau v. District County Court, 420 U.S. 425, 427 n. 2 (1975) (emphasis  added); see also Alaska v. Native Village of Venetie, 522 U.S. 520, 527 n.1 (1998) ( "Generally speaking . . .").* Rejecting any contention that "Indian country" status prescribes mandatory civil  tax consequences, the Supreme Court in *Atkinson Trading Co. v. Shirley, 520 U.S. at 654,*  expressly rejected applying Section 1151 to require a nonmember to pay Navajo Nation taxes on fee lands

within an undisputed, treaty-based reservation.[14]  In fact, given the disestablishment of the Osage and other Oklahoma reservations long before the Indian country statute was codified, using the 1948 statute to exempt Osage members from state income tax is particularly anomalous. *See, e.g., Yankton Sioux Tribe v. Gaffey, 188 F.3d 1010, 1022 (8th Cir. 1999) ( "Members of Congress in 1894 operated on a set of assumptions which are in tension with the modern definition of Indian country, and the intentions of that Congress . . . are what we must look to here.").* Considering the context of sovereignty pertinent to state taxation of tribal members, and Congress' understanding in 1906 that Osage members were citizens of Oklahoma for taxation and other purposes, 18 U.S.C. § 1151 creates no rights that may be asserted by such members - or by the Nation in this action.

### VII.  Longstanding Reliance by the State of Oklahoma Is a Significant Factor Counseling Against a Decision Altering Jurisdictional Assumptions.

The ability to raise revenues to support its services to Osage County lands and the tax status of Osage tribal members is of critical importance to Oklahoma. If this Court were to now establish Osage County as a reservation more than a century after Congress was understood to have dissolved that status *and* that such status automatically deprives Oklahoma of the ability to fund services in Osage County through income taxes, the State's provision of services would be

---

14. Cases such as the Tenth Circuit s decision in *Pittsburgh & Midway Coal Miining Company  v.  Watchman,* 52 F.3d 1531, 1540 (10th Cir. 1995), which rejected the argument that Section 1151 applies only to criminal jurisdiction, could not take into account the Supreme Court's subsequent guidance in *Atkinson.* They do not address whether federal policies preempt a state's ability to tax income in circumstances that do not implicate substantial federal interests.

severely threatened.  Such a ruling would also affect the State's Sovereign rights, the State's

jurisdiction over its citizens, and critical revenue, across a broad piece of land in which Congress

has previously recognized the State has a right to exert its dominion. See Enabling Act, Ch.

3335, 34 Stat. 267 (1906), § 11.

Such a result would contravene substantial reliance interests, as did a similar claim

affecting riverbed rights in Idaho: "[The Tribe's claim] is especially troubling when coupled

with the far-reaching and invasive relief the Tribe seeks, relief with consequences going well

beyond the typical stakes in a real property quiet title action. The suit seeks, in effect, a

determination  that the lands in question are not even within the regulatory jurisdiction of the

State. The requested injunctive relief would bar the State's principal officers from exercising

their governmental powers and authority over the disputed lands and waters. The suit would

diminish, even extinguish, the State's control over a vast reach of lands and waters long deemed

by the State to be an integral part of its territory. To pass this off as a judgment causing little or

no offense to Idaho's sovereign authority and its standing in the Union would be to ignore the

realities of the relief the Tribe demands." *Idaho v. Coeur D'Alene Tribe*, 521 U.S. 261, 282

(1997).  Similarly, standards of federal Indian law and federal equity practice preclude the

Nation from advancing its claims here.  City of Sherrill v. Oneida Indian Nation, 544 U.S. 197,

214 (2005).  In *City of Sherrill*, the Court ruled that equitable considerations of laches,

acquiescence and impossibility barred the Oneida Tribe's claim that it could exercise sovereign

control over lands within the boundaries of the tribe's former reservation and avoid payment of

city property taxes.

Oklahoma has governed Osage County as a county for over 100 years. The County is predominately non-Indian and non-Osage.[15]  The Osage have not sought to reestablish their claimed reservation or to challenge the State s taxation until recently. Recognizing Osage County as a reservation and ousting Oklahoma income taxation over Osage members would have significant practical consequences not only for income taxation, but potentially for civil, criminal and regulatory jurisdiction in Osage County.

Accordingly, Defendants' Motion for Summary Judgment is granted.

James H. Payne
United States District Judge
Northern District of Oklahoma

---

15.  According to the 2000 United States Census, Osage County had a population of 44,437, of whom 9,209 (or 20.7%) identified themselves as being American Indians, in whole or in part.  The number of inhabitants of Osage County who identified themselves as Osage Indians, in whole or in part, was 2,403 (or 5.4% of the population of Osage County).