FILED
United States Court of Appeals
Tenth Circuit

March 5, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

| | |
|---|---|
| OSAGE NATION,<br><br>    Plaintiff - Appellant,<br><br>v.<br><br>CONSTANCE IRBY Secretary - Member of the Oklahoma Tax Commission; THOMAS E. KEMP, JR., Chairman of the Oklahoma Tax Commission; JERRY JOHNSON, Warden, Vice-Chairman of the Oklahoma Tax Commission,<br><br>    Defendants - Appellees,<br>_____<br><br>OKLAHOMA FARM BUREAU; OKLAHOMA CATTLEMEN'S ASSOCIATION; OSAGE COUNTY FARM BUREAU; OSAGE COUNTY CATTLEMEN'S ASSOCIATION; OKLAHOMA ASSOCIATION OF ELECTRIC COOPERATIVES; OKLAHOMA INDEPENDENT PETROLEUM ASSOCIATION; OKLAHOMA MUNICIPAL LEAGUE; OKLAHOMA RURAL WATER ASSOCIATION; OKLAHOMA WILDLIFE MANAGEMENT ASSOCIATION; ENVIRONMENTAL FEDERATION OF OKLAHOMA; PUBLIC SERVICE COMPANY OF OKLAHOMA; OKLAHOMA STATE CHAMBER OF COMMERCE AND INDUSTRY,<br><br>    Amici Curiae. | No. 09-5050<br>(D.C. No. 4:01-CV-00516-JHP-FHM) |

---

## JUDGMENT

---

Before **TACHA**, **EBEL**, and **KELLY**, Circuit Judges.

---

      This case originated in the District Court for the Northern District of Oklahoma and was argued by counsel.

      The judgment  of that court is  affirmed.

                    Entered for the Court

                    ELISABETH A. SHUMAKER, Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

March 05, 2010

Douglas E. Cressler
Chief Deputy Clerk


Mrs. Stephanie Elaine Moser Goins
Mr. Gary Stanley Pitchlynn
Pitchlynn & Williams, PLLC
124 East Main Street
P.O. Box 427
Norman, OK 73069

Mr. Thomas Paul Schlosser
Morisset Schlosser & Jozwiak
801 Second Avenue
1115 Norton Building
Seattle, WA 98104

Mr. Olin Joseph Williams
Pitchlynn & Williams, PLLC
124 East Main Street
P.O. Box 427
Norman, OK 73069


**RE:**     **09-5050, Osage Nation v. Oklahoma Tax Commission, et al**
         Dist/Ag docket: 4:01-CV-00516-JHP-FHM

Dear Counsel:

Enclosed is a copy of the opinion of the court in the captioned case. Judgment was entered today.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker

Elisabeth A. Shumaker

Clerk of the Court


cc:     Kathryn L. Bass
         Steven W. Bugg
         Sean Robert McFarland
         Larry Dixon Patton
         William C. Scott
         Lynn H. Slade
         Jeff L. Todd


EAS/kf

FILED
United States Court of Appeals
Tenth Circuit

PUBLISH

**March 5, 2010**

Elisabeth A. Shumaker
Clerk of Court

# UNITED STATES COURT OF APPEALS

## TENH CIRCUIT

---

OSAGE NATION,

      Plaintiff - Appellant,

v.

CONSTANCE IRBY Secretary - Member of the Oklahoma Tax Commission; THOMAS E. KEMP, JR., Chairman of the Oklahoma Tax Commission; JERRY JOHNSON, Warden, Vice-Chairman of the Oklahoma Tax Commission,

      Defendants - Appellees.

