# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **OSAGE NATION,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| *v.* ) | **Case No. 01-CV-0516-JDR-MTS** |
| ) | |
| **Mark WOOD, Chairman,** ) | **PLAINTIFF'S MEMORANDUM IN SUPPORT** |
| **Oklahoma Tax Commission;** ) | **OF RULE 60(b) MOTION FOR RELIEF** |
| **Shelly PAULK, Vice Chairwoman,** ) | **FROM JUDGMENT** |
| **Oklahoma Tax Commission; and** ) | |
| **Charles PRATER, Secretary,** ) | |
| **Oklahoma Tax Commission,** ) | |
| **in their official capacities,** ) | |
| ) | |
| *Defendants.* ) | |
| ) | |

Clinton N. Patterson
Attorney General
OSAGE NATION
1071 Grandview Lane
Pawhuska, OK 74056
(918) 287-5514
*cpatterson@osagenation-nsn.gov*

Eugene Bertman
TALLEY, TURNER, STICE & BERTMAN
130 E. Eufaula St.
Norman, OK 73069
(405) 364-8300
*gbertman@ttsblaw.com*

Simon A. Steel[*]
V. Heather Sibbison
Camille Bacon-Schulte[**]
DENTONS US LLP
1900 K Street NW, Ste. 100
Washington, DC 20006
(202) 496-7077
*simon.steel@dentons.com*
*heather.sibbison@dentons.com*
*camille.bacon-schulte@dentons.com*

*Counsel for Plaintiff Osage Nation*

---

[*] Admitted in New York, not DC.

[**] *Pro hac vice* motion pending; admitted in Colorado, not DC.

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY ......................................................................1

STATEMENT ..........................................................................................................4

    A.  *Osage History And The Establishment Of The Osage Reservation* ...............4

    B.  *The Allotment Era* ......................................................................................5

    C.  *The Oklahoma Enabling Act Of 1906* ........................................................6

    D.  *The Osage Allotment Act Of 1906* ............................................................7

    E.  *Congressional And Judicial Recognition Of The Osage Nation's Continued Sovereignty Over Its Reservation After 1906* .......................9

    F.  *The 2001-2009* Irby *Litigation In This Court Finding Disestablishment* ........................10

    G.  *The Tenth Circuit's 2010* Irby *Decision* ..............................................12

    H.  *The* McGirt *Decision And Its Progeny* ................................................14

APPLICABLE LEGAL STANDARDS .................................................................16

ARGUMENT ..........................................................................................................17

I.   **The *Irby* Judgment Was Predicated On A Legal Test, An Analysis, And A Factual Premise That Cannot Survive *McGirt*** ................................17

II.  **Under The *McGirt* Test, The Osage Nation's Reservation Remains Intact** ...................26

    A.  *There Are No Differences Between The Legal Histories Of The Osage Nation And The Muscogee (Creek) Nation That Could Justify Deeming The Osage Reservation Disestablished While The Creek Reservation Has Been Determined To Remain Intact* ......................................27

        1.  The Oklahoma Enabling Act Of 1906 Applied Equally To The Osage Nation And The Creek Nation ......................................27

        2.  The Osage Allotment Provisions Are At Least As Protective Of Reservation Integrity As The Creek Allotment Provisions ....................29

        3.  Congressional Recognition Of Continued Tribal Authority Over The Reservation Is At Least As Clear For The Osage Nation As For The Creek Nation ......................................33

    B.  *There Are No Differences Between The Legal Histories Of The Osage Nation And The Cherokee, Chickasaw, Choctaw, Seminole, Quapaw And Wyandotte Nations And The Ottawa And Peoria Tribes That Could Justify Deeming The Osage Reservation Disestablished While The Other Tribes' Reservations Have Been Determined To Remain Intact* ......................................36

**III. Relief Under Rule 60(b) Is Warranted** ................................................................. 38

    *A. Relief From Judgment Is Appropriate Under Either Rule 60(b)(5) Or Rule 60(b)(6), As* Repsis *Demonstrates* ................................................................. 38

        1. <u>Rule 60(b)(5)</u> ................................................................................. 38

        2. <u>Rule 60(b)(6)</u> ................................................................................. 44

    *B. This Motion Is Timely Under Rule 60(c)* ................................................ 45

**CONCLUSION** ........................................................................................................ 48

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agostini v. Felton*,
    521 U.S. 203 (1997)................................................................................16, 39, 40

*Bosse v. State*,
    484 P.3d 286, *vacated on other grounds*,
    499 P.3d 771 (Okla. Crim. App. 2021)........................................................ 14-15, 36

*Buck v. State*,
    525 P.3d 39 (Okla. Crim. App. 2023)..............................................................37

*Carr v. United States*,
    560 U.S. 438 (2010)..............................................................................28

*Choteau v Burnet*,
    283 U.S. 691 (1931)..............................................................................32

*Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua
    S.A.B. de C.V.*,
    58 F.4th 429 (10th Cir. 2023) ..................................................................16

*Crow Tribe of Indians v. Repsis*,
    2024 WL 1478580 (D. Wyo. Mar. 28, 2024) ...........................................3, 42, 43, 44

*Crow Tribe of Indians v. Repsis*,
    73 F.3d 982 (10th Cir. 1995) ..................................................................42

*Crow Tribe of Indians v. Repsis*,
    74 F.4th 1208 (10th Cir. 2023) ...............................3, 16, 17, 38, 42, 43, 45, 46

*DeCoteau v. District Court*,
    420 U.S. 425 (1975)..............................................................................23

*Farm Credit Bank of Baltimore v. Ferrera-Goitia*,
    316 F.3d 62 (1st Cir. 2003)......................................................................45

*Fischer v. United States*,
    603 U.S. 480 (2024)..............................................................................38

*Grayson v. State*,
    485 P.3d 250 (Okla. Crim. App. 2021)........................................................14, 36

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*,
    484 U.S. 49 (1987)..............................................................................28

*Herrera v. Wyoming,*
    587 U.S. 329 (2019).................................................................................41, 43

*Horne v. Flores,*
    557 U.S. 433 (2009)..........................................................................16, 38, 39, 40

*Kemp v. United States,*
    596 U.S. 528 (2022).................................................................................16, 45

*Klapprott v. United States,*
    335 U.S. 601 (1949).................................................................................16, 45

*Klein v. United States,*
    880 F.2d 250 (10th Cir. 1989) ........................................................................38

*Labadie v. United States,*
    51 Pac. 666 (Okla. 1897) ............................................................................4, 5

*Logan v. Andrus,*
    640 F.2d 269 (10th Cir. 1981) ...................................................................8, 9, 35

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024)..................................................................................22

*Martinez v. State,*
    502 P.3d 1115 (Okla. Crim. App. 2021) ..............................................................37

*Mattz v. Arnett,*
    412 U.S. 481 (1973)................................................................................18, 31

*McCauley v. State,*
    548 P.3d 461 (Okla. Crim. App. 2024).....................................3, 15, 43, 44, 46, 48

*McCurdy v. United States,*
    246 U.S. 263 (1918)......................................................................................32

*McGirt v. Oklahoma,*
    591 U.S. 894 (2020).................................................................... *passim*

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
    526 U.S. 172 (1999)...........................................................................23, 42, 46

*Montana v. Blackfeet Tribe of Indians,*
    471 U.S. 759 (1985)......................................................................................23

*Murphy v. Royal,*
    875 F.3d 896 (10th Cir. 2017), *aff'd sub nom. Sharp v. Murphy,*
    591 U.S. 977 (2020)............................................................................. 17-18, 27

iv

*Nebraska v. Parker*,
    577 U.S. 481 (2016)............................................................................9, 18, 20, 31, 40

*New Prime, Inc. v. Oliveira*,
    586 U.S. 105 (2019).........................................................................................22

*Oklahoma v. Castro-Huerta*,
    597 U.S. 629 (2022)...............................................................................22, 25, 47

*Osage Nation v. Irby*,
    597 F.3d 1117 (10th Cir. 2010) ..................................................... *passim*

*Osage Nation v. Oklahoma*,
    597 F. Supp. 2d 1250 (N.D. Okla. 2009)...........................................................1, 12

*Osage Nation v. Oklahoma ex rel. Okla. Tax Comm'n*,
    260 Fed. Appx. 13 (10th Cir. 2007)..................................................................11

*Osage Tribe of Indians of Oklahoma v. United States*,
    72 Fed. Cl. 629 (C.F.C. 2006)..........................................................................10

*Pierce v. Cook & Co., Inc.*,
    518 F.2d 720 (10th Cir. 1975) .........................................................................45

*Rufo v. Inmates of Suffolk County Jail*,
    502 U.S. 367 (1992)...............................................................................16, 39, 41

*Seymour v. Sup't of Wash. State Penitentiary*,
    368 U.S. 351 (1962)............................................................................18, 31, 33, 41

*Sizemore v. State*,
    485 P.3d 867 (Okla. Crim. App. 2021)..............................................................14, 36

*Solem v. Bartlett*,
    465 U.S. 463 (1984)...............................................................................1, 35, 40

*South Dakota v. Yankton Sioux Tribe*,
    522 U.S. 329 (1998)....................................................................................30, 37

*Spears v. State*,
    485 P.3d 873 (Okla. Crim. App. 2021)..............................................................14, 36

*Standard Oil Co. of Calif. v. United States*,
    429 U.S. 17 (1976).......................................................................................17, 38

*State v. Brester*,
    531 P.3d 125 (Okla. Crim. App. 2023)..............................................................14, 37

*State v. Fuller*,
    547 P.3d 149 (Okla. Crim. App. 2024)..........................................................14, 37

*State v. Lawhorn*,
    499 P.3d 777 (Okla. Crim. App. 2021)..........................................................14, 36

*United States v. Felter*,
    752 F.2d 1505 (10th Cir. 1985) .........................................................................23

*Ward v. Race Horse*,
    163 U.S. 504 (1896)...........................................................................................42

*West v. Oklahoma Tax Comm'n*,
    334 U.S. 717 (1948)...........................................................................................32

*Whitebuffalo v. State*,
    Okla. C.C.A. No. F-2021-429 (summary opinion not for publication, dated
    Dec. 8, 2022)......................................................................................................37

*Yapp v. Excel Corp.*,
    186 F.3d 1222 (10th Cir. 1999) .....................................................................16, 45

*Young v. State*,
    Okla. C.C.A. No. PC-2020-954 (summary opinion not for publication, dated
    Sept. 20, 2021) ..................................................................................................15

*Ysleta Del Sur Pueblo v. Texas*,
    596 U.S. 685 (2022).............................................................................................23

**Federal Statutes and Treaties**

1 U.S.C. § 1 ................................................................................................................28

7 U.S.C. § 1985(e)(1)(A)(ii) ....................................................................................34

15 U.S.C. § 657a(b)(5)(C)(i)(II) ..............................................................................34

18 U.S.C. § 1151(a) .............................................................................................14, 41

18 U.S.C. § 1152 .........................................................................................................3

18 U.S.C. § 1153 .........................................................................................................3

25 U.S.C. § 339................................................................................................... 6, 29

25 U.S.C. § 1603(16)(B)(i) .......................................................................................34

25 U.S.C. § 1918(b)(1)(ii).........................................................................................34

25 U.S.C. § 2206(d)(1) ........................................................................................................34

25 U.S.C. § 2703 ................................................................................................................12

25 U.S.C. § 2719(a)(2)(A)(i) ...............................................................................................34

25 U.S.C. § 3103(12) ..........................................................................................................34

28 U.S.C. § 1341 ................................................................................................................11

40 U.S.C. § 523(b)(2)(A) ....................................................................................................34

42 U.S.C. § 1396a(ff)(1) ......................................................................................................34

42 U.S.C. § 2992c(3) ...........................................................................................................34

43 U.S.C. § 593 ..................................................................................................................34

43 U.S.C. § 647 ..................................................................................................................34

47 U.S.C. § 1705(a)(13)(A)(i) .............................................................................................34

1808 Osage Treaty, 7 Stat. 107:

    art. V, 7 Stat. 108 ........................................................................................................30

    art. VI, 7 Stat. 108 .......................................................................................................30

1818 Osage Treaty, art. I, 7 Stat. 184 ................................................................................30

1825 Osage Treaty, art. I, 7 Stat. 240 ................................................................................30

1839 Osage Treaty, art. I, 7 Stat. 576 ................................................................................30

1865 Osage Treaty, 14 Stat. 687 ..........................................................................................4

    art. I, 14 Stat. 687 .......................................................................................................30

Act of July 15, 1870, ch. 296, § 12, 16 Stat. 362 ...............................................................4

Act of June 5, 1872, ch. 310, 17 Stat. 228 ..........................................................................4

Act of Mar. 3, 1873, ch. 228, 17 Stat. 530 ..........................................................................5

Act of Aug. 7, 1882, ch. 434, 22 Stat. 341:

    § 1, 22 Stat. 341 .........................................................................................................31

    § 2, 22 Stat. 341 .........................................................................................................31

Act of Mar. 3, 1891, ch. 543, art. I, 26 Stat. 1022 ........................................................37

Act of Sept. 9, 1891, ch. 203, art. I, 27 Stat. 557..........................................................37

Act of Mar. 3, 1893, ch. 209, § 16, 27 Stat. 612 .............................................................6

Act of June 28, 1898, ch. 517, 30 Stat. 495:

    §§ 11-12, 30 Stat. 497-98 .........................................................................................6

    § 29, 30 Stat. 505-13 ..................................................................................................6

    § 30, 30 Stat. 514-19 ..................................................................................................6

Act of July 1, 1898, ch. 542, 30 Stat. 567......................................................................6

Act of June 2, 1900, ch. 610, 31 Stat. 250 .....................................................................6

Act of June 6, 1900, ch. 813, art. I, 31 Stat. 677...........................................................37

Act of Mar. 1, 1901, ch. 676, 31 Stat. 861 .....................................................................6

Act of June 30, 1902, ch. 1323, 32 Stat. 500 .................................................................6

Act of July 1, 1902, ch. 1362, 32 Stat. 641 ....................................................................6

Act of July 1, 1902, ch. 1375, 32 Stat. 716 ....................................................................6

Act of May 27, 1908, ch. 199, 35 Stat. 312 ............................................................14, 29

    § 1, 35 Stat. 312 ........................................................................................................32

    § 13, 35 Stat. 316 ......................................................................................................34

Act of May 29, 1924, ch. 210, 43 Stat. 244 ..................................................................10

Act of Mar. 2, 1929, ch. 493, 45 Stat. 1478:

    § 1, 45 Stat. 1478-79 ..................................................................................................8

    § 7, 45 Stat. 1481 ......................................................................................................35

Act of June 24, 1938, ch. 645, § 3, 52 Stat. 1035 ...........................................................8

Act of Oct. 6, 1964, Pub. L. No. 88-632, 78 Stat. 1008..................................................8

Act of Oct. 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660:

    § 1, 92 Stat. 1660 ............................................................................................9, 10, 35

§ 2, 92 Stat. 1660 ...........................................................................................................8, 10

Colville Indian Reservation Surplus Lands Act, ch. 1126, 34 Stat. 80 (1906) .............................33

§ 3, 34 Stat. 80-81 .........................................................................................................31

§ 4, 34 Stat. 81 ..............................................................................................................31

§ 6, 34 Stat. 81-82 .........................................................................................................31

Creek Allotment Act, ch. 676, 31 Stat. 861 (1901) ...........................................................6, 14, 29

§ 3, 31 Stat. 862-63 .......................................................................................................30

Five Civilized Tribes Act, ch. 1876, 34 Stat. 137 (1906) ........................................................14