_____

OKLAHOMA FARM BUREAU; OKLAHOMA CATTLEMEN'S ASSOCIATION; OSAGE COUNTY FARM BUREAU; OSAGE COUNTY CATTLEMEN'S ASSOCIATION; OKLAHOMA ASSOCIATION OF ELECTRIC COOPERATIVES; OKLAHOMA INDEPENDENT PETROLEUM ASSOCIATION; OKLAHOMA MUNICIPAL LEAGUE; OKLAHOMA RURAL WATER ASSOCIATION; OKLAHOMA WILDLIFE MANAGEMENT ASSOCIATION; ENVIRONMENTAL FEDERATION OF OKLAHOMA; PUBLIC SERVICE COMPANY OF OKLAHOMA; OKLAHOMA STATE CHAMBER OF

No. 09-5050

COMMERCE AND INDUSTRY,

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 4:01-CV-00516-JHP-FHM)**

---

Thomas P. Schlosser of Morisset, Schlosser & Jozwiak, Seattle, Washington (and Gary S. Pitchlynn, O. Joseph Williams and Stephanie Moser Goins of Pitchlynn & Williams, P.L.L.C., Norman Oklahoma, with him on the briefs), for Plaintiff - Appellant.

Lynn H. Slade, (William C. Scott and Joan D. Marsan of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, New Mexico; Kathryn L. Bass, Chief Deputy General Counsel, Oklahoma Tax Commission, Oklahoma City, Oklahoma, on the brief), for Defendants - Appellees.

Steven W. Bugg and Jeff L. Todd of McAfee & Taft A Professional Corporation, Oklahoma City, Oklahoma, for Amici Curiae.

---

Before **TACHA**, **EBEL**, and **KELLY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Plaintiff-Appellant the Osage Nation ("the Nation") appeals from the grant of summary judgment for Defendants-Appellees.  The Nation sought (1) a declaratory judgment that the Nation's reservation, which comprises all of Osage County, Oklahoma, has not been disestablished and remains Indian country within the meaning of 18 U.S.C. § 1151; (2) a declaratory judgment that Nation members

- 2 -

who are employed and reside within the reservation's geographical boundaries are exempt from paying state income tax; and (3) injunctive relief prohibiting Defendants from collecting income tax from such tribal members.  1 Aplt. App. at 24.

The pivotal issue in this case is whether the Nation's reservation has been disestablished, not Oklahoma's tax policies.  The district court held that the Osage reservation had been disestablished; that tribal members who work and live on non-trust/non-restricted land in Osage County are not exempt from state income tax; and that "[t]he Osage have not sought to reestablish their claimed reservation or to challenge [Oklahoma's] taxation until recently," and Oklahoma's longstanding reliance counsels against now establishing Osage County as a reservation.  2 Aplt. App. at 389-407.  The district court also denied the Nation's Rule 59 motion.  2 Aplt. App. at 416.  On appeal, the Nation argues that its reservation has never been disestablished and is coterminous with Osage County; that tribal members who work and live in Osage County are exempt from state income tax; and that the district court should not have applied equitable considerations to this case.  Our jurisdiction arises under 28 U.S.C. § 1291, and because we agree that the Osage reservation has been disestablished, we affirm.

<u>Background</u>

In 1872, Congress established a reservation for the Osage Nation in present

-3-

day Oklahoma.  <u>See</u> Act of June 5, 1872, ch. 310, 17 Stat. 228 (An Act to Confirm to the Great and Little Osage Indians a Reservation in the Indian Territory).  In 1887, due to increased demand for land by white settlers and a desire to assimilate tribal nations, Congress passed the Indian General Allotment Act.  <u>See</u> Act of February 8, 1887, ch. 119, 24 Stat. 388 (codified as amended at 25 U.S.C. §§ 331-334, 339, 341-342, 348-349, 354, 381).  The Osage reservation was expressly exempted from this Act.  25 U.S.C. § 339.  In 1907, Oklahoma became a state, and the Osage reservation was incorporated into the new state as Osage County as provided for in the Oklahoma Enabling Act.  <u>See</u> Act of June 16, 1906, ch. 3335, 34 Stat. 267, §§ 2, 21; <u>see</u> <u>also</u> Okla. Const., art. XVII, § 8 ("The Osage Indian Reservation with its present boundaries is hereby constituted one county to be know as Osage County.").  Osage County, the largest county in Oklahoma, covers about 2,250 square miles (about 3% of Oklahoma's total land area).