§ 28, 34 Stat. 148 ..........................................................................................................34

General Allotment Act, ch. 119, 24 Stat. 388 (1887):

§ 5, 24 Stat. 389 ............................................................................................................31

§ 8, 24 Stat. 291 ..............................................................................................................6

Klamath River Indian Reservation Act Lands Disposition Act, ch. 120, 27 Stat. 52 (1892) ...........................................................................................................31

Oklahoma Enabling Act, ch. 3335, 34 Stat. 267 (1906) ...........................................................6

§ 1, 34 Stat. 267-68 ....................................................................................................7, 27

§ 2, 34 Stat. 268-69 ....................................................................................................6, 28

§ 3, 34 Stat. 269-71 ....................................................................................................7, 27

§ 21, 34 Stat. 277-78 ......................................................................................................29

Osage Allotment Act, ch. 3572, 34 Stat. 539 (1906) .................................................................7

§ 2, 34 Stat. 540-43 .............................................................................................7, 8, 31, 32

§ 3, 34 Stat. 543-44 ...................................................................................................8, 32

§ 4, 34 Stat. 544 ........................................................................................................8, 33

§ 9, 34 Stat. 545 ....................................................................................................8, 9, 35

§ 10, 34 Stat.545 .......................................................................................................8, 33

§ 11, 34 Stat. 545 ......................................................................................................8, 33

Osage Sovereignty Act, Pub. L. 108-431, 118 Stat. 2609 (2004)....................................................10

Tribal Law and Order Act of 2010, Pub. L. 111-211, tit. II, 124 Stat. 2258 ............................2, 47

Violence Against Women Reauthorization Act of 2013, Pub. L. 113-4, tit. IX, 127 Stat. 54, 118-26 ........................................................................... 2-3, 47

Violence Against Women Reauthorization Act of 2022, Pub. L. 117-103, div. W, tit. VIII(A), 136 Stat. 840, 895-904 ................................................................. 2-3, 47

**Oklahoma Laws**

Okla. Const., art. XVII, § 8.........................................................................................6, 29

**Osage Laws**

Osage Const., art. VI ...................................................................................................9

Osage Nation Code .......................................................................................................9

    Title 11, Education...............................................................................................9

    Title 16, Health and Wellness............................................................................9

    Title 18, Housing .................................................................................................9

1881 Osage Nation Constitution....................................................................................5

**Rules**

Fed. R. Civ. P. 60:

    60(b)(5) ..........................................................................................................16, 38

    60(b)(6) .......................................................................................................... 16, 38

    60(c)(1) ...........................................................................................................16, 45

**Legislative History**

*Hearings on H.R. 1478 [sic] before a Subcommittee of the Committee on Indian Affairs of the House of Representatives* (GPO 1905) .............................................19

*Hearings on H.R. 17478 before a Subcommittee of the Committee on Indian Affairs of the House of Representatives*, vol. II (GPO 1905).................................19

H.R. Rep. No. 82-2503, *Investigation of Bureau of Indian Affairs* (1992) .................................10

H.R. Rep. No. 108-502, *To Reaffirm the Inherent Sovereign Rights of the Osage Tribe to Determine its Membership and Form of Government* (2004)....................................10

S. Rep. No. 59-4210, *Division of Lands and Funds of Osage Indians, Oklahoma* (1906)..............................................................................................................................19, 35

S. Rep. No. 108-343, *To Reaffirm the Inherent Sovereign Rights of the Osage Tribe to Determine its Membership and Form of Government* (2004)....................................10

**Other Authorities**

Alex Tallchief Skibine, *The Cautionary Tale of the Osage Indian Nation Attempt to Survive its Wealth*, 9 Kan. J.L. & Pub. Pol'y 815 (2000) ........................................................4

Barbara Moschovidis, Osage Nation v. Irby: *The Tenth Circuit Disregards Legal Precedent to Strip Osage County of its Reservation Status*, 38 Am. Indian L. Rev. 189 (2012) ........................................................................................................40

Letter from Harold D. Cox, Associate Commissioner for Support Services, to Sen. Henry L. Bellmon (Mar. 9, 1971) ........................................................................................21

Memorandum from Nathan R. Margold, Solicitor to the Commissioner of Indian Affairs, 1 Op. Sol. 591 (Dec. 17, 1935)..............................................................................21

Osage Nation, *Law Enforcement Department*, https://www.osagenation-nsn.gov/services/law-enforcement-department ..........................................................................9

Osage Nation, *The Osage Nation Reservation*, https://www.osagenation-nsn.gov/node/10632#;........................................................................................................5

Osage Nation, *Services*, https://www.osagenation-nsn.gov/services.................................................9

*Osage Resolution, Dec. 5, 1905,* National Archives—Fort Worth Record Group 75 Entry 9, Osage Agency, 1905-1205, Box 19, Book 63, pp. 3-5; Osage Journal, Dec. 9, 1905, p.1, col. 1 ..........................................................................................29

Philip H. Tinker, *Is Oklahoma Still Indian Country? "Justifiable Expectations" and Reservation Disestablishment in* Murphy v. Sirmons *and* Osage Nation v. Irby, 9 Dartmouth L.J. 120 (2011) ........................................................................................40

U.S. Office of Indian Affairs, *Annual Report of the Commissioner of Indian Affairs for the Year 1910* (1910)..............................................................................................8

## INTRODUCTION AND SUMMARY

In 2009, this Court ruled that the Reservation of the Osage Nation ("the Nation") had been disestablished, and accordingly dismissed the Nation's suit to confirm its Reservation and preclude the imposition of Oklahoma state income taxes upon the income of Osage Nation members who are employed, earn income and reside on the Osage Reservation. *Osage Nation v. Oklahoma*, 597 F. Supp. 2d 1250 (N.D. Okla. 2009). The Tenth Circuit affirmed that ruling on *de novo* review, applying a three-step test, derived from *Solem v. Bartlett*, 465 U.S. 463 (1984), that involves consideration of (1) "statutory language," (2) "surrounding circumstances," and (3) "subsequent events." The Tenth Circuit identified multiple examples of "statutory language" suggesting the Osage Reservation remained intact, and none even ambiguously suggesting disestablishment. *Osage Nation v. Irby*, 597 F.3d 1117, 1122-24 (10th Cir. 2010) ("*Irby*"). Nevertheless, "despite statutory language that would otherwise suggest unchanged reservation boundaries," the Tenth Circuit found disestablishment based entirely on extratextual factors it considered under the second and third steps of the *Solem* test. *Id.* at 1122; *see also id.* at 1124-27. Central to the court's conclusion were out-of-court statements made years after the 1906 enactment of the Osage Allotment Act and the Oklahoma Enabling Act, including historian opinions that ***all*** reservations in Oklahoma had been disestablished. *See id.* at 1125.

*Irby* cannot be reconciled with the Supreme Court's subsequent decision in *McGirt v. Oklahoma*, 591 U.S. 894 (2020). In *McGirt*, the Supreme Court held that disestablishment requires "explicit" statutory language expressing a "clear and plain" intent to disestablish a reservation, and that reliance on "extratextual sources" for purposes beyond clarifying the meaning of ambiguous statutory terms is improper. *Id.* at 916 (citations omitted). Under *McGirt*, "there is only one place we may look: the Acts of Congress." *Id.* at 903. And that is

1

what the Supreme Court did in *McGirt* when it ruled against Oklahoma, concluding that the Creek Reservation had ***not*** been disestablished.  The Supreme Court repudiated both of *Irby*'s essential premises—its legal premise (use of the three-step test/reliance on extratextual factors) and its factual premise (all reservations in Oklahoma disestablished).

Further, as elaborated at pages 26-38 below, there are no material differences between the statutes pertaining to the Creek Reservation (or the other reservations in Oklahoma that have been held intact in light of *McGirt*) and the statutes pertaining to the Osage Reservation that could justify deeming the former intact but the latter disestablished.  Indeed, the Osage Allotment Act and the Osage-specific provisions of the Oklahoma Enabling Act of 1906 provide, if anything, even less basis for inferring disestablishment than the analogous provisions applicable to the Creek Nation and other Oklahoma tribes that have been held to retain their reservations after *McGirt*.  Accordingly, application of *McGirt* compels the conclusion that the Osage Reservation remains intact.

This Court's judgment in *Irby* (as affirmed by the Tenth Circuit) severely impairs the Nation's authority to regulate its own affairs within its own sovereign territory, and it inflicts multiple ongoing concrete harms on the Nation.  This Court's judgment directly implicates the tax treatment of members of the Nation.  But the effects of this Court's order stating that the Osage Reservation has been disestablished sweep much more broadly, dramatically undermining the Nation's essential sovereign interests.  For example, *Irby* severely limits the authority and resources available to the Nation for law enforcement on its Reservation, including vital law enforcement tools to combat sexual assault, domestic, dating and child violence, sex trafficking and other crimes under the Tribal Law and Order Act of 2010, Pub. L. 111-211, tit. II, 124 Stat. 2258, 2261-2301 and the Violence Against Women Reauthorization Acts of 2013 and 2022, Pub.

2

L. 113-4, tit. IX, 127 Stat. 54, 118-26, and Pub. L. 117-103, div. W, tit. VIII(A), 136 Stat. 840, 895-904.  Further, *Irby* has been the basis for decisions applying state rather than federal criminal law on the Osage Reservation, contrary to the General Crimes Act, 18 U.S.C. § 1152, and the Major Crimes Act, 18 U.S.C. § 1153.  *See, e.g., McCauley v. State*, 548 P.3d 461, 464 (Okla. Crim. App. 2024) (holding that notwithstanding *McGirt, Irby* precluded an Osage defendant from asserting a Major Crimes Act challenge to state court jurisdiction over a crime allegedly committed on the Osage Reservation).  *Irby* thus impedes federal law enforcement and subjects tribal members, and members of other federally recognized tribes, to state law enforcement on the Osage Reservation.

Most fundamentally, *Irby* is a stain on the integrity of the United States, which 150 years ago induced the Nation to cede its prior sovereign territory with a promise of a permanent Reservation where the Nation could exercise its sovereignty and govern itself, and it creates an anomalous exception to the consistent application of the rule of law (as set forth in *McGirt*).

Rule 60(b) of the Federal Rules of Civil Procedure authorizes this Court to vacate its judgment in *Irby*, thereby eliminating the conflict with *McGirt* and relieving the Nation of the profound and ongoing harmful effects of the *Irby* judgment.  As the Tenth Circuit recently confirmed, under Rule 60(b)(5) and (6), appellate affirmance of the prior judgment presents no bar to this Court's authority—and, indeed, obligation—to act, and a new Supreme Court decision repudiating the understanding of tribal treaty and statutory rights upon which the prior judgment was founded presents a compelling basis for relief.  *See Crow Tribe of Indians v. Repsis*, 74 F.4th 1208 (10th Cir. 2023), *and on remand*, 2024 WL 1478580 (D. Wyo. Mar. 28, 2024) ("*Repsis*").

The *Irby* judgment should be vacated.

**STATEMENT**

*A.     Osage History And The Establishment Of The Osage Reservation*[1]

Through the early nineteenth century, the Osage Nation exercised sovereignty over a vast territory encompassing areas of what are now the states of Arkansas, Kansas, Louisiana, Missouri, and of course Oklahoma.[2]  In the nineteenth century, however, both migrants from other tribes and non-Indian immigrants pressed into Osage territory.  In treaties dating from 1808 to 1865, the United States made a series of unfulfilled promises to the Osage Nation that it would curb these constant unwelcome incursions into the Nation's sovereign territory in exchange for ever more land cessions from the Nation.  In the 1865 Treaty, the Osage Nation agreed to cede much of its remaining territory to the United States in exchange for a cash payment (held by the U.S. Treasury in trust for the Nation) and the United States' promise to continue to reserve the remaining territory in Kansas for the Nation.  1865 Osage Treaty, 14 Stat. 687.

Yet only a few years later, in 1870, the United States urged the Osage Nation to make another land cession.  Congress provided for the Nation to cede its existing diminished reservation in Kansas and remove to a new reservation—a "***permanent home***"—in what is now Oklahoma, purchasing the new lands with proceeds from the 1865 sale.  Act of July 15, 1870, ch. 296, § 12, 16 Stat. 335, 362 (emphasis added).  The Nation agreed, and two years later Congress confirmed that the new reservation—the present Osage Reservation in Oklahoma—was "hereby set apart for and confirmed as [the Osage Nation's] reservation."  Act of June 5, 1872, ch. 310, 17 Stat. 228, 229 ("An Act to confirm to the Great and Little Osage Indians a Reservation in the

---

[1] The history outlined in this section was summarized in *Labadie v. United States*, 51 Pac. 666, 668-69 (Okla. 1897).

[2] *See, e.g.,* Alex Tallchief Skibine, *The Cautionary Tale of the Osage Indian Nation Attempt to Survive its Wealth*, 9 Kan. J.L. & Pub. Pol'y 815, 819 (2000).

Indian Territory").[3]

On that Reservation, the Osage Nation has exercised sovereignty, "maintain[ing] a tribal form of government,"[4] preserved its culture, taken care of its people, and built a successful economy.  In 1881, the Osage Nation adopted a constitution providing for a three-branch separation-of-powers government, with legislative power vested in a National Council, executive power in a Principal Chief, and judicial power in a supreme court and inferior courts as established by the National Council.  *See* 1881 Osage Nation Constitution.

B.    *The Allotment Era*

The 1880s brought new efforts by non-Indian settlers to take Indian lands.  With an eye to facilitating that eventual outcome, their allies in Congress adopted an allotment policy.  As the Supreme Court summarized it in *McGirt*:

> Starting in the 1880s, Congress sought to pressure many tribes to abandon their communal lifestyles and parcel their lands into smaller lots owned by individual tribe members.  Some allotment advocates hoped that the policy would create a class of assimilated, landowning, agrarian Native Americans.  Others may have hoped that, with lands in individual hands and (eventually) freely alienable, white settlers would have more space of their own. . . .
>
> [A]llotment was often the first step in a plan ultimately aimed at disestablishment [of tribal reservations]. . . . Congress's expressed policy at the time "was to continue the reservation system and the trust status of Indian lands, but to allot tracts to individual Indians for agriculture and grazing."  Then, "[w]hen all the lands had been allotted and the trust expired, the reservation could be abolished."  This plan was set in motion nationally in the General Allotment Act of 1887 . . . No doubt, this is why Congress at the turn of the 20th century "believed to a man" that "the reservation system would cease" "within a generation at most."

*McGirt*, 591 U.S. at 904, 907-08 (citations omitted).

---

[3] For further details, *see* Act of Mar. 3, 1873, ch. 228, 17 Stat. 530, 538; Osage Nation, *The Osage Nation Reservation,* https://www.osagenation-nsn.gov/node/10632#*; Labadie*, 51 Pac. at 668.

[4] *Labadie,* 51 Pac. at 669.

Congress expressly excluded from the General Allotment Act of 1887 the reservations of the Osage and several other tribes in Oklahoma, including the Cherokee, Chickasaw, Choctaw, Creek and Seminole Nations (the "Five Tribes"), the Sac and Fox, the Miami, and the Peoria. Act of Feb. 8, 1887, ch. 119, § 8, 24 Stat. 388, 391, *codified at* 25 U.S.C. § 339. Nevertheless, the Federal Government pressured these tribes to accept allotment. In 1893, Congress created the Dawes Commission to negotiate with the Five Tribes and administer allotment of their reservations, *see* Act of Mar. 3, 1893, ch. 209, § 16, 27 Stat. 612, 645-46. Over the next decade, Congress provided for allotment of each of the Five Tribes' reservations.[5] By the time Congress enacted the Oklahoma Enabling Act in 1906, the Osage Reservation was the last reservation remaining in Oklahoma that Congress had not subjected to allotment.