Contemporaneous to passing the Oklahoma Enabling Act, Congress enacted the Osage Allotment Act.  <u>See</u> Act of June 28, 1906, ch. 3572, 34 Stat. 539.  The 1906 Osage Allotment Act severed the mineral estate from the surface estate of the reservation and placed it in trust for the tribe.  <u>Id.</u> at §§ 2-3.  The Act included several provisions regarding tribal government and tribal membership and granted the Osage tribal council general tribal authority.  <u>See</u> <u>Logan v. Andrus</u>, 640 F.2d 269, 270 (10th Cir. 1981) (noting that nothing in the Osage Allotment Act

-4-

"limited the authority of the officers therein named to mineral administration or any other specific function").  The Act also allotted most of the Osage surface land in severalty to tribal members.  Osage Allotment Act at § 2.

In 2004, Congress passed a statute clarifying the 1906 Act and authorizing the Osage Nation to determine its membership and government structure.  Pub. L. No. 108-431, 118 Stat. 2609 (2004) (An Act to Reaffirm the Inherent Sovereign Rights of the Osage Tribe to Determine Its Membership and Form of Government).  This Act refers to the Osage as "based in Pawhuska, Oklahoma," id. at § 1, but does not specifically refer to an Osage reservation in the text of the statute, and does not address the reservation status of Osage land.

In 1999, a tribal member who was employed by the Tribe on trust land and lived within the boundaries of the Osage County on fee land protested the State's assessment of income tax on her.  Osage Nation v. Oklahoma ex rel. Okla. Tax Comm'n, 260 F. App'x 13, 15 (10th Cir. 2007).  The Oklahoma Tax Commission determined that she did not live in Indian country within the meaning of 18 U.S.C. § 1151, and that her income was taxable.  Id.  After the Commission's decision, the Osage Nation filed the instant suit seeking declaratory and injunctive relief.  Id. at 15-16.  Specifically, the Nation seeks a declaratory judgment: "(1) that the Nation's reservation boundaries have not been extinguished, disestablished, terminated, or diminished and is and remains the Indian country of the Nation; and (2) that the Nation's members who both earn

-5-

income and reside within the geographical boundaries of the Nation's reservation are not subject to or required to pay taxes to the State . . . on [] income." 1 Aplt. App. at 24.  The Nation further seeks injunctive relief prohibiting "Defendants . . . from levying or collecting Oklahoma state income taxes upon the income of the Nation's members who both earn income and reside within the geographical boundaries of the Nation's reservation."  1 Aplt. App. at 24.

The state of Oklahoma and the Oklahoma Tax Commission filed a motion to dismiss, arguing that the Nation's suit was barred by the Eleventh Amendment. Osage Nation, 260 F. App'x at 16.  The Nation amended the complaint to include the individual members of the Tax Commission as defendants.  Id.  All of the defendants again moved to dismiss based on Eleventh Amendment immunity, and the district court denied the motion.  Id.  On appeal, we reversed the district court's decision to allow the suit to proceed against the State of Oklahoma and the Oklahoma Tax Commission.  We determined that the suit could proceed against the individual members of the Tax Commission under the Ex parte Young exception to Eleventh Amendment immunity.  Id. at 22.

On remand, the remaining defendants moved to dismiss, and the district court converted their motion to one for summary judgment.  1 Aplt. App. at 204. The district court determined that "the Osage reservation ceased to exist more than a century ago," 2 Aplt. App. at 389, and that tribal members that work and live on private fee lands in Osage County are not exempt from state income tax, 2

-6-

Aplt. App. at 397-02.  Applying <u>City of Sherrill v. Oneida Indian Nation</u>, 544

U.S. 197, 214 (2005), the district court also held that federal equity practice

precludes the Nation from advancing its claims after Oklahoma has governed

Osage County for over a hundred years.  2 Aplt. App. 405-07.


<u>Discussion</u>

It is well established that Congress has the power to diminish or

disestablish a reservation unilaterally, although this will not be lightly inferred.

<u>See, e.g.</u>, <u>Solem v. Bartlett</u>, 465 U.S. 463, 470, 472 (1984).  Congress's intent to

terminate must be clearly expressed, <u>South Dakota v. Yankton Sioux Tribe</u>, 522

U.S. 329, 343 (1998), and there is a presumption in favor of the continued

existence of a reservation, <u>Solem</u>, 465 U.S. at 472.  Courts may not "'ignore plain

language that, viewed in historical context and given a fair appraisal clearly runs

counter to a tribe's later claims.'" <u>Pittsburg & Midway Coal Mining Co. v.