C.    *The Oklahoma Enabling Act Of 1906*

Oklahoma was established as a state, effective upon its adoption of a state constitution in 1907 by the Oklahoma Enabling Act, Act of June 16, 1906, ch. 3335, 34 Stat. 267. That Act expressly acknowledged the existence of the "Osage Indian Reservation," *id.* § 2, 34 Stat. at 268, and it provided that in forming the new state, the Oklahoma constitutional convention "shall constitute the Osage Indian Reservation a separate county," *id.* § 21, 34 Stat. at 277.[6]

The Oklahoma Enabling Act contains no language disestablishing the Osage (or any

---

[5] *See* Act of June 28, 1898, ch. 517, §§ 11-12, 30 Stat. 495, 497-98 (authorizing process for preparing allotment of Five Tribes' reservations); *id.* § 29, 30 Stat. at 505-13 (Choctaw and Chickasaw); *id.* § 30, 30 Stat. at 514-19 (Creek); Act of July 1, 1898, ch. 542, 30 Stat. 567, *amended by* Act of June 2, 1900, ch. 610, 31 Stat. 250 (Seminole); Act of Mar. 1, 1901, ch. 676, 31 Stat. 861, *amended by* Act of June 30, 1902, ch. 1323, 32 Stat. 500 (Creek); Act of July 1, 1902, ch. 1375, 32 Stat. 716 (Cherokee); Act of July 1, 1902, ch. 1362, 32 Stat. 641 (Choctaw and Chickasaw).

[6] When it was adopted in late 1907—more than a year after passage of the Oklahoma Enabling Act and the Osage Allotment Act of 1906—the Oklahoma Constitution provided (as it still does today) that "*[t]he Osage Indian Reservation with its present boundaries* is hereby constituted one county to be known as Osage County." Okla. Const., art. XVII, § 8 (emphasis added).

other) Reservation, nor any language abrogating any treaty rights.  To the contrary, Congress

explicitly provided that the new State of Oklahoma must

> forever disclaim all right and title in or to . . . all lands lying within said limits
> owned or held by any Indian, tribe, or nation; and that until the title to any such . .
> . land shall have been extinguished by the United States, the same shall be and
> remain subject to the jurisdiction, disposal, and control of the United States.

Oklahoma Enabling Act § 3, ¶3, 34 Stat. at 270.  It further provided that nothing in the

Oklahoma Constitution

> shall be construed to limit or impair the rights of person or property pertaining to
> the Indians of said Territories (so long as such rights shall remain unextinguished)
> or to limit or affect the authority of the Government of the United States to make
> any law or regulation respecting such Indians, their lands, property, or other rights
> by treaties, agreement, law, or otherwise, which it would have been competent to
> make if this Act had never been passed.

*Id.* § 1, 34 Stat. at 267-68.

> D.    *The Osage Allotment Act Of 1906*

Twelve days after it enacted the Oklahoma Enabling Act, Congress enacted the Osage

Allotment Act, Act of June 28, 1906, ch. 3572, 34 Stat. 539.  The Allotment Act provided that

most land within the Osage Reservation would be allocated to individual Osage members.  *Id.* §

2, 34 Stat. at 540; *id.* § 2, ¶5, 34 Stat. at 541.[7]  Each member was entitled to a 160-acre

"homestead" plus additional "surplus land," with the homestead being permanently "inalienable

and nontaxable" and the surplus land being inalienable for 25 years, *id.* § 2, ¶4, 34 Stat. at 541,

except that the Secretary of Interior could issue a certificate of competency authorizing

alienation (with alienation leading to taxation) of surplus land at any time or of homestead land

---

[7] The Allotment Act excluded three villages (Hominy Indian Village, Grayhorse Indian Village, and Pawhuska Indian Village) from allotment, along with a few parcels of land for specific public purposes, such as schools, the Nation's governmental headquarters, and a cemetery.

after 25 years or the death of the allottee, *id.* § 2, ¶7, 34 Stat. at 542.[8]  The Act reserved to the Nation for 25 years—which Congress subsequently extended in perpetuity[9]—all mineral rights underlying the Reservation, as well as the proceeds therefrom, and it provided that all leases of the mineral estate were to be made by the Osage Tribal Council with the approval of the Secretary of the Interior.  Osage Allotment Act § 3, 34 Stat. at 543-44.

The Allotment Act expressly preserved the Nation's authority to govern itself, affirming the general tribal authority of the Osage Tribal Council.  *See id.* § 9, 34 Stat. at 545; *Logan v. Andrus*, 640 F.2d 269, 270 (10th Cir. 1981).  The Act also acknowledged the continued existence of the Reservation in several provisions.  For example, it created a fund "for the support of the Osage Boarding School and for other schools ***on the Osage Indian Reservation***." Osage Allotment Act § 4, ¶3, 34 Stat. at 544 (emphasis added).  It regulated the establishment of highways and roads within "***the Osage Indian Reservation***."  *Id.* § 10, 34 Stat. at 545 (emphasis added).  And it protected from allotment lands earlier acquired by railroads within the "***Osage Reservation***," while affirming that the Nation nevertheless retained ownership of the mineral estate beneath those lands (the railroad companies "shall not take or acquire hereby any right or title to any oil, gas or other mineral in any of said lands").  *Id.* § 11, 34 Stat. at 545 (emphasis added).

What is ***not*** in the Osage Allotment Act is any language whatsoever about

---

[8] Allotment of Osage lands took four years to complete.  All allotment deeds were executed by the Principal Chief of the Osage Nation and approved by the Secretary of Interior.  *See* U.S. Office of Indian Affairs, *Annual Report of the Commissioner of Indian Affairs for the Year 1910*, at 47 (1910).

[9] *See* Act of Mar. 2, 1929, ch. 493, § 1, 45 Stat. 1478, 1478-79 (extending the mineral trust through 1959); Act of June 24, 1938, ch. 645, § 3, 52 Stat. 1034, 1035 (extending the mineral trust through 1983); Act of Oct. 6, 1964, Pub. L. No. 88-632, 78 Stat. 1008, 1008 (extending the mineral trust indefinitely subject to future legislation); Act of Oct. 21, 1978, Pub. L. No. 95-496, § 2, 92 Stat. 1660 (extending mineral trust in perpetuity).

disestablishment or diminishment of the Reservation.  There is no reference to "cession or other language evidencing the present and total surrender of all tribal interests."  *McGirt*, 591 U.S. at 904 (quoting *Nebraska v. Parker*, 577 U.S. 481, 488 (2016) ("*Parker*")).  None of the typical indicators of disestablishment are present—nearly the entire Reservation was reserved for allotments to Osage members, no surplus lands were set aside for settlement by non-Indians, and no sum-certain was paid to the Nation (as was customary to compensate tribes when they ceded lands).  *See Irby,* 597 F.3d at 1124.

> E.    *Congressional And Judicial Recognition Of The Osage Nation's Continued Sovereignty Over Its Reservation After 1906*

While *McGirt* makes clear that extratextual evidence is irrelevant where there is no statutory ambiguity, it bears noting that from 1906 to the present, the Osage Nation has continued to exercise sovereignty over its Reservation.[10]  The Nation has and enforces on its Reservation its own civil and criminal laws;[11] it has its own police department;[12] and it provides educational,[13] social,[14] housing,[15] and other government services[16] on the Reservation.

Further, the existence of the Osage Reservation and the Nation's continued sovereignty

---

[10] Through 2006, the Osage Tribal Council continued to exercise plenary legislative authority on behalf of the Nation, as repeatedly recognized and supported by the courts and the Congress of the United States.  *See, e.g., Logan*, 640 F.2d at 270; Act of Oct. 21, 1978, Pub. L. No. 95-496, § 1, 92 Stat. 1660; Osage Allotment Act § 9, 34 Stat. at 545.  In 2006, the Osage Nation adopted a new constitution, which vests legislative power in the Osage National Congress.  Osage Const., art. VI, https://osage.nation.codes/Constitution.

[11] *See* Osage Nation Code, https://osage.nation.codes/.

[12] *See* Osage Nation, *Law Enforcement Department,* https://www.osagenation-nsn.gov/services/law-enforcement-department.

[13] *See* Osage Nation Code, Title 11, Education.

[14] *See* Osage Nation Code, Title 16, Health and Wellness.

[15] *See* Osage Nation Code, Title 18, Housing.

[16] *See generally* Osage Nation, *Services,* https://www.osagenation-nsn.gov/services.

9

over it has continued to be recognized in various ways by Congress and the federal courts.  For example:

- As noted in section D above, Congress repeatedly has recognized the Nation's "tribal government," and repeatedly extended—now in perpetuity—the Reservation-wide mineral trust on behalf of the Nation as a whole.  *See, e.g.*, Act of Oct. 21, 1978, Pub. L. No. 95-496, §§ 1-2, 92 Stat. 1660;

- In the Act of May 29, 1924, ch. 210, 43 Stat. 244, 244, Congress provided for regulation of oil and gas leases on "unallotted land on Indian reservations other than lands of the Five Civilized Tribes ***and the Osage Reservation***" (emphasis added);

- A 1952 congressional report noted that "[s]tate jurisdiction exercised on ***Osage Reservation*** . . . is subject to attack due to absence of congressional authority." H.R. Rep. No. 82-2503, *Investigation of Bureau of Indian Affairs* at 109 n.11 (1992) (emphasis added);

- In 2004, Congress enacted the Osage Sovereignty Act, Pub. L. 108-431, 118 Stat. 2609.  Both Senate and House reports on that legislation recorded that the Nation "is a Federally recognized tribe ***with a nearly 1.5 million-acre reservation***" in Oklahoma.  S. Rep. No. 108-343, *To Reaffirm the Inherent Sovereign Rights of the Osage Tribe to Determine its Membership and Form of Government* at 1 (2024) (emphasis added); *accord* H.R. Rep. No. 108-502, *To Reaffirm the Inherent Sovereign Rights of the Osage Tribe to Determine its Membership and Form of Government* at 1 (2004).  The House report noted that the House Committee had held a hearing on the bill "on ***the Osage Reservation*** on March 10, 2004." *Id.* (emphasis added);

- In *Osage Tribe of Indians of Oklahoma v. United States,* 72 Fed. Cl. 629 (C.F.C. 2006), the court adopted the United States' express stipulation that "***[t]he Osage Reservation*** encompasses all of present-day Osage County, located in northern Oklahoma, and covers approximately 1.47 million acres."  *Id.* at 633 (emphasis added).

F.      The *Irby Litigation In This Court Finding Disestablishment*

The Osage Nation filed this suit in 2001.  As articulated in its second amended complaint filed in 2008, the Nation sued the members of the Oklahoma Tax Commission ("OTC"), in their official capacities, for (1) a declaration that the Osage Reservation had not been disestablished and remained intact as per the 1870 and 1872 statutes; and (2) declaratory and injunctive relief to the effect that "the Nation's members who both earn income and reside within the geographical

boundaries of the Nation's reservation are not subject to or required to pay taxes to the State and the OTC on the income earned by the Nation's members from their employment in the Indian country of the Nation." 2d Am. Compl., D.E. 70, at 6 (filed Apr. 11, 2008).

OTC moved to dismiss the case under the Eleventh Amendment and the Tax Injunction Act, 28 U.S.C. § 1341, but this Court denied that motion, and its ruling was upheld on appeal. *Osage Nation v. Oklahoma ex rel. Okla. Tax Comm'n*, 260 Fed. Appx. 13 (10th Cir. 2007). OTC then moved to dismiss for failure to state a claim, contending that since 1906 "there are no reservations in Oklahoma." D.E. 72, at 7 (filed May 30, 2008). Since OTC relied on evidence outside the complaint, the Court converted its motion to one for summary judgment. D.E. 78 (Sept. 18, 2008). On September 26, 2008, OTC filed a further brief and evidence (comprised of three affidavits and three extracts from publications) in support of summary judgment, arguing that "The Nation's claim that its Reservation continues to exist is without merit, because the Osage Reservation was disestablished by the Oklahoma Enabling Act and the Osage Allotment Act." D.E. 79, at 8 (filed Sept. 26, 2008).

The Nation rebutted OTC's arguments,[17] underscoring that nothing in the Oklahoma Enabling Act or the Osage Allotment Act expressly or even impliedly disestablished the Osage Reservation; that clear congressional language is required for disestablishment; that under Supreme Court precedent, neither state enabling acts nor allotment acts effectuate disestablishment in and of themselves; and that by expressly preserving the Osage Reservation's integrity as its own county in the new State of Oklahoma, and by expressly preserving the authority of the Osage Tribal Council, Congress confirmed in 1906 that the Osage Reservation was not disestablished. *See generally* D.E. 80 (filed Oct. 3, 2008). The Nation incorporated by

---

[17] This Court allowed the Nation only one week to respond.

reference its prior arguments and evidence in opposition to Oklahoma's motion to dismiss, D.E. 76 (filed June 30, 2008).[18]  The Nation also challenged OTC's reliance on *post hoc* commentary by historians and state and federal officials, including opinion witnesses who were neither qualified as experts under the Federal Rules of Evidence nor proffered for cross-examination.  *Id.* at 3-4; D.E. 86 (filed Oct. 30, 2008).

This Court nevertheless granted summary judgment to OTC, relying on its interpretation of the Supreme Court's decision in *Solem* to conclude that the Osage Reservation was disestablished by the 1906 Osage Allotment Act, and concluding that "there are no Indian reservations in Oklahoma."  *Osage Nation,* 597 F. Supp. 2d at 1259.

G.      *The Tenth Circuit's 2010* Irby *Decision*

The Tenth Circuit affirmed this Court's grant of summary judgment to OTC, holding that "the 1906 Osage Allotment Act disestablished the Osage reservation."  *Irby*, 597 F.3d at 1122. Like this Court, the Tenth Circuit applied "the three-part test summarized in *Solem*," *id.*, weighing (1) "statutory language," *id.*, (2) "circumstances surrounding passage of the Act," *id.* at 1124, and (3) "[p]ost-enactment history," *id.* at 1126.

The Tenth Circuit recognized that under Supreme Court precedent, allotment *per se* does not indicate disestablishment.  *Id.* at 1123.  It acknowledged that the Osage Allotment Act

---

[18] The incorporated evidence included a 2005 formal Indian lands opinion issued by the General Counsel of the National Indian Gaming Commission under the Indian Gaming Regulatory Act, 25 U.S.C. § 2703, determining that the Osage Nation "may conduct gaming on [certain parcels of land] because they are within the Tribe's reservation," and specifically concluding as part of that determination that the Osage Reservation had not been disestablished, D.E. 76-3; a 1997 Executive Department Proclamation by the Governor of Oklahoma stating that "the Osage Reservation covering all of Osage County is the only federally recognized reservation remaining in Oklahoma," D.E. 76-4; and a 1994 formal determination by the Department of the Interior's Office of the Solicitor that Oklahoma "has no jurisdiction or authority to adjudicate the rights of the Osage Tribe to use the waters appurtenant to its reservation," and expressly confirming the existence of the Osage Reservation, co-extensive with Osage County, D.E. 76-7.

contains none of the "express termination language" usually included in disestablishment statutes. *Id.* at 1124. In fact, the Tenth Circuit identified several provisions "weighing in favor of continued reservation status." *Id.* at 1123. It recognized that "the operative language of the statute does not unambiguously suggest diminishment or disestablishment of the Osage reservation." *Id.* at 1124. Indeed, the Tenth Circuit identified nothing in the statute that might even ambiguously suggest disestablishment. Nonetheless, it proceeded to consider extratextual considerations.