Yazzie</u>, 909 F.2d 1387, 1393 (10th Cir. 1990) (quoting <u>Or. Dep't of Fish &

Wildlife v. Klamath Indian Tribe</u>, 473 U.S. 753, 774 (1985)).

We have noted that "the Supreme Court has applied, without comment, a *de

novo* standard of review in determining congressional intent [regarding

reservation boundary diminishment]." <u>Yazzie</u>, 909 F.2d at 1393 (listing cases).

While determining congressional intent is a matter of statutory construction,

which typically involves a de novo review, to the extent that statutory

-7-

construction turns on an historical record, it involves a mixed question of law and fact. Id.  "Where a mixed question primarily involves the consideration of legal principles, then a *de novo* review by the appellate court is appropriate."  Id. at 1393-94 (internal quotation marks and citation omitted).

We apply the three-part test summarized in Solem to determine whether a reservation has been diminished or disestablished.  Congress's intent at the time of the relevant statute governs our analysis.  The Supreme Court has repeatedly stated and Defendants have conceded that allotment/opening of a reservation alone does not diminish or terminate a reservation.  Aplee. Br. at 18.  In ascertaining Congress's intent, the effect of an allotment act depends on both the language of the act and the circumstances underlying its passage.  Solem, 465 U.S. at 469.  The "operative" language of the statute carries more weight than incidental language embedded in secondary provisions of the statute.  Id. at 472-76.  The Court will infer diminishment or disestablishment despite statutory language that would otherwise suggest unchanged reservation boundaries when events surrounding the passage of [the] act "unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation."  Id. at 471.  In addition to (1) explicit statutory language and (2) surrounding circumstances, the Court looks to (3) "subsequent events, including congressional action and the demographic history of the opened lands, for clues to whether Congress expected the reservation boundaries to be

diminished." <u>Yazzie</u>, 909 F.2d at 1395.  Such latter events will not govern if "an

act and its legislative history fail to provide substantial and compelling evidence

of a congressional intention to diminish Indian lands . . . ." <u>Solem</u>, 465 U.S. at

472.  Thus, "subsequent events and demographic history can support and confirm

other evidence but cannot stand on their own; by the same token they cannot

undermine substantial and compelling evidence from an Act and events

surrounding its passage." <u>Yazzie</u>, 909 F.2d at 1396.

     With these standards in mind, we turn to whether the 1906 Osage Allotment

Act disestablished the Osage reservation.

A.  <u>Statutory Language</u>

     Statutory language is the most probative evidence of congressional intent to

disestablish or diminish a reservation.  "Explicit reference to cession or other

language evidencing the present and total surrender of all tribal interests strongly

suggests that Congress meant to divest from the reservation all unallotted opened

lands." <u>Solem</u>, 465 U.S. at 470.  Examples of express termination language

include: "'the Smith River reservation is hereby discontinued,'" <u>Mattz v. Arnett</u>,

412 U.S. 481, 505 n.22 (1973) (discussing 15 Stat. 221 (1868)); "'the same being

a portion of the Colville Indian Reservation . . . be, and is hereby, vacated and

restored to the public domain,'" <u>id.</u> (discussing 27 Stat. 63 (1892)); "'the

reservation lines of the said Ponca and Otoe and Missouria Indian reservations . .

. are hereby, abolished,'" <u>Rosebud Sioux Tribe v. Kneip</u>, 430 U.S. 584, 618

(1977) (discussing 33 Stat. 218 (1904)); "'the . . . Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest,'" DeCoteau v. District County Court, 420 U.S. 445, 455-56 (1975) (discussing Agreement of 1889, ratified by 26 Stat. 1035 (1891)).  An act's language is not sufficient evidence of an intent to terminate a reservation when it simply opens the way for non-Indians to own land on the reservation—e.g., making reservation lands "'subject to settlement, entry, and purchase.'" Mattz, 412 U.S. at 495, 497; Seymour v. Superintendent of Wash. State Penitentiary, 368 U.S. 351, 356 (1962).  Likewise, language authorizing the Secretary of the Interior to "sell and dispose" of reservation land is insufficient to terminate a reservation.  Solem, 465 U.S. at 472-73.