Addressing the "surrounding circumstances," the Tenth Circuit emphasized that "[i]n preparation for Oklahoma's statehood, the Dawes Commission had already implemented an allotment process with the Five Civilized Tribes that extinguished national and tribal title to lands within the territory and disestablished the Creek and other Oklahoma reservations." *Id*. In the Tenth Circuit's view, the Osage Nation eventually also reluctantly agreed to allotment, understanding that it would then share in the same fate as the Five Tribes. *See id*. The Tenth Circuit equated allotment in Oklahoma with disestablishment, relying on two historians who had opined that through allotment acts applicable to the various Oklahoma tribes, Congress had disestablished ***all*** tribal reservations in Oklahoma by 1906. *Id.* at 1125. The Tenth Circuit also focused on "post-enactment history," emphasizing statements by federal officials several years after 1906 attributing police power authority in the Osage Reservation to state officials, and considering demographic data reflecting an influx of non-Osage members onto the Reservation after the Osage Allotment Act. *Id.* at 1126-27.

Based on these extratextual considerations, the Tenth Circuit issued its mandate affirming this Court's 2009 final judgment ruling that the Osage Reservation was disestablished in 1906. D.E. 136 (June 2, 2010). That 2009 final judgment is the subject of the present motion.

H.      The McGirt Decision And Its Progeny

In 2020, in *McGirt*, 591 U.S. 894, the Supreme Court held that the Reservation established in Oklahoma for the Creek Nation pursuant to its 1833 treaty with the United States had ***not*** been disestablished and remains intact.  The Court rejected the same arguments that had prevailed in the Tenth Circuit in this case, including use of the "three-part test" Oklahoma inferred from *Solem*.  The Court held that determining whether a reservation has been disestablished entails only one analytical "step":  determining "the original meaning of the law." *Id.* at 913.  It made clear that to effectuate disestablishment, Congress must "explicitly" do so in "clear and plain" terms, and that "disestablishment may not be lightly inferred."  *Id.* at 916 (citations omitted).  The Court specifically held that neither the Creek Allotment Act of 1901, ch. 676, 31 Stat. 861, nor the Five Civilized Tribes Act, Act of Apr. 26, 1906, ch. 1876, 34 Stat. 137, nor a 1908 Act accelerating the Creek allotment process, Act of May 27, 1908, ch. 199, 35 Stat. 312, nor the combination of those statutes and various other statutes undermining the Creek Nation's sovereignty, disestablished the Creek Reservation.  *McGirt,* 591 U.S. at 904-11.

The Oklahoma Court of Criminal Appeals since has applied *McGirt* on multiple occasions in the course of determining whether the scene of an alleged crime by a tribal member is on a reservation within the meaning of 18 U.S.C. § 1151(a) such that state courts lack jurisdiction.  In the vast majority of these cases, it has concluded that the relevant Tribe's reservation remains intact.  *See State v. Fuller,* 547 P.3d 149 (Okla. Crim. App. 2024) (Wyandotte Reservation); *State v. Brester,* 531 P.3d 125 (Okla. Crim. App. 2023) (Ottawa and Peoria Reservations); *State v. Lawhorn,* 499 P.3d 777 (Okla. Crim. App. 2021) (Quapaw Reservation); *Spears v. State,* 485 P.3d 873 (Okla. Crim. App. 2021) (Cherokee Reservation); *Sizemore v. State,* 485 P.3d 867 (Okla. Crim. App. 2021) (Choctaw Reservation); *Grayson v. State*, 485 P.3d 250 (Okla. Crim. App. 2021) (Seminole Reservation); *Bosse v. State,* 484 P.3d

14

286 (Chickasaw Reservation), *vacated on other grounds*, 499 P.3d 771 (Okla. Crim. App. 2021).

The application of *McGirt* to the Osage Reservation has been raised in two cases before the Oklahoma Court of Criminal Appeals, in both of which the Nation filed *amicus* briefs arguing that pursuant to *McGirt,* the Osage Reservation remains intact.  *See Young v. State,* Okla. C.C.A. No. PC-2020-954, Br. *Amicus Curiae* of the Osage Nation in Support of the Uninterrupted and Continuing Existence of the Osage Reservation (filed June 1, 2021); *McCauley v. State*, Okla. C.C.A. No. F-2022-208, Br. *Amicus Curiae* in Support of the Existence of the Osage Nation's Reservation (filed May 11, 2023).[19]  In *Young v. State*, Okla. C.C.A. No. PC-2020-954 (summary opinion not for publication, dated Sept. 20, 2021), the Oklahoma Court of Criminal Appeals did not reach the application of *McGirt* to the Osage Reservation because it held that *McGirt* does not retroactively void state court convictions that were final before *McGirt* was decided.  In *McCauley,* 548 P.3d 461, the Oklahoma Court of Criminal Appeals again declined to address *McGirt* on the merits.[20]  There, it held that notwithstanding *McGirt*, it was bound by the preclusive and/or *stare decisis* effect of the 2010 *Irby* decision, and that *Irby's* preclusive effect applied to McCauley because as an Osage member asserting the continued existence of the Osage Reservation he was in privity with the Osage Nation.  *Id. at* 464-65.  In a concurring opinion, Presiding Judge Rowland (joined by Judge Lumpkin) characterized *McGirt* as a departure from the "usual application of the *Solem* framework," but opined that if *McGirt*

---

[19] The Nation also filed *amicus* briefs based on *McGirt* in a trial court-level criminal proceeding. *State v. Phillips*, Osage Cty. Dist. Ct. No. CF-2019-327, Br. *Amicus Curiae* in Support of the Existence of the Osage Nation's Reservation (filed Dec. 8, 2021); Reply Br. *Amicus Curiae* in Support of the Existence of the Osage Nation's Reservation (filed Apr. 14, 2022).

[20] The court's only discussion of *McGirt* was conclusory: "*McGirt* did not expressly overrule [*Irby*], nor is the binding precedent established in [*Irby*] incongruent with the Supreme Court's decision in *McGirt*.  Further, the Tenth Circuit's decision in [*Irby*] applies here because of its preclusive effect."  *Id.* at 464.

means that *Irby* "should no longer be followed, ***that pronouncement must come from the federal courts*.*"  *Id.* at 472 (emphasis added).

## APPLICABLE LEGAL STANDARDS

This Court may relieve a party from a final judgment on motion, and on "just terms," if "applying [the final judgment] prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5), or for "any other reason that justifies relief," Fed. R. Civ. P. 60(b)(6).  Rule 60(b) provides district courts with "a grand reservoir of equitable power to do justice in a particular case."  *Compañía de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuahua S.A.B. de C.V.*, 58 F.4th 429, 446 (10th Cir. 2023) (citations omitted).  "Relief under Rule 60(b) is 'extraordinary and may only be granted in exceptional circumstances,'" and the burden is on the movant to demonstrate that it is justified.  *Repsis*, 74 F.4th at 1216.  However, the court abuses its discretion if it fails to grant appropriate relief.  *Agostini v. Felton*, 521 U.S. 203, 215 (1997).  A Rule 60(b)(5) or (6) motion must be made "within a reasonable time."  Fed. R. Civ. P. 60(c)(1).

Under the "equitable" standard of Rule 60(b)(5), a judgment may be modified or vacated if a significant change in fact or law "renders continued enforcement 'detrimental to the public interest.'"  *Horne v. Flores*, 557 U.S. 433, 447 (2009) (citation omitted).  In making that judgment, traditional, "flexible" equitable principles apply; a showing of "grievous wrong" is not required.  *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378-80 (1992).

Rule 60(b)(6) is a catchall provision that applies only when other Rule 60(b) grounds for relief do not.  *Kemp v. United States*, 596 U.S. 528, 533 (2022).  Rule 60(b)(6) authorizes the court "to vacate judgments whenever such action is appropriate to accomplish justice."  *Klapprott v. United States*, 335 U.S. 601, 615 (1949).  It applies "'when it offends justice to deny such relief.'"  *Yapp v. Excel Corp.*, 186 F.3d 1222, 1232 (10th Cir. 1999) (citation omitted).

A Rule 60(b) motion is properly addressed in the first instance by the district court that issued the judgment from which relief is sought, notwithstanding that the judgment was issued pursuant to a mandate of an appellate court, and no leave of the appellate court is required to do so. *Standard Oil Co. of Calif. v. United States*, 429 U.S. 17 (1976). That is true even when the appellate court affirmed the district court's judgment based on its own rationale, at least if the movant relies on an intervening change in the law. *See Repsis*, 74 F.4th at 1220-21.

## ARGUMENT

I.   **The *Irby* Judgment Was Predicated On A Legal Test, An Analysis, And A Factual Premise That Cannot Survive *McGirt***

The Tenth Circuit in *Irby* read *Solem* as requiring it to employ a three-step test to determine whether the Osage Reservation had been disestablished, as follows:

> The Court will infer diminishment or disestablishment ***despite statutory language that would otherwise suggest unchanged reservation boundaries*** when events surrounding the passage of [the] act "unequivocally reveal a widely-held, contemporaneous understanding that the affected reservation would shrink as a result of the proposed legislation." In addition to (1) explicit statutory language and (2) surrounding circumstances, the Court looks to (3) "subsequent events, including congressional action and the demographic history of the opened lands, for clues to whether Congress expected the reservation boundaries to be diminished."

*Irby,* 597 F.3d at 1122 (citations omitted) (emphasis added). Accordingly, the Tenth Circuit examined (1) "statutory language," *id*., (2) "circumstances surrounding passage of the Act," *id.* at 1124, and (3) "post-enactment history," *id.* at 1126, to conclude that Congress disestablished the Osage Reservation pursuant to the Osage Allotment Act of 1906.

It was the latter two non-statutory factors that proved decisive for the Tenth Circuit. It conceded that nothing in the statutory language itself "suggest[ed] diminishment or disestablishment of the Osage reservation." *Id.* at 1124; *see also Murphy v. Royal*, 875 F.3d 896, 954 (10th Cir. 2017) (acknowledging that in *Irby*, "we concluded Congress had disestablished

the Osage Reservation, despite an absence of clear textual evidence"), *aff'd sub nom. Sharp v. Murphy*, 591 U.S. 977 (2020).  Indeed, the Tenth Circuit identified multiple aspects of the statutory language that weighed ***against*** disestablishment, noting that:

- The Osage Allotment Act contained no "express termination language" indicative of disestablishment, such as references to disestablishment, discontinuation, termination or abolition of a reservation, or cession, sale, relinquishment or conveyance or restoration to the public domain of tribal lands, *Irby,* 597 F.3d at 1123;

- The Act provided only for allotment, which is insufficient in and of itself to indicate disestablishment, *id*.;[21]

- The Act authorized the Secretary to set aside lands for tribal purposes, *id.*;

- The Act did not directly open tribal land to non-Indian settlement, but instead reserved almost all Reservation land to Osage members, with substantial restrictions on alienation for 25 years, *id.* at 1123-24;

- The Act provided no compensation to the Osage Nation, as would be expected if the Reservation was being disestablished, *id.*;

- The Act reserved the entire mineral estate underlying the Reservation for the Osage Nation as a whole, *id.* at 1124; and

- The Act "provid[ed] for a form of tribal government," *id.* at 1125.

Under *McGirt*, the analysis would have stopped there, with a finding of no disestablishment.  Instead, the Tenth Circuit went on to infer disestablishment notwithstanding the complete lack of statutory textual support for it and without identifying any ambiguous language in the Allotment Act (or in the Oklahoma Enabling Act) that needed clarification from extratextual sources.  The Tenth Circuit based its decision on a combination of four factors:

---

[21] *Accord McGirt*, 591 U.S. at 906-08; *Parker*, 577 U.S. at 488-90 (holding that a reservation was not diminished by legislation subjecting a substantial area of the reservation to allotment and opening it up for non-Indian settlement); *Mattz v. Arnett*, 412 U.S. 481, 497 (1973) (disestablishment cannot be inferred from allotment on the model of the General Allotment Act); *Seymour v. Sup't of Wash. State Penitentiary*, 368 U.S. 351, 354-59 (1962) (same).

- what it called "tribal consent" to allotments—albeit in circumstances wherein the Osage Nation "felt pressure" and Osage witnesses expressed that if "compelled to take their allotments[] [the Osage would not] do[] as well," *id.* at 1124 (citations omitted);[22]

- *post hoc* statements by certain historians, contrary to what the Supreme Court later concluded in *McGirt, id.* at 1125, that all reservations in Oklahoma had been disestablished through allotment acts. (The Nation's objection that these historians had never been properly qualified as expert witnesses was ignored.);

- *post hoc* statements by some federal officials noting the State's assertion, with federal acquiescence, of various state powers on the Reservation, *id.* at 1126-27; and

- *post hoc* changes in demographics and land ownership on the Reservation, *id.* at 1127.

In doing so, the Tenth Circuit relied on *dicta* in prior Supreme Court cases that referred to "*de facto*, if not *de jure*, diminishment" of a reservation, *id.* at 1126 (citation omitted), and suggested that "heavy weight" be given in a disestablishment analysis to state assertions of jurisdiction over reservation land, *id.* at 1127-28.

That analysis simply cannot be reconciled with the Supreme Court's subsequent ruling in *McGirt*.  Under *McGirt,* to determine if a reservation has been disestablished "there is only one place we may look:  the Acts of Congress."  591 U.S. at 903.  Where there is no language concerning disestablishment, that is the end of the inquiry.  Indeed, *McGirt* squarely rejected Oklahoma's argument that the Supreme Court should apply the same three-step test that the

---

[22] The Nation did not "consent," even under duress, to the Osage Allotment Act as passed.  Some provisions of the Act were agreed in negotiations between the Nation and the United States, but the United States then elected to impose several provisions on the Nation without its consent. *See generally* S. Rep. No. 59-4210, *Division of Lands and Funds of Osage Indians, Oklahoma*, at 1-6 (1906).  Osage witnesses before Congress pressed for the opportunity to negotiate, and in due course vote on ratifying, allotment provisions before they could take effect, but they were rebuffed.  *See Hearings on H.R. 1478 [sic] before a Subcommittee of the Committee on Indian Affairs of the House of Representatives* 3-5 (GPO 1905); *Hearings on H.R. 17478 before a Subcommittee of the Committee on Indian Affairs of the House of Representatives*, vol. II, at 11 (GPO 1905).

Tenth Circuit applied in *Irby*:[23]

> [Oklahoma's argument] is mistaken.  When interpreting Congress's work in this arena, no less than any other, our charge is usually to ascertain and follow the original meaning of the law before us.  That is the only "step" proper for a court of law.

*Id.* at 913-14 (citation omitted).

Under *McGirt,* the disestablishment question turns on whether Congress, in specific legislation, has "explicitly" disestablished a reservation in "clear and plain" terms, with the presumption being that it has not.  *Id.* at 916.  To disestablish a reservation, Congress must, in the text of the statute, "clearly express its intent to do so," which normally entails an "[e]xplicit reference to cession or other language evidencing the present and total surrender of all tribal interests."  *Id.* at 904 (quoting *Parker*, 577 U.S. at 488).  Hints that Congress may be working towards disestablishment as a goal are not enough.  *See id.* at 907-08.