The manner in which a statute compensates a tribe for opened land is also instructive.  Some statutes provide that the tribe will be paid a sum-certain amount as compensation for all of the unallotted land.  Others provide payment to the tribe as the lands are sold.  Sum-certain payments indicate an intent to terminate the reservation, but payment that is contingent on future sales usually indicates an intent not to terminate.  Compare DeCoteau, 420 U.S. 425 (holding that the reservation was terminated where there was express language regarding termination, a sum-certain payment, and tribal consent to the agreement) with Mattz, 412 U.S. 481 (holding that the reservation was not terminated where there was no express language regarding termination nor a sum-certain payment).

Explicit language signifying an intent to terminate a reservation combined with a

sum-certain payment creates "an almost insurmountable presumption that

Congress meant for the tribe's reservation to be diminished."  <u>Solem</u>, 465 U.S. at

470-71.

The <u>Solem</u> court found additional factors weighing in favor of continued

reservation status: (a) authorization for the Secretary of the Interior to set aside

lands for tribal purposes; (b) permission for tribal members to obtain individual

allotments before the land was officially opened to non-Indian settlers; and (c)

reservation of the mineral resources for the tribe as a whole.  465 U.S. at 474.  All

three of these factors are present in the Osage Allotment Act.  Unlike other

allotment acts, the Act did not directly open the reservation to non-Indian

settlement.  With the exception of certain parcels of trust land reserved for the

Osage Nation, the Act allotted the entire reservation to members of the tribe with

no surplus lands allotted for non-Indian settlement.  As the Act did not open any

land for settlement by non-Osage, there is no sum-certain or any other payment

arrangement in the Act.  And neither the Osage Allotment Act nor the Oklahoma

Enabling Act contain express termination language.  Thus, the operative language

of the statute does not unambiguously suggest diminishment or disestablishment

of the Osage reservation.

B.  <u>Circumstances Surrounding Passage of the Act</u>

If the statute is ambiguous, we turn to the circumstances surrounding the

passage of the act, in particular the manner in which the transaction was

negotiated and its legislative history, for evidence of a contemporaneous

understanding that the affected reservation would be diminished or disestablished

as a result of the proposed legislation.  Solem, 465 U.S. at 471.  The Court

sometimes considers whether there was tribal consent.  Compare DeCoteau, 420

U.S. at 448 (the reservation was found to have been terminated, and the Court

found importance in the fact that the tribe consented to the agreement) with

Rosebud Sioux, 430 U.S. at 587 (the reservation was disestablished although there

was no tribal consent).

      The manner in which the Osage Allotment Act was negotiated reflects clear

congressional intent and Osage understanding that the reservation would be

disestablished.  The Act was passed at a time where the United States sought

dissolution of Indian reservations, specifically the Oklahoma tribes' reservations.

See Francis Paul Prucha, The Great Father 737-57 (1984) (Aplee. Supp. Add.

104-24).  In preparation for Oklahoma's statehood, the Dawes Commission had

already implemented an allotment process with the Five Civilized Tribes that

extinguished national and tribal title to lands within the territory and

disestablished the Creek and other Oklahoma reservations.  See H.R. Rep. No. 59-

496, at 9, 11 (1906) (Aplee. Supp. Add. at 28, 30).  While the Osage were

excepted from the Dawes Commission process, the Osage felt pressure having

observed the Commission's activities with respect to other tribes, and "[f]or

-12-

several years, the Osage . . .ha[d] been considering the question of asking the

Government to divide its lands and moneys among the members of the tribe." S.