What matters is what Congress actually enacted in 1906—not what some Osage witnesses feared would ensue, not what historians who were neither qualified as experts nor proffered for cross-examination had opined, not whether non-Indians live within the Reservation boundary, not how Oklahoma has undermined the Nation's sovereignty, and not whether federal Executive Branch officials acquiesced in its doing so.[24]  As the Tenth Circuit correctly found,

---

[23] In *McGirt*, Oklahoma devoted more of its brief to extratextual considerations under steps two and three of the test than it did to statutory text, just as the Tenth Circuit had done in *Irby* (which Oklahoma cited).  *See McGirt v. Oklahoma*, U.S.S.C. No. 18-9526, Br. of Resp. Oklahoma, 2020 WL 1478582, at *35-*42 (discussing "historical context" and "subsequent history and demographics"); *id.* at *40 (citing *Irby*).

[24] In *McGirt*, Justice Gorsuch discussed extratextual and post-enactment evidence relating to the history of the Creek Reservation, not because such post-enactment history is relevant to the critical question of statutory interpretation—he was emphatic that it is not, *id.* at 913-16—but because the parties and the dissent raised it, *see id.* at 917-24.  In doing so, he emphasized "the perils of substituting stories for statutes," noting that "the Tribe could tell more than a few stories of its own."  *Id.* at 917.  Among those "stories" for the Creek Nation were the narrative of Congress's shift after the allotment era to protecting tribal sovereignty, and various actions taken

there is nothing in the language of the Osage Allotment Act, or any other statute, that indicates disestablishment. Accordingly, looking beyond the statutory language for indications of disestablishment is improper under *McGirt*.

More specifically, the Tenth Circuit's reasoning in *Irby* deviates from the *McGirt* test in three distinct ways. ***First***, under *McGirt*, a court cannot go beyond statutory language unless it first finds in the statute specific "ambiguous language . . . that could plausibly be read as an Act of disestablishment." *Id.* at 914. The Tenth Circuit in *Irby* identified no such language in the Osage Allotment Act, but nonetheless proceeded to rely on extratextual factors. ***Second***, under *McGirt*, even if there is statutory text that includes ambiguous language that plausibly could be read as effecting disestablishment, the court may only "consult contemporaneous usages, customs, and practices" for the limited purpose of "shed[ding] light on the ***meaning of the language in question*** at the time of the enactment." *Id.* (emphasis added); *see also id.* at 915-16 (extratextual evidence has only "interpretative" value: it can be used only "to the extent it sheds light on what the terms found in a statute meant at the time of the law's adoption, not as an alternative means of proving disestablishment"). The Tenth Circuit in *Irby* did not connect its

---

subsequently by the Creek Nation to exercise sovereignty over its reservation. *See id.* at 911-12. In this, as in other respects, the parallels between the Osage Nation and the Creek Nation are striking. While under the *McGirt* test resort to extratextual evidence is improper in both cases, *see id.* at 913-16, if resort to such evidence were had, the Osage Nation would have plenty of its own "stories" to tell from the record in this case and other public record documents demonstrating federal and state recognition of tribal sovereignty over the Osage Reservation after 1906. *See supra*, pages 6 n.6, 8 & n.9, 9-10, 12 n.18; *see also* Memorandum from Nathan R. Margold, Solicitor of Department of Interior, to the Commissioner of Indian Affairs, 1 Op. Sol. 191-92 (Dec. 17, 1935) (formal opinion memorandum rejecting arguments that the Osage Reservation had been disestablished); Letter from Harold D. Cox, Associate Commissioner of the Bureau of Indian Affairs, to Sen. Henry L. Bellmon (Mar. 9, 1971) (stating that the Bureau's maps had for over 35 years depicted the Osage Reservation as the sole remaining reservation in Oklahoma, distinguishing the Osage Reservation from other tribal reservations in Oklahoma (which it assumed to have been disestablished), and concluding that "we have not found any Act of Congress which expressly or otherwise terminated the [Osage] reservation status").

reliance on extratextual factors to the meaning of any particular statutory "language in question." Instead, it did precisely what *McGirt* forbids: it "favor[ed] contemporaneous or later practices *instead* of the laws Congress passed." *Id.* at 914. **Third**, the Tenth Circuit in *Irby* looked far beyond "**contemporaneous** usages, customs and practices," *id.* (emphasis added) (the only historical data *McGirt* permits to be consulted *to clarify ambiguous statutory language*). It heavily relied on "post-enactment history," 597 F.3d at 1126-27, including *post hoc* statements by officials and historians, and demographic and land ownership data from decades after the enactment of the Osage Allotment Act, none of which have any bearing on what Congress intended in 1906 when it passed the Act.

The strict rule in *McGirt* reflects the textualist approach to statutory construction, as Justice Gorsuch's majority opinion emphasized. *See McGirt,* 591 U.S. at 913-14 (citing *New Prime, Inc. v. Oliveira*, 586 U.S. 105, 112-13 (2019)); *see also Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("As this Court has repeatedly stated, the text of a law controls over purported legislative intentions unmoored from any statutory text."). As Justice Gorsuch recently explained in a different context, textualism is now the prevailing approach to statutory construction, making old precedents that sought to divine congressional intent through less disciplined means suspect. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2291 n.6 (2024) (Gorsuch, J., concurring).

Justice Gorsuch also explained why strict adherence to statutory text is especially important in the disestablishment context. While it is within Congress's power, disestablishing a reservation is a breach of the United States' solemn commitment to a fellow sovereign. Such a stain on the integrity of the United States should not be inferred lightly. *McGirt,* 591 U.S. at 903. And more generally, "'statutes are to be construed liberally in favor of the Indians, with

ambiguous provisions interpreted to their benefit.'" *Ysleta Del Sur Pueblo v. Texas,* 596 U.S. 685, 703 n.3 (2022) (*quoting Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985)); *see McGirt,* 591 U.S. at 916; *see also DeCoteau v. District Court,* 420 U.S. 425, 444 (1975) (applying that rule in the context of disestablishment).  In other words, there is a presumption against disestablishment.  If Congress chooses to disestablish a reservation, it must take moral responsibility for doing so by saying so clearly and expressly.  *McGirt,* 591 U.S. at 903-04. "[W]ishes don't make for laws, and saving the political branches the embarrassment of disestablishing a reservation is not one of our constitutionally assigned prerogatives."  *Id.* at 903.

This principle of exclusive congressional authority over Indian issues is not unique to disestablishment cases; it is rooted in the Constitution and is a fundamental principle of federal Indian law.  Congress alone can abrogate tribal treaty or statutory rights, including by diminishing or disestablishing a reservation, and when it does, "it must clearly express its intent to do so." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999) ("*Mille Lacs*").  "There must be 'clear evidence that Congress actually considered the conflict between its intended action on the one hand and Indian treaty rights on the other, and chose to resolve that conflict by abrogating the treaty.'"  *Id.* at 202-03 (citation omitted).[25]  For these reasons, Justice Gorsuch explained, the courts cannot properly give effect to *de facto* disestablishment.  Given the long history of broken federal promises and state incursions on tribal sovereignty, to do so "would be the rule of the strong, not the rule of law."  *McGirt,* 591 U.S. at 924.

The Tenth Circuit in *Irby* did precisely what *McGirt* now forbids—it usurped congressional authority.  *See id.* at 903 ("courts have no proper role in the adjustment of

---

[25] This clear statement principle applies to abrogation of Indian statutory rights, just as it applies to abrogation of Indian treaty rights.  *See, e.g., United States v. Felter*, 752 F.2d 1505, 1510 n.8 (10th Cir. 1985).

reservation borders.").  The Tenth Circuit inferred disestablishment without any basis in statutory text, improperly converting an alleged congressional expectation that allotment would be "the first step" leading to disestablishment, *id.* at 907, into a judicial disestablishment.   Further, while in its discussion of "statutory language" the Tenth Circuit properly acknowledged Supreme Court precedent distinguishing between the allotment of a reservation and the disestablishment of one, *see Irby*, 597 F.3d at 1123, in its discussion of "circumstances surrounding the passage of the Act," it hollowed out that distinction by conflating the two.  It inferred disestablishment from (1) alleged understandings (not articulated by **Congress** in the Osage Allotment Act) that the "allotment process" in Oklahoma had "disestablished the Creek and other Oklahoma reservations," and therefore would have the same effect on the Osage, *id.* at 1124; *compare McGirt,* 591 U.S. at 917-23 (rejecting Oklahoma's arguments that "everyone" understood disestablishment was intended), and from (2) decades-later changes in "[l]and ownership" precipitated by the allotment process, *Irby,* 597 F.3d at 1127; *compare McGirt,* 591 U.S. at 917, 922-23 (rejecting similar arguments made by Oklahoma with respect to the Creek Reservation). Further, the Tenth Circuit relied on Oklahoma's violations of tribal sovereignty and some federal officials' acquiescence in those violations as evidence of "*de facto*" disestablishment.  *See Irby,* 597 F.3d at 1126-28; *compare McGirt,* 591 U.S. at 917-19 (rejecting similar arguments made by Oklahoma with respect to the Creek Reservation).  Essentially, the Tenth Circuit "elevat[ed] commentary over the law," *id.* at 921, by inferring disestablishment from *post hoc* commentary of some historians and federal officials notwithstanding the lack of any disestablishment language in the actual text of the Osage Allotment Act.  *See Irby,* 597 F.3d at 1125-27; *compare McGirt,* 591 U.S. at 921-24 (again rejecting similar arguments made by Oklahoma with respect to the Creek Reservation).

24

The Tenth Circuit also relied on a factual premise that plainly cannot be reconciled with *McGirt*. It expressly assumed that ***all*** reservations in Oklahoma had been disestablished by 1906. *See Irby*, 597 F.3d at 1124 (stating that the reservations of the Creek and the rest of the Five Tribes had been disestablished before 1906); *id.* at 1125 (approvingly quoting statements by historians that as of 1906 all reservations in Oklahoma had been disestablished). That was the essence of Oklahoma's argument throughout *Irby* and *McGirt*—that a series of broadly similar allotment acts had disestablished all reservations prior to statehood. *See* D.E. 72, OTC Mot. to Dismiss, at 13 ("This termination of Osage reservation status was part of a broader pattern of reservation termination accompanying Oklahoma's entry into the Union."); *McGirt v. Oklahoma*, U.S.S.C. No. 18-9526, Br. of Resp. Oklahoma, 2020 WL 1478582, at *40 (citing *Irby* in support of the proposition that since 1906, all reservations in Oklahoma had been disestablished). But the Supreme Court definitively rejected that argument when it held that the Creek Reservation in Oklahoma had ***never*** been disestablished. *McGirt*, 591 U.S. at 937. Further, since *McGirt* the Oklahoma Court of Criminal Appeals has concluded that all of the reservations of the Five Tribes, plus the reservations of at least four more tribes in Oklahoma, survived the allotment and statehood era and remain intact. *See supra*, pages 14-15. Moreover, the Supreme Court has since confirmed that at least 43% of Oklahoma remains tribal reservation land. *Castro-Huerta*, 597 U.S. at 647.

In sum, the Tenth Circuit in *Irby* relied on the three-step test it took from *Solem*, placing decisive emphasis on the two extratextual factors, 597 F.3d at 1124-27, and it relied on the erroneous understanding that through allotment acts, Congress had disestablished all reservations in Oklahoma, *id.* at 1124-25. Neither its legal nor its factual premise can withstand *McGirt*.

## II.    Under The *McGirt* Test, The Osage Nation's Reservation Remains Intact

*McGirt* not only repudiates the premises of the *Irby* decision; it demonstrates affirmatively and conclusively that the Osage Reservation has ***not*** been disestablished and remains intact.  As the Tenth Circuit itself made clear in *Irby,* there is no "statutory language" that "suggest[s] diminishment or disestablishment of the Osage reservation."  *Id.* at 1124. Indeed, the Tenth Circuit found in the Osage Allotment Act of 1906 multiple "factors weighing in favor of continued reservation status."  *Id.* at 1123.  Accordingly, under *McGirt,* it is plain that the Osage Reservation is intact.

That conclusion is reinforced by comparing the statutes applicable to the Osage Nation with those applicable to the Creek Nation and other tribes whose reservations have been held to remain intact.  Every tribe located in present-day Oklahoma has its own unique history, including its own unique history of treaties with, and promises broken by, the Federal Government. However, there are no material differences between the statutory language Congress enacted with respect to the Osage Nation and with respect to the Creek Nation during the allotment and statehood era that could justify concluding that the Osage Reservation has been disestablished while the Creek Reservation remains intact.  Nor are there any such material differences between what Congress enacted during that time period with respect to the Osage Nation and with respect to the other Oklahoma tribes whose reservations the Oklahoma Court of Criminal Appeals, applying *McGirt*, has held not to have been disestablished.[26]

---

[26] Decisions of the Oklahoma state courts on the federal law issue of reservation disestablishment do not bind on this Court.  But as persuasive authority examining similar history in the context of Congress's actions with respect to the several tribes with reservations in what is now Oklahoma, the Oklahoma Court of Criminal Appeals' decisions applying *McGirt* reinforce the conclusion that the Osage Reservation has not been disestablished.  They also highlight the inequity of treating the Osage Nation differently from other tribes with materially similar legal histories.

      A.     *There Are No Differences Between The Legal Histories Of The Osage Nation And The Muscogee (Creek) Nation That Could Justify Deeming The Osage Reservation Disestablished While The Creek Reservation Has Been Determined To Remain Intact*

In *McGirt*, the Supreme Court did not merely rule that premising a conclusion of disestablishment based on extratextual evidence pursuant to the three-step test derived from *Solem* is "mistaken," 591 U.S. at 913—it affirmatively ruled that the Creek Reservation remains intact, *see id.* at 937 ("Congress has never withdrawn the promised reservation."). Application of the *McGirt* analysis leads inexorably to the same conclusion for the Osage Nation, because there are no material differences between the allotment and statehood era statutes applicable to the Osage Nation and the Creek Nation that could provide any basis for concluding that the Osage Reservation was disestablished while the Creek Reservation remained intact.[27]

      1.     <u>The Oklahoma Enabling Act of 1906 Applied Equally To The Osage Nation And The Creek Nation</u>

There is no material difference between the Osage Nation and the Creek Nation with respect to the Oklahoma Enabling Act of 1906 that could justify a conclusion that the Osage Reservation has been disestablished while the Creek Reservation has not. In most respects, the Oklahoma Enabling Act did not distinguish among tribes. It plainly and expressly reserved tribal rights and land from state jurisdiction, subject to further federal legislation. Oklahoma Enabling Act § 1, 34 Stat. at 267-68; *id.* § 3, 34 Stat. at 270. And it is well-established that "Oklahoma's

---

[27] In *McGirt*, the Supreme Court did not expressly address *Irby*. Between *Irby* and *McGirt*, in 2017, the Tenth Circuit in *Murphy* reached the same conclusion the Supreme Court later reached in *McGirt*: the Creek Reservation has not been disestablished. *Murphy*, 875 F.3d 896. In doing so, the Tenth Circuit distinguished *Irby* only with respect to the application of the second and third steps under *Solem*—the extratextual factors the Court in *McGirt* later held should not be considered—while acknowledging that nothing in the Osage Allotment Act (or the Oklahoma Enabling Act) provided "clear textual evidence" of disestablishment. *Id.* at 954. And even with respect to those extratextual factors, the Tenth Circuit did not identify any specific distinctions between the Creek Nation and the Osage Nation that it viewed as material under pre-*McGirt* law.

admission into the Union is compatible with [tribal reservations in Oklahoma remaining intact]. States and reservations co-exist throughout the country." *Murphy,* 875 F.3d at 953.