Rep. No. 59-4210, at 1 (1906) (Aplee. Supp. Add. at 42).  In 1905, the Osage

approached Congress to begin negotiating a bill "to abolish their tribal affairs and

to get their lands and money fairly divided, among themselves, so that every

individual will be there to give his views in the matter, and the majority agree

upon a plan."  1 Division of the Lands and Moneys of the Osage Tribe of Indians:

Hearings on H.R. 17478 Before the H. Subcomm. of the Comm. on Indian Affairs,

58th Cong. 8 (1905) ("Division Hearings") (Aplt. Add. at 9).  The Osage were

"very anxious to bring about the allotment at the earliest possible time."  40

Cong. Rec. 3581 (1906) (Statement of Sen. Dillingham) (Aplee. Supp. Add. at

51).  Congress and the Osage recognized that allotment may result in loss of much

of the tribal land.  See, e.g., W. David Baird, The Osage People 68 (1972) (2

Aplt. App. at 237) ("James Bigheart and Black Dog, for example, noted that, like

Indians of other tribes, the Osage may very well lose their allotments after

dissolution of the reserve.").  The Osage also recognized that the allotment

process would terminate reservation status.  1 Division Hearings, at 6 (Aplt. Add.

at 12) (statement of Black Dog, Osage Representative) ("Indians in Oklahoma

living on their reservations who have had negotiations with the Government[,]

since they have been compelled to take their allotments[,] they are not doing as

well as the Indians who live on the reservations.").

The Osage themselves presented an allotment act to Congress in February 1906, and by June of that year, Congress passed the Osage Allotment Act.  Baird at 70 (2 Aplt. App. at 238).  A primary concern during the negotiations was a desire to ensure that some tribal members were not unfairly enriched at the expense of other tribal members.  These concerns were addressed by allotting land in several rounds, severing the mineral estate and placing it in trust for the tribe, and providing for a form of tribal government.  See, e.g., 1 Division Hearings, at 11-14, 55-56 (Aplt. Add. at 17-20, 54-55); Osage Allotment Act at §§ 2, 3, & 9.  The Osage tried to prevent their land from becoming alienable through certificates of competency, but Congress rejected this approach.  See 2 Division Hearings, at 4 (Aplt. Add. at 59).  They also attempted to prevent a large portion of their lands, the surplus lands, from being taxed; this was also rejected by Congress.  S. Rep. No. 59-4210, at 8 (Aplee. Supp. Add. at 49).

The legislative history and the negotiation process make clear that all the parties at the table understood that the Osage reservation would be disestablished by the Osage Allotment Act, and uncontested facts in the record provide further evidence of a contemporaneous understanding that the reservation had been dissolved.  Historian Lawrence Kelly concludes that "[t]reatises and articles in professional journals that have considered the history of the former Osage Reservation have acknowledged that, after the Osage Allotment Act and Oklahoma's admission to the Union in accordance with the Oklahoma Enabling

-14-

Act, the Osage Reservation no longer existed and that area became Osage County, a subdivision of the State of Oklahoma." Kelly Aff., ¶ 10 (2 Aplt. App. 244). Historian Francis Prucha has thoroughly discussed the United States' persistent efforts to end tribal control in the Indian Territory, which eventually became part of Oklahoma. Prucha at 738-57 (Aplee. Supp. Add. at 105-24). He notes, "The Indians of Oklahoma were an anomaly in Indian-white relations. . . . There are no Indian reservations in Oklahoma . . . . [T]he reservation experience that was fundamental for most Indian groups in the twentieth century was not part of Oklahoma Indian history." Prucha at 757 (Aplee. Supp. Add. at 124). Another historian, Berlin Chapman, states that while Congress had established many reservations before Oklahoma's statehood, "[t]he last of these reservations to be dissolved by allotments was that owned and occupied by the Osage[], embracing about 1,470,059 acres, now comprising Osage county." Berlin B. Chapman, Dissolution of the Osage Reservation, 20 Chrons. Okla. 244, 244 (1942) (1 Aplt. App. at 98). Historian W. David Baird concurs, stating "[w]ith their land allotted and their reserve an Oklahoma county. . . [the Osage] no longer existed as an independent people." Kelly Aff., ¶ 10 (2 Aplt. App. at 244) (quoting Baird at 72).