The Oklahoma Enabling Act treated the Osage Nation and the Creek Nation differently in some respects, but if anything, those differences represent an even clearer reflection of continuing Osage sovereignty. Congress made no specific reference in the Oklahoma Enabling Act to the Creek Reservation, although it implicitly referenced it in providing for the "Commissioner to the Five Civilized Tribes" and other federal officials to perform various administrative functions, including with respect to the election of delegates to the State constitutional convention, in "Indian Territory." Oklahoma Enabling Act § 2, 34 Stat. at 268-69. In contrast, Congress explicitly acknowledged "the Osage Indian Reservation," preserving its integrity by constituting it as a distinct district entitled to two representatives at the Oklahoma constitutional convention and to representation in the Oklahoma legislature. *Id.* In doing so, it referred to the "Osage Indian Reservation" in the present tense as of the time of the constitutional convention and elections to the legislature—notwithstanding that Congress, which was within days of passing the Osage Allotment Act, must have been aware that the constitutional convention and elections would inevitably post-date the Osage Allotment Act—thereby implying an understanding that the "Osage Indian Reservation" would survive the Osage Allotment Act.[28] And, as specifically requested by the Osage Nation in order to assure the preservation and integrity of its Reservation,[29] Congress provided that the Oklahoma constitutional convention

---

[28] "[W]ords used in the present tense include the future as well as the present." 1 U.S.C. § 1. The Supreme Court has repeatedly stated that Congress's choice of verb tense matters; when Congress uses the present tense in a provision, it "generally does not include the past." *Carr v. United States*, 560 U.S. 438, 448 (2010); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 57 (1987) ("Congress could have phrased its requirement in language that looked to the past . . . , but it did not choose this readily available option").

[29] The Nation had issued a formal Resolution objecting to an earlier bill because it failed to

"shall constitute the Osage Indian Reservation a separate county" within Oklahoma, *id.* § 21, 34 Stat. at 277, which it remains to this day, *see* Okla. Const., art. XVII, § 8.

        2.       <u>The Osage Allotment Provisions Are At Least As Protective Of Reservation Continuity As The Creek Allotment Provisions</u>

There is also no material difference between the Osage Nation and the Creek Nation with respect to allotment legislation that could justify a conclusion that the Osage Reservation has been disestablished while the Creek Reservation has not.  Both Nations were excluded from the General Allotment Act of 1887, *see* 25 U.S.C. § 339, and both Nations resisted allotment for years before eventually agreeing to it under pressure, subject to conditions designed to preserve their sovereignty, *see McGirt*, 591 U.S. at 905; *Irby,* 597 F.3d at 1124.  In *McGirt*, the Supreme Court held that "allotment . . . itself won't work" to effectuate disestablishment of the Creek Reservation, *McGirt*, 591 U.S. at 909, because the Creek Allotment Act of 1901, ch. 676, 31 Stat. 861, and Act of May 27, 1908, ch. 199, 35 Stat. 312, that amended it, included no language beyond the allotment provisions to indicate cession of sovereignty over the reservation, *see McGirt,* 591 U.S. at 905-08.  In doing so, the Court emphasized the contrast between the Creek Allotment Act of 1901 and nineteenth century treaties between the Creek Nation and the United States which had explicitly provided for the Creek Nation to "cede" its prior reservations.  *Id.* at 906.  Exactly the same is true of the Osage Allotment Act of 1906:  as the Tenth Circuit recognized, the Osage Allotment Act said nothing whatsoever about cession, termination discontinuance, abolition, or disestablishment of the Osage Reservation.  *See Irby,* 597 F.3d at 1123.  And that silence is highly significant given that the Osage Nation, like the Creek Nation,

---

affirm "that the Osage Indian Reservation would remain intact and be constituted one county." *Osage Resolution, Dec. 5, 1905*, National Archives—Fort Worth Record Group 75 Entry 9, Osage Agency, 1905-1205, Box 19, Book 63, pp. 3-5; Osage Journal, Dec. 9, 1905, p.1, col. 1.

has a prior history of nineteenth century treaties with the United States in which the Nation expressly "ceded" earlier reservations.[30]  With respect to both Nations, Congress knew what language was required to effectuate disestablishment, and it did not use that language in either Nation's allotment act.

The two Nations' allotment acts are similar in other respects, too.  Both Nations negotiated the substance of the allotment provisions with the Federal Government before they were ultimately enacted by Congress.  *See id.* at 1125 ("[t]he Osage themselves presented an allotment act to Congress"); *McGirt,* 591 U.S. at 905 (the Dawes Commission's "work culminated in an allotment agreement with the [Creek] Tribe").[31]  And neither Nation's allotment act provided for any direct payment in exchange for agreeing to allotment, as had been provided to each Nation when prior land cessions had disestablished or diminished their reservations, *see Irby,* 597 F.3d at 1123-24; *McGirt,* 591 U.S. at 905, and as was customary under Congress's "cession and sum certain" model for disestablishing reservations for compensation, *see South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 344 (1998) ("*Yankton Sioux*") (describing that established model as "'precisely suited' to terminating reservation status.") (citation omitted).

Further, both Nations' allotment acts provided that reservation land, with a few special

---

[30] *See* 1808 Osage Treaty, art. V, 7 Stat. 107, 108 ("In consideration of the lands relinquished . . ."); *id.,* art. VI, 7 Stat. at 108 ("we do further cede and relinquish to the United States forever . . ."); 1818 Osage Treaty, art. I, 7 Stat. 183, 184 ("cede to the United States, and forever quit claim . . ."); 1825 Osage Treaty, art. I, 7 Stat. 240 ("do, hereby, cede and relinquish . . ."); 1839 Osage Treaty, art. I, 7 Stat. 576 ("make the following cessions . . . of all titles of interest in any reservation heretofore claimed . . ."); 1865 Osage Treaty, art. I, 14 Stat. 687 ("hereby grant and sell to the United States. . .").

[31] The United States unilaterally altered the terms of the Osage Allotment Act after an initial agreement with Osage leaders and eliminated a provision that would have required the eventual statute to be submitted to the Nation for ratification. *See supra,* n. 22.  That breach of good faith by the United States is all the more reason why the Act should be construed in favor of the Nation.  *See, e.g., McGirt*, 591 U.S. at 903 (courts should not "lightly infer" that Congress has abrogated a tribe's rights in a "breach" of trust).

exceptions, be allotted to the Nations' members. Neither the Creek nor Osage Reservations were opened to sale and settlement by non-members. *See* Osage Allotment Act § 2, 34 Stat. at 540; *id.* § 2, ¶5, 34 Stat. at 541; Creek Allotment Act of 1901, ch. 676, § 3, 31 Stat. at 862-63. In that respect, the Osage and Creek Allotment Acts were more protective of reservation integrity than the General Allotment Act and other tribal allotment acts modeled on it, which generally created "surplus land" to be made available for non-Indian settlement.[32]

The Supreme Court has repeatedly held that even statutes like the General Allotment Act that combine allotment with the opening of "surplus land" to "non-Indian settlers" do not disestablish a reservation.[33] *A fortiori,* the Osage (and Creek) Allotment Acts' provisions reserving essentially all reservation land for allotment to the Nation's members did not effectuate disestablishment. As the Tenth Circuit acknowledged in *Irby,* that allotment to Osage Nation members "before the land was officially opened to non-Indian settlers" indicates an intent to preserve the integrity of a reservation, not disestablish it. *Irby,* 597 F.3d at 1123.

---

[32] *See, e.g.,* General Allotment Act, Act of Feb. 8, 1887, ch. 119, § 5, 24 Stat. 388, 388, 389-90 (providing for lands remaining after allotment to individual tribe members to be purchased from the tribe by the United States and sold to "actual and bona fide settlers"); Klamath River Indian Reservation Act Lands Disposition Act, Act of June 17, 1892, ch. 120, 27 Stat. 52, 52 (declaring "all of the lands embraced in what was Klamath River Reservation . . . to be subject to settlement, entry and purchase," subject to the preservation of existing residences and limited rights of allotment for tribe members); Colville Indian Reservation Surplus Lands Act, Act of Mar. 22, 1906, ch. 1126, §§ 3, 4, 6, 34 Stat. 80, 80-82 (providing for Colville Reservation lands remaining after allotment to individual tribe members to be "opened to settlement and entry" by non-members, subject to compensation to the tribe).

[33] *See McGirt*, 591 U.S. at 906; *Parker*, 577 U.S. at 488-90 (holding that the Omaha Reservation was not diminished by the Act of Aug. 7, 1882, ch. 434, §§ 1, 2, 22 Stat. 341, 341, which authorized the Secretary of Interior "to issue [a] proclamation" that a substantial area of that reservation's "lands are open for settlement under such rules and regulations as he may prescribe," in conjunction for providing for allotments and compensation to tribe members); *Mattz*, 412 U.S. at 496-97 (holding that the Klamath River Reservation survived the Klamath River Indian Reservation Act Lands Disposition Act of 1892); *Seymour*, 368 U.S. at 356-58 (holding that the Colville Reservation survived the Colville Indian Reservation Surplus Lands Act of 1906).

*McGirt* emphasized that "missing" from the Creek Allotment Act was any language "evincing anything like the 'present and total surrender of all tribal interest' in the affected lands." *McGirt*, 591 U.S. at 906.  Exactly the same is true of the Osage Allotment Act.

If anything, differences between the allotment provisions make the preservation of the Osage Reservation even clearer than that of the Creek Reservation.  The Osage Allotment Act of 1906 placed even stronger restrictions on alienation than the restrictions included in the Creek Allotment Act of 1901.  *Compare* Osage Allotment Act § 2, ¶¶4, 7, 34 Stat. at 541, 542 (160-acre homesteads "inalienable and nontaxable" for a minimum of 25 years or the life of the allottee),[34] *with* Creek Allotment Act of 1901, § 7, 31 Stat. at 863 (40-acre homesteads "inalienable and nontaxable" for 21 years).  Moreover, a 1908 statute loosening alienation restrictions was applicable to the Creek Nation but not the Osage Nation.  Act of May 27, 1908, ch. 199, § 1, 35 Stat. 312 (eliminating many, and authorizing the Secretary to eliminate all, restrictions on Creek (and other Five Tribes') allotments).[35]  Further, the Creek legislation contains no analog to a key provision negotiated by the Osage Nation to reinforce its sovereignty and independence—the long-term (and still in force today, *see supra,* n.9) reservation of all mineral rights on the Osage Reservation to the Nation as a whole.  Osage Allotment Act § 3, 34 Stat. at 543-44.[36]

---

[34] *See also West v. Oklahoma Tax Comm'n*, 334 U.S. 717, 720–21 (1948) (summarizing § 2: "The homestead was to be inalienable and nontaxable for 25 years or during the life of the allottee. The surplus lands, however, were to be inalienable for 25 years and nontaxable for 3 years, except that the Secretary of the Interior might issue a certificate of competence to an adult, authorizing him to sell all of his surplus lands; upon the issuance of such a certificate, or upon the death of the allottee, the surplus lands were to become immediately taxable."); *Choteau v Burnet*, 283 U.S. 691, 695 (1931) (same); *McCurdy v. United States*, 246 U.S. 263, 266 (1918) (same).

[35] *See also McGirt*, 591 U.S. at 905 (summarizing Creek Allotment Act alienation restrictions and their relaxation in 1908).

[36] Prior briefing by the United States indicates that it believed the Osage Nation had a stronger case against disestablishment than the Creek Nation.  Both before and after *Irby* (and before *McGirt*), the United States took the position (ultimately rejected by the Supreme Court in

3.   <u>Congressional Recognition Of Continued Tribal Authority Over The Reservation Is At Least As Clear For The Osage Nation As For The Creek Nation</u>

Congress was clear and consistent in recognizing the continuation of the Osage Reservation, and of tribal authority over it, even more so than it was for the Creek Reservation. The Osage Allotment Act, unlike the Creek Allotment Act, repeatedly and expressly referred to the "Osage Indian Reservation" as a continuing entity.  *See* Osage Allotment Act § 4, ¶3, 34 Stat. at 544 (establishing a fund "for the support of the Osage Boarding School and for other schools ***on the Osage Indian Reservation***") (emphasis added); *id.* § 10, 34 Stat. at 545 (providing that highways and roads only of a certain size "may be established" within "***the Osage Indian Reservation***") (emphasis added); *id.* § 11, 34 Stat. at 545 (providing that lands earlier acquired by the railroads within the "***Osage Reservation***" were protected from allotment, but that the railroad companies "shall not take or acquire hereby any right or title to any oil, gas or other mineral of said lands") (emphasis added).  Congress's express reference to the Osage Reservation as existing ***after*** allotment confirms that it did not intend to effectuate disestablishment through the Osage Allotment Act.  *See, e.g., Seymour*, 368 U.S. at 355 (finding it significant that "the 1906 Act [Colville Indian Reservation Surplus Lands Act, Act of Mar. 22, 1906, ch. 1126, 34 Stat. 80] repeatedly refers to the Colville Reservation in a manner that makes

---

*McGirt*), based on the *Solem* three-step test, that the Creek Reservation had been disestablished. *See Murphy v. Oklahoma*, U.S.S.C. No. 05-10787, Br. of United States as *Amicus Curiae*, 2007 WL 1319320, at *8-*20 (filed May 4, 2007); *Carpenter v. Murphy*, U.S.S.C. No. 17-1107, Br. of United States as *Amicus Curiae* Supporting Pet., 2018 WL 3642789, at *6-*27 (filed July 30, 2018); *McGirt v. Oklahoma*, U.S.S.C. No. 18-9526, Br. of United States as *Amicus Curiae* Supporting Resp., 2020 WL 1478583, at *3-*31 (filed Mar. 20, 2020).  In sharp contrast, in *Irby*, the United States opined that the status of the Osage Reservation was unclear:  "Although Congress has disestablished the formal reservations of other Oklahoma tribes, [citing the United States' 2007 *amicus* brief in *Murphy*], it is unclear whether Congress went so far as to disestablish the Osage Reservation."  *Osage Nation v. Irby*, U.S.S.C. No. 10-537, Br. of United States as *Amicus Curiae*, 2011 WL 2135025, at *16 (filed May 27, 2011).

it clear that the intention of Congress was that the reservation should continue to exist as such," referencing provisions (sections 2, 3, 6, and 12 of the Act) that referred to the reservation in the present tense while providing for post-allotment events).[37]

With respect to the preservation of tribal authority, as the Supreme Court noted in *McGirt*, 591 U.S. at 910, the 1901 Creek Allotment Act provided that the Creek tribal government "shall not continue" past 1906, "subject to such further legislation as Congress may deem proper." Creek Allotment Act § 46, 31 Stat. at 872. While in 1906 Congress instead elected to recognize the Creek Nation's continued "tribal existence and present tribal government," Five Civilized Tribes Act of 1906 ("An Act To provide for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory . . . "), ch. 1876, § 28, 34 Stat. 137, 148, it placed significant curbs on the Creek Nation (along with the rest of the Five Tribes) that it never placed on the Osage Nation.[38]

Congress never enacted any law providing for the termination of Osage tribal authority, or the "disposition" of Osage tribal affairs. Notably, in enacting the Osage Allotment Act of 1906, Congress rejected a provision recommended by the Department of the Interior that would have terminated the Osage tribal government and removed all legal distinctions (including as to

---

[37] Again, Congress's choice of verb tense (and related language) is significant. *See supra,* n.28. To denote a reservation that has been disestablished, Congress uses the term "former reservation" (or some variation thereof). *See, e.g.,* 7 U.S.C. § 1985(e)(1)(A)(ii); 15 U.S.C. § 657a(b)(5)(C)(i)(II); 25 U.S.C. §§ 1603(16)(B)(i), 1918(b)(1)(ii), 2206(d)(1), 2719(a)(2)(A)(i); 40 U.S.C. § 523(b)(2)(A); 42 U.S.C. § 1396a(ff)(1), 2992c(3); 47 U.S.C. § 1705(a)(13)(A)(ii); 25 U.S.C. § 3103(12) ("former Indian reservations in Oklahoma"); 43 U.S.C. §§ 593 ("former Flathead Indian Reservation"), 647 ("former Ute Indian Reservation").