Instead of presenting evidence regarding widely held understanding of the Osage Allotment Act at the time it was passed, the Osage Nation primarily presents evidence of continued existence of their reservation contemporaneous to this litigation including: (1) the legislative history of the 2004 Osage Act, which

-15-

refers to the Osage as a "federally recognized tribe with a nearly 1.5 million-acre reservation in northeast Oklahoma," H.R. Rep. No. 108-502, at 1 (2004); (2) the Assistant Secretary for Indian Affairs' certification of an Osage Tribe Liquor Control Ordinance in 2005, Aplt. Add. at 95-100; (3) a 2005 National Indian Gaming Commission opinion letter concluding that certain parcels of fee land in Osage County are part of the tribe's reservation, 1 Aplt. App. at 166-72; (4) a 1997 gubernatorial proclamation declaring October 25, 1997 as "Osage Day," 1 Aplt. App. at 174; (5) the 2005 compact between the Osage Nation and the state of Oklahoma authorizing the Nation to conduct gaming on its "Indian lands" which has resulted in the operation of casinos on fee lands in Osage County, Aplt. Add. at 101-03; (6) the Osage Nation's compacts with the state regarding sharing of revenue from gaming activity and cigarette sales, Atkinson Aff. (2 Aplt. App. at 411-12); Mashunkashey Aff. (2 Aplt. App. at 414-15); (7) a "reservation" sign on a state highway, 1 Aplt. App. at 141; and (8) a map by the Dept. of the Interior and the U.S. Geological Survey depicting the boundaries of an Osage reservation as Osage County, 1 Aplt. App. at 182.  Such evidence is too far removed temporally from the 1906 Act to shed much light on 1906 Congressional intent. See, e.g., Hagen v. Utah, 510 U.S. 399, 420 (1994) (subsequent legislative record "is less illuminating than the contemporaneous evidence" because it does not contain "'deliberate expressions of informal conclusions about congressional intent [at the time of enactment]"').

-16-

C.  Post-enactment History

The final factor used to determine Congressional intent to disestablish is

subsequent events.  Actions by Congress, the Bureau of Indian Affairs (BIA), and

local authorities with regard to the unallotted open lands, "particularly in the years

immediately following the opening, ha[ve] some evidentiary value."  Solem, 465

U.S. at 471.  Express recognition of the continued existence of specific

reservations by Congress in subsequent statutes, of course, supports the continued

existence of a reservation.  See e.g., Seymour, 368 U.S. at 356 (citing statues

enacted 50 years after allotment); Mattz, 412 U.S. at 505.  In contrast, a state's

unquestioned exertion of jurisdiction over an area and a predominantly non-Indian

population and land use supports a conclusion of reservation disestablishment.

Rosebud Sioux, 430 U.S. at 604-05 ("The longstanding assumption of jurisdiction

by the State over an area that is over 90% non-Indian, both in population and in

land use . . . demonstrates the parties' understanding of the meaning of the Act.").

The Court has also explicitly focused on population demographics, noting that

"[w]here non-Indian settlers flooded into the opened portion of a reservation and

the area has long since lost its Indian character, we have acknowledged that *de

facto*, if not *de jure*, diminishment may have occurred."  Solem, 465 U.S. at 471

(acknowledging that this was an "unorthodox and potentially unreliable method of

statutory interpretation," 465 U.S. at 472 n.13, but admitting a desire that the

result be in some general conformance with the modern day balance of the area

demographics, id. at 472 n.12).

The uncontested facts support disestablishment under this prong of the

Solem test.  After enactment, federal officials responsible for the Osage lands

repeatedly referred to the area as a "former reservation" under state jurisdiction.

For example, an annual report from the Superintendent to the Commissioner of

Indian Affairs notes that his office "has experienced no difficulty maintaining

order . . . .  This duty, of course, falls to the County and State Officials."  2 Aplt.

App. at 259 (1916 report); see also 2 Aplt. App. at 263 (1919 report) (same); 2

Aplt. App. at 268 (1920 report) ("Osage County, formerly Osage Indian

Reservation, is organized under the constitution of the State of Oklahoma and the

duty of maintaining order and enforcing the law is primarily in the hands of the

County officials."); 2 Aplt. App. at 272 (1921 report) (same); 2 Aplt. App. at 276

(1922 report) (same).  Such "'jurisdictional history' . . . demonstrates a practical

acknowledgment that the Reservation was diminished."  Hagen, 510 U.S. at 421.