[38] For example, the 1906 act instructed the Secretary to take and in some cases transfer to the State possession of the Five Tribes' tribal government and school buildings, *id.* § 15, 34 Stat. at 143, and it prohibited the Five Tribes' tribal councils from convening for more than one month a year, *id.* § 28, 34 Stat. at 148. And in 1908, Congress required the Five Tribes' tribal officials to turn over all tribal records and funds in their possession to the Secretary. Act of May 27, 1908, ch. 199, § 13, 35 Stat. at 316.

the application of Oklahoma law) between the Osage members and non-members after 25 years. *See* S. Rep. 59-4210, at 4, 6, 9. Instead, the Osage Allotment Act of 1906 expressly preserved the general tribal authority of the Osage Tribal Council. Osage Allotment Act § 9, 34 Stat. at 545. And, in subsequent legislation, Congress repeatedly provided for the Osage Tribal Council to continue to exercise its general sovereignty as the "tribal government." Act of April 18, 1912, § 10, 37 Stat. 86, 88 (providing for funding of the Osage Tribal Council); Act of Mar. 2, 1929, ch. 493, § 7, 45 Stat. 1478, 1481 (revising election procedures for the Osage Tribal Council and re-confirming its authority as the "tribal government" through 1959); Act of Oct. 21, 1978, Pub. L. No. 95-496, § 1, 92 Stat. 1660 (same, through 1984); *see also Logan*, 640 F.2d at 270 (confirming that Congress continued to recognize the Osage Tribal Council as the "tribal government" exercising general authority as of the 1980s).

In *Irby,* the Tenth Circuit inferred disestablishment in part from concerns expressed by Osage witnesses before Congress (albeit not the Nation's appointed leaders at the time) that allotment would lead to loss of sovereignty ***as it already had done for other Oklahoma tribes***. For example, the Tenth Circuit quoted contemporaneous Osage statements that "like Indians of other tribes, the Osage may very well lose their allotments after dissolution of their reserve," and "Indians in Oklahoma living on their reservations who have had negotiations with the Government[,] since they have been compelled to take their allotments[,] they are not doing as well as the Indians who live on the reservations." *Irby*, 597 F.3d at 1124 (citations omitted). The Tenth Circuit erred in relying on these statements. Even under *Solem*, courts were not licensed to effectuate "the turn-of-the-century assumption that Indian reservations were a thing of the past," as opposed to what Congress actually enacted. *Solem*, 465 U.S. at 468. The impropriety of such reliance on extratextual considerations is all the more clear after *McGirt*.

35

But the Tenth Circuit was right about one thing:  the general expectation, and likely intent of Congress, was that the Osage Nation would be treated in a manner broadly consistent with the "other tribes," meaning the Five Tribes.  The provisions of the Osage Allotment Act are at least as protective of reservation integrity as those of the Creek (and other Five Tribes) Allotment Acts; it was enacted in the same context; and it followed broadly the same model.

Assuming that all reservations in Oklahoma, including the Creek Reservation, had been disestablished, the Tenth Circuit inferred that the Osage Reservation must also have been disestablished.   After *McGirt*, the same logic compels the opposite conclusion:  just as the Creek Nation's and other Five Tribes' (and several other Indian) reservations in Oklahoma have not been disestablished, the Osage Reservation has not been disestablished.

> B.     *There Are No Differences Between The Legal Histories Of The Osage Nation And The Cherokee, Chickasaw, Choctaw, Seminole, Quapaw, And Wyandotte Nations And The Ottawa And Peoria Tribes That Could Justify Deeming The Osage Reservation Disestablished While The Other Tribes' Reservations Have Been Determined To Remain Intact*

There, are, likewise, no differences material to the *McGirt* analysis between the Osage Nation and the eight other Oklahoma tribes whose reservations have been confirmed by the Oklahoma Court of Criminal Appeals to be intact in light of *McGirt*.[39]   That court has determined, without dissent, that the analysis for the rest of the Five Tribes and for the Quapaw Nation is essentially the same as for the Creek Nation, yielding the same conclusion:  no disestablishment.  *See Spears,* 485 P.3d 873 (Cherokee); *Sizemore,* 485 P.3d 867 (Choctaw); *Grayson,* 485 P.3d 250 (Seminole); *Bosse,* 484 P.3d 286 (Chickasaw); *Lawhorn,* 499 P.3d 777 (Quapaw).  It likewise found that *McGirt* compelled the conclusion that the reservations of the

---

[39] For example, allotment and statehood era legislation was largely uniform in its treatment of the Five Tribes.  *See supra*, pages 6 & n.5, 28, 34 & n.38.

Ottawa and Peoria Tribes and the Wyandotte Nation had not been disestablished—the only difference in those cases being 1956 legislation terminating the federal trust relationship with those tribes which was repealed in 1978, and which never applied to the Osage Nation.  *See Fuller*, 547 P.3d 149 (Wyandotte); *Brester*, 531 P.3d 125 (Ottawa and Peoria).

Conversely, the few cases in which the Oklahoma Court of Criminal Appeals has ruled that a tribe's reservation was disestablished, notwithstanding *McGirt*, are readily distinguishable. In *Buck v. State*, 525 P.3d 39 (Okla. Crim. App. 2023) (Kickapoo Reservation), *Whitebuffalo v. State*, Okla. C.C.A. No. F-2021-429 (summary opinion not for publication, dated Dec. 8, 2022) (Cheyenne-Arapahoe Reservation); and *Martinez v. State*, 502 P.3d 1115 (Okla. Crim. App. 2021) (Kiowa Comanche Apache Reservation), the Oklahoma Court of Criminal Appeals determined that reservations had been disestablished based on express statutory language providing that those tribes "hereby cede, convey, transfer, and relinquish, forever and absolutely, without any reservation whatever, all their claim, title, and interest of every kind and character in and to the lands embraced in" their reservations in exchange for immediate and direct monetary compensation from the United States.  *Buck,* 525 P.3d at 44-45 (quoting Act of Sept. 9, 1891, ch. 203, art. I, 27 Stat. 557); *Martinez*, 502 P.3d at 1118-19 (quoting Act of June 6, 1900, ch. 813, art. I, 31 Stat. 672, 677) (almost identical language); *Whitebuffalo*, slip op. at 8 (relying on Act of Mar. 3, 1891, ch. 543, art. I, 26 Stat. 989, 1022) (following *Martinez* in a case involving "almost identical language ceding all tribal interests").  In *McGirt*'s terms, those decisions rely on an "[e]xplicit reference to cession" by Congress.  *McGirt*, 591 U.S. at 904 (citation omitted).[40] There is no such statutory language applicable to the Osage Nation.  "Congress knows how to

---

[40] In pre-*McGirt* terms, the disestablishment statutes addressed in *Buck, Whitebuffalo* and *Martinez* appear to be "cession and sum certain" statutes disestablishing reservations for direct compensation while allotting reservation land.  *See, e.g., Yankton Sioux*, 522 U.S. at 343.

withdraw a reservation when it can muster the will." *Id.*  It simply did not do so with respect to the Osage Reservation.

## III.    Relief Under Rule 60(b) Is Warranted

### A.    *Relief From Judgment Is Appropriate Under Either Rule 60(b)(5) Or Rule 60(b)(6), As* Repsis *Demonstrates*

Rule 60(b) of the Federal Rules of Civil Procedure creates exceptions to the general rule that final judgments are, indeed, final.  The exceptions relevant to this case are Rule 60(b)(5) and Rule 60(b)(6).  This Court may grant relief from its final judgment under either exception, notwithstanding that the Tenth Circuit gave its own reasons for affirming it.  *See Standard Oil*, 429 U.S. 17; *Repsis*, 74 F.4th at 1220-21.  The exceptions apply:

- If "[i] the judgment has been satisfied, released, or discharged; [ii] it is based on an earlier judgment that has been reversed or vacated; or [iii] applying it prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5); or

- For "any other reason that justifies relief," Fed. R. Civ. P. 60(b)(6).

### 1.    Rule 60(b)(5)

The three prongs of 60(b)(5) can each independently justify relief.  *See Horne*, 557 U.S. at 454.  The Osage Nation does not contend that reasons [i] or [ii] of paragraph (5) directly apply in this case.[41]  However, they inform the meaning of reason [iii].  *See, e.g., Fischer v. United States*, 603 U.S. 480, 486-91 (2024) (construing a general statutory term in light of accompanying specific terms).  The changed-facts reason in [i] and the changed-law reason in [ii] are examples of the broader principle, encompassed by reason [iii], that significant changes in fact or law may so undermine the rationale for maintaining a judgment in force that relief from the judgment is appropriate.

---

[41] Reason [ii] applies only to a judgment "based on an earlier judgment" in the sense of *res judicata* or collateral estoppel.  *Klein v. United States*, 880 F.2d 250, 258 n.10 (10th Cir. 1989).

The Supreme Court has held that under reason [iii]'s "equitable" standard, a judgment may be modified or vacated if a significant change in fact or law "renders continued enforcement 'detrimental to the public interest.'" *Horne,* 557 U.S. at 447 (citation omitted); *see also Rufo,* 502 U.S. at 388 (noting Rule 60(b)(5), reason [iii] relief "may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent"). In making that judgment, the "traditional flexible" approach of equity—not an artificially heightened standard—applies, *id.* at 379, and a flexible approach is particularly necessary when the judgment at issue "reach[es] beyond the parties involved directly in the suit and impact[s] on the public's right to the sound and efficient operation of its institutions," *id.* at 381 (citations omitted). Further, when "intervening Supreme Court precedent" makes it clear that the case "would be decided differently" now, even if that intervening precedent did not expressly overrule prior decisions, keeping in place a judgment that is now contrary to the law can amount to a "manifest injustice," requiring relief under reason [iii]. *Agostini*, 521 U.S. at 236-37 (ordering Rule 60(b)(5) reason [iii] relief to terminate an Establishment Clause injunction in light of evolving precedent that had undermined, albeit not expressly overruled, prior precedent on which the injunction was based).

The application of those Supreme Court directions to this case is straightforward. As demonstrated above, *McGirt* effected a fundamental change from what the Tenth Circuit in *Irby* understood the law to be. That *McGirt* was framed as a clarification of *Solem* rather than overruling it does not matter, any more than it mattered that the evolving Establishment Clause precedents relied upon as changing the law in *Agostini* had been framed as clarifying rather than overruling the precedents on which the original *Agostini* decree was founded. Under *McGirt*,

39

*Irby* "would be decided differently." *Agostini,* 521 U.S. at 236.[42]

In these circumstances, keeping in place a judgment that deprives the Osage Nation of its

Reservation, vitiating the solemn promise the United States made to it a century and a half ago in

the 1872 Act, and treating the Osage Nation inconsistently with similarly situated tribes in

Oklahoma, would be a "manifest injustice," *id.,* and "detrimental to the public interest," *Horne*,

557 U.S. at 447.  The harm that the *Irby* judgment currently inflicts on the Osage Nation cannot

be overstated, and continuing to apply it prospectively, as a judgment with perpetual *res judicata*

and *stare decisis* effect precluding recognition of the Osage Reservation, would make it

exponentially worse.

Reservation status is critical to concrete tribal interests ranging from criminal jurisdiction

under the Major Crimes Act and the General Crimes Act, to law enforcement jurisdiction and

resources under the Tribal Law and Order Act of 2010 and the Violence Against Women

Reauthorization Acts of 2013 and 2022, to various federal programs tied to reservation status,

---

[42] In fairness to the Tenth Circuit, the Supreme Court majority in *McGirt* acknowledged that there is language in *Solem* that could be taken "[o]ut of context" to "suggest historical practices or current demographics can suffice to disestablish or diminish reservations." *McGirt*, 591 U.S. at 914 (referencing *Solem*, 465 U.S. at 471-72).  And the four dissenting Justices characterized the majority opinion as inconsistent with *Solem* and other relevant Supreme Court precedent, opining that "[u]nless the Court is prepared to overrule these precedents, it should follow them." *Id*. at 948 (Roberts, C.J., dissenting).  Further, as recently as 2016, the Supreme Court had referred to the three-part test section of the *Solem* opinion as providing a "well settled" analytical framework, *Parker*, 577 U.S. at 487, and examined "the contemporaneous and subsequent understanding of the status of the reservation by members and nonmembers, as well as the United States and the State," *id.* at 488; *see also id.* at 490-93, before concluding that it could not "overcome" the lack of support in the statutory language for a finding of disestablishment, *id.* at 493.  The Nation continues to believe that *Irby* was wrong when it was decided.  *See* Barbara Moschovidis, Osage Nation v. Irby: *The Tenth Circuit Disregards Legal Precedent to Strip Osage County of its Reservation Status*, 38 Am. Indian L. Rev. 189, 204-20 (2012); Philip H. Tinker, *Is Oklahoma Still Indian Country? "Justifiable Expectations" and Reservation Disestablishment in* Murphy v. Sirmons *and* Osage Nation v. Irby, 9 Dartmouth L.J. 120, 149-52 (2011).  But there can be no question that *McGirt* effected a significant and material change in the law.

and of course to state taxation issues such as those that were the original focus of this case.  Most fundamentally, the Nation's sovereignty is profoundly undermined by the *Irby* judgment insofar as *Irby* continues to deny the existence of a Reservation over which that sovereignty can be exercised.  Moreover, continued application of *Irby's* denial that the Osage Reservation continues to exist engenders continued confusion as to the division of governmental authority[43] and continued impairment of the Nation's ability to govern itself, resulting in a profound adverse "impact on the public's right to the sound and efficient operation of its institutions," *Rufo,* 502 U.S. at 381.

For these reasons, and applying a traditional, flexible equitable approach, *see id.* at 379, the equities in favor of applying the law of the land (*McGirt*) to the Osage Nation vastly outweigh any equities favoring the continued application of a judgment that no longer reflects the law and never, for the reasons explained by Justice Gorsuch, reflected the duly expressed intent of Congress or basic justice to the Osage Nation.  Finality and *res judicata* principles are subject to "change-in-law exception[s]" precisely because the continued application of judgments that are contrary to current law is contrary to "'the equitable administration of the law.'"  *Herrera v. Wyoming*, 587 U.S. 329, 343 (2019) (citation omitted).   Neither a prior erroneous court decision, nor any reliance interests the State may assert based on such a decision, can justify continued judicial denial of the existence of the Reservation established by Congress for the Osage Nation.  "[C]ourts have no proper role in the adjustment of reservation borders,"

---

[43] Continued application of *Irby* inflicts on the Osage Reservation the "impractical pattern of checkerboard jurisdiction" that has otherwise been resolved by Congress in 18 U.S.C. § 1151(a) where there is an intact reservation boundary.  *Seymour*, 368 U.S. at 358.  If *Irby*'s determination regarding the status of the Osage Reservation accurately reflected the law and the intent of Congress, such impractical jurisdictional checkerboarding would be unavoidable.  But since *McGirt* now makes it clear that *Irby*'s ruling on the Reservation's continued existence is incorrect, the continuation of unnecessary jurisdictional checkerboarding should not be tolerated.