Compare Solem, 465 U.S. at 480 (not finding diminishment where "tribal

authorities and Bureau of Indian Affairs personnel took primary responsibility for

policing . . . the opened lands during the years following [the opening in] 1908")

with Hagen, 510 U.S. at 421 (finding diminishment where "[t]he State of Utah

exercised jurisdiction over the opened lands from the time the reservation was

opened").

In addition, uncontested population demographics demonstrate a dramatic

-18-

shift in the population of Osage County immediately following the passage of the

Osage Allotment Act.  From the 1907 Special Census following the founding of

Oklahoma to the 1910 Census, Osage County's population grew by a third.

Glimpse Aff., ¶ 9 (2 Aplt. App. at 307-08); 2 Aplt. App. at 319-29 (census data for

1907, 1910, 1920, and 1930).  By 1910, Osage Indians represented roughly six

percent of the Osage County population.  Glimpse Aff., ¶ 9 (2 Aplt. App. at 307-

08).  From 1910 to 1920, the county's population grew by 82%, but the Indian

population in the county (not limited to Osage Indians) dropped to roughly 3

percent.  Glimpse Aff., ¶ 10 (2 Aplt. App. at 308).  As of the 2000 Census, Osage

County was 84% non-Indian, Osage Indians accounting for 3.5% of the county's

population.  Glimpse Aff., ¶ 14 (2 Aplt. App. at 309); 2 Aplt. App. at 331 (2000

population demographics map for Osage County).

Land ownership also dramatically shifted from tribal members to

nonmembers through certificates of competency.  By 1957, 1.1 million of the 1.4

million-acre county was alienated from trust/restricted status, Baird at 83 (2 Aplt.

App. at 239), and as of 1972, just 231,070 acres remained in restricted ownership.

1 Aplt. App. at 89.  As of 2008, the United States holds about 0.04% of the total

land in Osage County in trust for the Osage Nation.  Harwell Aff., ¶¶ 3-6 (2 Aplt.

App. at 291-92).  Like in <u>Hagen</u>, we think "[t]his 'jurisdictional history,' as well

as the current population situation in [Osage County], demonstrates a practical

acknowledgment that the Reservation was diminished."  <u>Hagen</u>, 510 U.S. at 421.

We conclude that the Osage reservation has been disestablished by Congress.[1]  As a result, we need not reach whether tribal members who reside and earn income on fee lands located within the geographic boundaries of a reservation are exempt from state income tax.  We also need not address the district court's application of laches to this case, although we note that the Nation concedes that Oklahoma has had a "long-standing practice of asserting jurisdiction" in Osage County.  2 Aplt. App. at 356.  "[T]he longstanding assumption of jurisdiction by the State over an area that is [predominantly] non-Indian, both in population and in land use, may create justifiable expectations" that "merit heavy weight." City of Sherrill, 544 U.S. at 215-16 (internal quotation marks and citations omitted) (applying laches, acquiescence, and impossibility to preclude the Oneida Indian Nation's requested relief).

---

[1]  In reaching this conclusion, we have also carefully considered the other arguments raised by the Nation including: (1) that tribal, federal, and state sovereign authorities currently co-exist within the reservation's boundaries, Aplt. Br. at 19, 33-34; (2) that the district court improperly relied on judicial statements involving other tribes and reservations in Oklahoma, Aplt. Br. at 24; (3) that the district court improperly relied on "modern academic commentary of historians and demographers, post hoc commentary which has little probative value" and "is not subject to the legal standards applied by the Supreme Court," Aplt. Reply Br. at 11-12, Aplt. Br. at 24; (4) that the district court placed undue reliance on modern-day demographics, Aplt. Br. at 41-42; and (5) that the Defendants' 2000 census data is misleading and underrepresents the Osage, Aplt. Reply Br. at 16-17.  To the extent these arguments are not subsumed by our analysis, we are not persuaded.

AFFIRMED.

The motion to withdraw as attorney filed by Kathryn L. Bass is GRANTED.