*McGirt,* 591 U.S. at 903, and "the magnitude of a legal wrong"—including any reliance interests the State may assert based on practices undertaken on the false assumption that Congress had disestablished the Reservation—"is no reason to perpetuate it," *id.* at 934; *see also id.* at 937-38 ("Unlawful acts, performed long enough and with sufficient vigor, are never enough to amend the law."). Accordingly, the *Irby* judgment should be vacated under Rule 60(b)(5), reason [iii].

This conclusion is buttressed by the recent *Repsis* case. *Repsis* involves a strikingly similar scenario: a judgment based on a Tenth Circuit ruling that had denied tribal rights was vacated under Rule 60(b)(5), reason [iii], based on intervening Supreme Court precedent. Insofar as relevant, the original Tenth Circuit decision, *Crow Tribe of Indians v. Repsis*, 73 F.3d 982 (10th Cir. 1995), had denied the Crow Tribe's claim of a treaty right to hunt in the Bighorn National Forest based on two alternative rationales: (1) that Wyoming's admission as a state extinguished that treaty hunting right (the "statehood" rationale); and (2) that the Bighorn National Forest was "occupied" within the meaning of the Crow Tribe's treaty, such that the Tribe's hunting right could not be exercised within it (the "occupation" rationale). *See Repsis*, 74 F.4th at 1210.[44] The Tenth Circuit's statehood rationale in *Repsis* was, like the Tenth Circuit's rationale in *Irby*, based on a Supreme Court decision (in *Repsis, Ward v. Race Horse*, 163 U.S. 504 (1896); in *Irby, Solem*) that the Supreme Court has since "qualified" in ways that repudiate the reasoning on which the Tenth Circuit relied. *See Mille Lacs*, 526 U.S. at 203 (rejecting a statehood argument based on *Race Horse* because *Race Horse* "has been qualified by later

---

[44] The Tenth Circuit's 1995 opinion had also suggested a third alternative rationale—that Wyoming's hunting restrictions were justified as necessary for conservation. *See id.* But it is unclear whether that was intended as an independent basis for decision, or was merely *obiter dictum*, and in the most recent *Repsis* decision, the district court determined (based on what amounted to a stipulation by Wyoming) that the conservation rationale was limited to the specific facts of the 1995 case, and therefore had no preclusive effect, so there was no need for Rule 60(b) relief. *See Repsis*, 2024 WL 1478580, *11-*12.

decisions of this Court"); *Herrera*, 587 U.S. at 342 ("*Race Horse* is repudiated to the extent it held that treaty rights can be impliedly extinguished at statehood."). In *Herrera*, the Supreme Court also repudiated the occupation rationale insofar as it deemed the entire Bighorn National Forest "occupied," albeit it left open whether particular areas of the Forest might be occupied such that the treaty hunting right did not apply there. *See id*. at 348-52. But even after *Herrera* repudiated the 1995 *Repsis* decision's two main rationales, a Wyoming state court held that a Crow Tribe member remained bound by its *res judicata* effect, *see Repsis*, 74 F.4th at 1213—just as the Oklahoma Court of Criminal Appeals held in *McCauley*, 548 P.3d 461, that notwithstanding *McGirt*, an Osage member remains bound by *Irby*'s *res judicata* effect.

As in this case, that state court *res judicata* ruling spurred the Crow Tribe to seek Rule 60(b) relief. *See Repsis*, 74 F.4th at 1213-14. The district court in *Repsis* initially held that it lacked jurisdiction to grant Rule 60(b) relief, since its 1995 final judgment was issued pursuant to a mandate from the Tenth Circuit based on the Tenth Circuit's own rationales, which extended beyond the district court's original reasoning. However, the Tenth Circuit held that a district court addressing a Rule 60(b)(5) or 60(b)(6) motion founded on new factual or legal developments that were not before the Court of Appeals when it issued its appellate mandate can and must address the motion on its merits, even if it is the continued validity of the Court of Appeals' conclusions that is challenged. *Id.* at 1219-21. Accordingly, the Tenth Circuit remanded the case to the district court to apply Rule 60(b)(5) and (6). *Id.* at 1221-22.

When the case returned to the district court on remand, Wyoming and its appellate courts had conceded that the statehood rationale could not survive *Herrera*, so all parties agreed that no Rule 60(b) relief was necessary as to that issue. *See Repsis*, 2024 WL 1478580, *9. But the district court concluded that the part of the *Repsis* judgment that could have ongoing effects—the

43

occupation rationale—should be vacated pursuant to reason [iii] of Rule 60(b)(5), given the "substantial change in the law," *i.e.,* the Supreme Court's repudiation of that rationale in *Herrera*. *Id.* at \*10.  In doing so, it concluded that continuing to enforce a judgment based on a narrow interpretation of tribal rights the Supreme Court had since rejected, or compelling the tribe to re-litigate in other fora what the Supreme Court had already decided, would be "detrimental to public interest and oppressive to the Tribe." *Id.*

Just so here:  *McGirt* plainly repudiated the basis for the *Irby* judgment.  The Osage Nation should not have to relitigate the issue in another forum—and certainly should not be barred by *res judicata* or *stare decisis*, as the Oklahoma Court of Criminal Appeals held it was in *McCauley*.  It is not "equitable" to apply *Irby* prospectively such that it deprives the Osage Nation of the Reservation that the Federal Government guaranteed to it in 1872, and that *McGirt* clearly demonstrates to be intact under the law, and such that it enables Oklahoma to secure a result contrary to the law (as authoritatively stated in *McGirt*) in cases like *McCauley.*  As the Presiding Judge of the Oklahoma Court of Criminal Appeals indicated in *McCauley*, the Oklahoma courts are waiting for the federal courts to confirm what should be apparent—that *Irby* is no longer good law and should no longer bind any court or litigant after *McGirt.  See McCauley,* 548 P.3d at 472 (Rowland, P.J., concurring).  Injustices will keep mounting until *Irby* is eliminated as a basis for applying *res judicata* and *stare decisis* to reach outcomes contrary to law, as occurred in *McCauley*.  This Court should end those injustices by vacating the *Irby* judgment pursuant to Rule 60(b)(5).

## 2.    Rule 60(b)(6)

Insofar as relief is appropriate under Rule 60(b)(5), the Court need not address Rule 60(b)(6), which is a catchall provision that applies only when other Rule 60(b) grounds for relief

do not. *Kemp,* 596 U.S. at 533.  If, however, the Court concludes for some reason that Rule 60(b)(5) does not apply, Rule 60(b)(6) provides a sound alternative basis for relief.  *See Repsis*, 2024 WL 1478580, *11 ("assuming, arguendo, that (b)(5) was inapplicable, we find vacatur under (b)(6) could also provide relief.").  Rule 60(b)(6) authorizes the court "to vacate judgments whenever such action is appropriate to accomplish justice," *Klapprott,* 335 U.S. at 615, and constitutes a "grand reservoir of equitable power to do justice in a particular case," *Pierce v. Cook & Co., Inc.,* 518 F.2d 720, 722 (10th Cir. 1975) (*en banc*) (citation omitted), "'when it offends justice to deny such relief.'"  *Yapp,* 186 F.3d at 1232 (citation omitted).  For the reasons discussed above, it would plainly offend justice to maintain the *Irby* judgment in force notwithstanding that it is clearly irreconcilable with *McGirt*.

> B.    *This Motion Is Timely Under Rule 60(c)*

A Rule 60(b)(5) or (b)(6) motion must be made "within a reasonable time" (unlike Rule 60(b) motions based on defects intrinsic to the case, such as mistake, newly discovered evidence or fraud, which must be brought within a shorter, one-year time frame).  Fed. R. Civ. P. 60(c)(1). Application of the "reasonable time" standard entails consideration of length of delay, reasons for delay, prejudice (if any) to the non-party and the circumstances warranting relief.  *See, e.g., Repsis*, 74 F.4th at 1217-18.  In weighing those factors, a court should consider the purpose of Rule 60(b):  "to balance the importance of finality against the desirability of resolving disputes on the merits."  *Farm Credit Bank of Baltimore v. Ferrera-Goitia*, 316 F.3d 62, 66 (1st Cir. 2003).  The standard is "fact-intensive," and appellate review under Rule 60(c)(1) is "deferential," under an "abuse of discretion" standard.  *Repsis*, 74 F.4th at 1217-18.

This motion is filed just four years after *McGirt*—far less time than the 20 years that elapsed between the successful Rule 60(b) motion in *Repsis* and the Supreme Court decision,

*Mille Lacs*, 526 U.S. 172, that initially undermined the original *Repsis* ruling.  *See Repsis*, 74 F.4th at 1218 (concluding that the Rule 60(b) motion in *Repsis* was timely).  And it was not until last year that the Tenth Circuit in *Repsis* clarified the availability of Rule 60(b) relief in these circumstances when it held that relief can be sought in the district court notwithstanding that it is the Tenth Circuit's reasoning that can no longer stand.  *See id.* at 1219-21 (holding that the district court had erred in concluding that it lacked authority to grant Rule 60(b) relief).

In any event, it is not length of time *per se* that matters, but the equities that the Court must balance.  The Osage Nation has been diligent in raising the argument that *McGirt* compels the reversal of *Irby* in multiple fora.  It briefed the issue as *amicus curiae* in the Oklahoma Court of Criminal Appeals, advancing essentially the same arguments advanced herein, when the first opportunity to do so arose in *Young*, in 2021, and again in 2023, in *McCauley*.  *See supra*, page 15.  Indeed, the Oklahoma court's ruling in *McCauley*—that regardless of *McGirt*, it was bound by *Irby* to hold that the Osage Reservation has been disestablished, 548 P.3d at 464-65—constitutes a new injury to tribal sovereignty that necessitates relief from this Court.

Oklahoma has no basis to contend that it is surprised by the obvious argument that the Osage should be treated on a par with other tribes with reservations in Oklahoma.  Nor is Oklahoma prejudiced by any delay in that argument being brought before this Court.  In *McGirt*, Oklahoma told the Supreme Court that its ruling would extend to other tribes across Oklahoma, relying on that expectation as a basis for arguing that the Court should not rule in favor of the Creek Nation.  *McGirt v. Oklahoma*, U.S.S.C. No. 18-9526, Br. of Resp. Oklahoma, 2020 WL 1478582, at *43-*46.  The Court squarely rejected that argument:  "the magnitude of a legal wrong is no reason to perpetuate it."  *McGirt,* 591 U.S. at 934.  Oklahoma has adapted after learning that the Creek Reservation and most other tribal reservations—comprising more than

46

43% of Oklahoma, *see Castro-Huerta*, 597 U.S. at 647—have not been disestablished.  It can adapt again, in cooperation with the Federal Government and the Osage Nation, to what Oklahoma must already have suspected:  the Osage Nation's Reservation was also not disestablished.[45]

On the other side of the equitable ledger, the circumstances warranting relief in the Osage Nation's favor are extraordinarily compelling.  The Nation's fundamental ability to exercise its sovereignty within its congressionally-promised Reservation is at stake, as is its right to be treated on equal footing with every other similarly situated tribe in Oklahoma.  Reservation status affects the Nation profoundly, with impacts that include but extend far beyond the rules applicable to state taxation of Osage members living and working on the Reservation.  Reservation status is critical to fundamental issues such as the Nation's ability to exercise criminal jurisdiction over sexual, domestic and child violence and other covered crimes under Violence Against Women Reauthorization Acts of 2013 and 2022, 127 Stat. at 118-26, and 136 Stat. at 895-904, and to its law enforcement jurisdiction and resources under the Tribal Law and Order Act, 124 Stat. 2258.  Reservation status further crucially affects federal (and state) criminal jurisdiction pursuant to the Major Crimes Act and the General Crimes Act.  And various federal Indian programs are tied to reservation status.

Along with other tribes, the Osage Nation has argued to the Oklahoma courts that the rules and principles announced by the Supreme Court in *McGirt* should apply equally to it, today

---

[45] In *Castro-Huerta*, in arguing that restricting state jurisdiction over reservation lands would have undue consequences, Oklahoma specifically identified the Osage Nation as among the tribes "seeking affirmation of their reservation status in pending criminal cases" in the Oklahoma courts.  *Oklahoma v. Castro-Huerta*, U.S.S.C. No. 21-429, Br. of Pet. Oklahoma, 2022 WL 628282, at *6 n.1 (filed Feb. 28, 2022) (citing *State v. Phillips*, No. CF-2019-327 (Okla. Dist. Ct. Osage Cty.)).

and for its future generations.  But uniquely, because of this Court's final judgment in *Irby,* the Oklahoma Court of Criminal Appeals has declined to apply *McGirt* to the Osage Nation.  *See McCauley*, 548 P.3d at 464-65.  In doing so, that court's Presiding Judge explicitly flagged that this is a problem that needs to be resolved by a federal court order.  *See id.* at 472 (Rowland, P.J., concurring).  The time has come to remove *Irby* as an obstacle to equal treatment and consistent application of the law, to restore the Osage Nation's ability to fully exercise its tribal sovereignty and protect its members within its Reservation, and to restore the integrity of the Federal Government, by confirming that *McGirt* applies to the Osage Nation, and that the Osage Reservation, like other reservations in Oklahoma, remains intact.

## CONCLUSION

The *Irby* judgment should be vacated pursuant to Rule 60(b).

Dated: January 2, 2025                                      Respectfully submitted,

Clinton N. Patterson                          */s/ Simon A. Steel*
Attorney General                              Simon A. Steel
OSAGE NATION                                  V. Heather Sibbison
1071 Grandview Lane                           Camille Bacon-Schulte
Pawhuska, OK 74056                            DENTONS US LLP
(918) 287-5514                                1900 K Street NW, Ste. 100
*cpatterson@osagenation-nsn.gov*             Washington, DC 20006
                                              (202) 496-7077
                                              *simon.steel@dentons.com*
Eugene Bertman                                *heather.sibbison@dentons.com*
TALLEY, TURNER, STICE & BERTMAN              *camille.bacon-schulte@dentons.com*
130 E. Eufaula St.
Norman, OK 73069
(405) 364-8300
*gbertman@ttsblaw.com*

*Counsel for Plaintiff Osage Nation*

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2025, I effected service of the foregoing Plaintiff's

Memorandum in Support of Rule 60(b) Motion for Relief from Judgment on counsel for all

parties as follows:

(1) on all counsel of record, through the CM/ECF system:

| | | |
|---|---|---|
| Douglas B. Allen | Stephanie Elaine Moser Goins | Guy Lee Hurst |
| Sean R. McFarland | Gary Stanley Pitchlynn | William Clayton Scott |
| Lynn Heyer Slade | Olin Joseph Williams; | |

(2) on counsel for the Oklahoma Tax Commission, by email, as follows:

Taylor Ferguson
Assistant General Counsel
OKLAHOMA TAX COMMISSION
*taylor.ferguson@tax.ok.gov*

Sierra Pfeiffer
Counsel to the Commissioners
OKLAHOMA TAX COMMISSION
*sierra.pfeiffer@tax.ok.gov*; and

(3) on defendants Mark Wood (Chairman), Shelly Paulk (Vice Chairwoman) and Charles

Prater (Secretary), in their official capacities, by courier service upon:

Charles Prater
Secretary
OKLAHOMA TAX COMMISSION
123 Robert S. Kerr Avenue
Oklahoma City OK 73102.

January 2, 2025

*/s/ Simon A. Steel*
Simon A. Steel
DENTONS US LLP
1900 K Street NW, Ste. 100
Washington DC 20016
(202) 496-7077
*simon.steel@dentons.com*